CINDY SOLES SMITH, Administratrix of the
ESTATE OF MARK KEANNAN SMITH,

             Plaintiff/Counterclaim-
             Defendant,

v.

XPO LOGISTICS FREIGHT, INC.,

             Defendant/Counterclaim-
             Plaintiff.

**RESPONSE IN OPPOSITION TO
PLAINTIFF'S MOTION FOR REMAND**

## I.    INTRODUCTION & SUMMARY OF THE ARGUMENT

1.    For sixteen months, this case was not removable. Plaintiff sued both XPO and its driver, a North Carolina citizen, then did almost nothing to prosecute said driver while directing nearly all discovery and motion practice at XPO. XPO did what a defendant must do: it answered, counterclaimed, engaged in discovery, and defended against sanctions motions. Only after Plaintiff obtained a July 9, 2025 severance order creating a separate, diverse XPO-only case and, in her September 18, 2025 RFA responses (after twice refusing to provide a Rule 8 monetary statement) admitted that she seeks damages that "far exceed $75,000", did XPO timely remove. Just prior, XPO served 29 pages of detailed supplemental responses and roughly 4,000 pages of additional production explaining in elaborate detail how the supplement satisfied pending state court orders.

2.    The record shows that Plaintiff used Lamb as a jurisdictional spoiler and deliberately obscured the amount in controversy. On these facts, removal was timely, not waived, and falls squarely within § 1446(c)(1)'s bad-faith exception; any fee award is foreclosed.

## II.     RELEVANT FACTS

### a.     THE ACCIDENT AND THE CLAIMS AGAINST LAMB AND XPO

3.     This wrongful-death action arises from an October 11, 2023 collision in Robeson County, North Carolina, when a vehicle driven by Mark Smith struck the side of an XPO tractor-trailer operated by William Lamb. Dkt. 2-5, *First Am. Compl.* ("FAC"), ¶¶ 1, 24–29.

4.     Plaintiff alleges that Lamb, while stopped at a stop sign at the intersection of U.S. 74 Alternate and West 5th Street Extension, observed Smith's vehicle approaching from his left and a school bus and another vehicle to his right, yet nonetheless pulled his tractor-trailer into the intersection and stopped so that his trailer blocked all westbound lanes of U.S. 74 Alternate, causing Smith to collide with the trailer. FAC ¶¶ 24–28. Notably, the incident was captured on video by the Tractor's onboard camera as well as the bus. Despite ample opportunity to stop, there has been no evidence to date that the Decedent braked before impact.

5.     Plaintiff further alleges that after the impact Smith "became trapped in his vehicle and was unable to be rescued," "was alive, moaning and moving his arm after impact," and "sustained unimaginable physical pain and mental suffering prior to his death," ultimately dying at the scene. FAC ¶¶ 28–29, 35. In the damages allegations and prayer for relief, Plaintiff seeks all available compensatory and punitive damages under North Carolina's Wrongful Death Act. FAC ¶¶ 35, 43, 49 & *Prayer for Relief*; *see also* FAC ¶ 43 (seeking punitive damages "in an amount to be determined by the jury but in any event exceeding $25,000.00").[1]

[CONTINUED ON NEXT PAGE]

---

[1] Including: (i) medical & funeral expenses; (ii) the "present monetary value" of Smith to his beneficiaries, including "net income" earned during normal life expectancy and his services, protection, care, assistance, society, companionship, security, comfort, and advice; (iii) damages for pre-death pain, suffering, fear of impending death, and "pre-death terror"; and (iv) punitive damages for allegedly willful and wanton misconduct by Lamb and XPO

2

### b. PROCEDURAL HISTORY AND THE FOCUS OF STATE COURT LITIGATION

6.     Plaintiff initially filed suit only against Lamb in Robeson County Superior Court on February 15, 2024. Dkt. 2-3. Plaintiff later amended her complaint to add XPO as a defendant on February 22, 2024. FAC. When it answered the First Amended Complaint, XPO also filed a counterclaim for property damage to its tractor-trailer. Dkt. 3-1, *XPO's Answer and Counterclaim.* On June 5, 2024, Plaintiff served separate sets of written discovery on Lamb and XPO, including First Interrogatories, Requests for Production, and Requests for Admission. Dkt. 26, *Plaintiff's Memorandum of Law in Support of Remand*, p. 4.

7.     Discovery disputes centered exclusively on XPO rather than Lamb. On January 2, 2025, Plaintiff filed a "Motion to Compel Against Defendant XPO" directed solely to XPO's responses to first set of demands, and seeking orders compelling XPO to provide full responses, and produce declaration pages for "the entire tower of liability insurance coverage." Beckmann Decl., ¶1, *Pl.'s 1st Mot. to Compel*, "**Ex. 1**", pp. 3–6, ¶¶ 11–13, 16, 23(c) & Prayer for Relief. On February 26, 2025, Plaintiff filed a "Motion for Sanctions and Second Motion to Compel," again directed only to XPO. Beckmann Decl., ¶2, *Pl.'s 2d Mot. to Compel*, "**Ex. 2**", pp. 6–8, ¶¶ 19–28.

8.     On April 25, 2025, the state court granted Plaintiff's request for sanctions. XPO later appealed on May 22, 2025. Dkt. 2, *XPO's Notice of Removal*, ¶¶ 14–15 (describing Exs. 40, 47, which are Dkt. 8-5 and 9-7, respectively). *See also* Dkt. 10-19, *Appendix to Removal*.

9.     At the January 13, 2025 hearing on Plaintiff's first motion, XPO made clear that its concern was the sheer breadth and burden of Plaintiff's corporate-wide demands. Beckmann Decl., ¶3, *Jan. 13, 2025 Hr'g Tr.*, "**Ex. 3**", p. 4:3–22; p. 5:10–16; pp. 6–7. XPO advised that it had served multiple supplements, held several meet-and-confers and exchanged letters, and was facing 38

ROGs, 74 RFPs, and 25 RFAs, explaining that its objections were directed to overbreadth and undue burden, not an unwillingness to produce relevant materials. *Id.*, p. 3:19–25; pp. 9–10.

10. At the April 16, 2025 hearing on Plaintiff's second motion, XPO explained that Plaintiff had served 74 requests for production, 38 interrogatories, plus a second set of 15 additional RFPs and 25 RFAs, and that XPO had responded, conferred repeatedly, and was struggling with the sheer breadth of massive, company-wide demands rather than refusing to participate in discovery. Beckmann Decl., ¶4, *Apr. 16, 2025 Hr'g Tr.*, "**Ex. 4**", p. 18:10–25.

11. XPO also noted that it had already produced nearly 2,000 pages of documentation, including telematics/ECM data, videos, photographs, incident reports, drug test results, Lamb's personnel and training records, maintenance records, hours-of-service logs, DVR reports, and safety policies, and had proposed narrowing telematics requests to data for Lamb, the accident, and the subject tractor-trailer. *Id.*, p. 24. It also reaffirmed that XPO had produced materials and supplemented its written responses "over the course of several months." *Id.*, p. 47:15–21.

12. Ultimately, the Court entered discovery sanctions against XPO, which included deeming Lamb's and XPO's negligence and gross negligence established, striking XPO's contributory-negligence, causation, and other core liability defenses, and required expansive supplemental discovery. Dkt. 8-5, *April 25, 2025 Robeson County Order*, pp. 11–18. XPO timely filed a notice of appeal of the sanctions order.

### c. Severance after More than a Year of State Court Litigation

13. On June 5, 2025, more than a year after filing suit, in a direct play to avoid the stay resulting from XPO's proper and timely appeal of the discovery sanctions order against XPO, Plaintiff moved to sever her claims, asking the state court to split the action into separate cases against XPO and Lamb so that she could "continue to prosecute this case as to Defendant Lamb,

4

separate and distinct from Defendant XPO." Dkt. 9-6, *XPO Notice of Appeal*. Plaintiff affirmatively stated that "there is no dispute" Lamb was employed by XPO and was acting in the course and scope of his employment at the time of the accident, and that any alleged "ongoing discovery misconduct" was "separate and distinct" to XPO, not Lamb. Beckmann Decl., ¶5, *Plaintiff's Motion to Sever*, "**Ex. 5**", p. 4, ¶¶ 25–27; p. 5, ¶33.

14. At the relevant June 30, 2025 hearing, Plaintiff's counsel repeatedly emphasized that the April 25 sanctions order was entered "against defendant XPO Logistics Freight, Inc.," "not against Lamb," and assured the court, "I'm not trying to use this order against Lamb." Beckmann Decl., ¶6, June 30, 2025 Hr'g Tr., "**Ex. 6**", p. 9:7–17.

15. He stressed that only XPO had noticed an appeal, that "Lamb is not a party to the appeal," and asked the court "to sever these two parties so we can proceed against defendant Lamb separately and defendant XPO" and to clarify that the sanctions order "only applies to defendant XPO and not to defendant Lamb." **Ex. 6**, p. 10:17–20; p. 12:23 to p. 13:14.

16. Counsel further stated that Plaintiff had "never once moved for sanctions against defendant Lamb" or "moved to compel against defendant Lamb," and described Lamb and XPO as "different, distinct parties." *Id.*, p. 14:1–15; p. 20:3–5. He urged severance, in part, so that Lamb would not be "drag[ged] … through the mud" by sanctions directed at XPO. *Id.*, p. 25:15–18.

17. Despite keeping Lamb in the unified action for more than a year, Plaintiff never served a notice of deposition for Lamb, even as she sought to sever the claims so she could proceed to trial against him while XPO pursued its appeal.

18. On July 9, 2025, over XPO's objection and at Plaintiff's request, the state court granted the Motion to Sever. In its order, the court clarified that the previously entered discovery sanctions applied only to XPO, not Lamb, and directed the clerk to create a new civil action against

5

Lamb (No. 25-CV-003758-770) while allowing the original civil action (No. 24-CVS-468-770) to continue solely against XPO (the "State Court Action Against XPO"). Dkt. 2, *XPO's Notice of Removal*, ¶17 (Order Granting Mot. to Sever, Ex. 59, Dkt. 10-4).

19.     XPO is a Delaware Corporation with its principal place of business in Michigan. *FAC*, ¶5; Dkt. 3-1, *XPO's Answer and Counterclaim*, ¶5. Mr. Lamb is a citizen and resident of North Carolina. FAC, ¶4; Dkt. 3-2, *Answer and Defenses of William Lamb*, ¶4. Until the July 9, 2025 Severance Order, complete diversity did not exist because Lamb and Plaintiff are North Carolina citizens, and the case was proceeding in a single action against both Lamb and XPO.

20.     Although North Carolina pleading rules prohibit a complaint from specifying a precise dollar amount of unliquidated damages (*see* N.C. Gen. Stat. Ann. 1A-1, Rule 8(a)(2)), Plaintiff's First Amended Complaint pleads all categories of wrongful-death damages available under § 28A-18-2, together with punitive damages "in an amount to be determined by the jury but in any event exceeding $25,000.00." *FAC*, ¶¶43, 49 & Prayer for Relief.

21.     On December 2, 2024, in light of Rule 8's bar on pleading a specific sum, XPO served a Rule 8 Request for Statement of Monetary Relief Sought pursuant to Rule 8, asking Plaintiff to state her monetary relief sought. Beckmann Decl., ¶8, *Initial Rule 8 Request*, "**Ex. 7**".

22.     On or about December 5, 2024, Plaintiff responded without providing any dollar amount or range, instead repeating the categories of damages described in the pleadings, while deferring any quantification to the jury. Beckmann Decl., ¶9, *Plaintiff's Response to Initial Rule 8 Request*, "**Ex. 8**".

23.     In August 2024, Plaintiff's counsel wrote that the case would likely appear on the next Robeson County administrative calendar, stated he intended to ask for a Spring 2025 trial setting, and emphasized that "we need to keep this moving along." Beckmann Decl., ¶10, *2023–*

*2025 Email Excerpts Between Counsel*, "**Ex. 9**", p. 5. He later confirmed that he would request, and then obtained, a May 12, 2025 trial date and reminded XPO that written discovery needed to be "finalize[d] ASAP so that we can get depositions scheduled, especially in light of the May 12, [2025] trial setting." **Ex. 9**, pp. 5, 9–10, 13, 18–19, 21.

24.     During this same period, Plaintiff noticed or sought multiple videotaped depositions of bystanders, the school bus driver, and first responders, yet never once noticed Lamb's deposition or moved to compel further discovery. **Ex. 9**, pp. 21, 27, 38, 40, 45, 57.

25.     At the same time, in pressing for a broad "sharing provision" in the protective order, Plaintiff's counsel sought authority to share XPO's "confidential information" with lawyers in "similar ongoing or past personal injury or wrongful death lawsuits or claims against XPO," asserting this would "keep[] large corporate defendants (such as XPO) honest." **Ex. 9**, pp. 3–4, 6.

26.     In September 2024, in an email enclosing a deficiency letter, Plaintiff's counsel described this as "a very serious death case," characterized XPO as a large, sophisticated motor carrier and stated he was "surprised that XPO cannot seem to formulate a response to our Request for Monetary Relief Sought" on XPO's property-damage counterclaim; XPO then served a Supplemental Response on December 2, 2024, indicating that it was seeking compensatory damages of $3,373.58 relative to its counterclaim. **Ex. 9**, pp. 10, 17; Beckmann Decl., ¶11, *XPO December 2, 2024 Supplemental Rule 8 Response*, "**Ex. 10**".

27.     In October 2024 correspondence, Plaintiff's counsel demanded XPO's "entire tower of coverage," while XPO's counsel reasonably asked whether there was "a certain monetary threshold" behind that request, but received no response to that inquiry. **Ex. 9**, p. 10.

28.     On September 8, 2025, after the Severance Order created a stand-alone case against XPO, XPO served a Second Rule 8 Request specifically asking Plaintiff to state the monetary

relief she sought from XPO alone, in order to determine whether the federal jurisdictional minimum was met. Beckmann Decl., ¶12, *XPO Second Rule 8 Request*, "**Ex. 11**".

29. That same day, Plaintiff's counsel responded by email stating only that "Plaintiff responded to Defendant XPO Logistics Freight, Inc.'s Request for Monetary Relief Sought on December 5, 2024. I have attached it again for your review," once again refusing to provide any amount or range of damages sought from XPO. Dkt. 2, *XPO Notice of Removal*, ¶19.

### d. XPO'S RFAS CONCERNING AMOUNT IN CONTROVERSY

30. On September 17, 2025, XPO served its First Set of RFAs to Plaintiff in the State Court Action Against XPO as an additional effort to determine whether the federal jurisdiction minimum amount in controversy of $75,000 was met. Beckmann Decl., ¶13, *XPO First Set of RFAs*, "**Ex. 12**". The requests included detailed definitions and instructions aimed at ensuring clear, non-evasive responses regarding the amount in controversy. They defined "seek/seeking" to mean that, "after reasonable inquiry," Plaintiff "presently intend[s]" to ask the court or jury to award that category of damages at trial and, where a dollar threshold is stated, that she does "not stipulate to any cap at or below that threshold," expressly noting that all thresholds were exclusive of interest and costs. *Id.*, pp. 1–2.

*31.* The Instructions further defined "cap" as an irrevocable stipulation not to request or collect any judgment above the stated amount; required Plaintiff to admit or deny each request notwithstanding that damages might ultimately be determined by the jury; required Plaintiff to conduct "reasonable inquiry," including conferring with beneficiaries and experts and reviewing available information; and directed that any denial "fairly meet the substance" of the request and that lack-of-knowledge denials be accompanied by a description of the inquiry undertaken. *Id.*

8

32.     Against that backdrop, on September 18, 2025, Plaintiff served her Responses to XPO's First Set of RFAs. Plaintiff admitted in those responses that she is "seeking substantial compensatory and punitive damages that far exceed the sum of $75,000.00," and that she would not stipulate to any cap at or below $75,000. Beckmann Decl., ¶14, *Plaintiff's Responses to XPO First Set of RFAs*, "**Ex. 13**."

33.     Given the RFAs' definitions of "seek" and "cap," and their requirement that Plaintiff answer yes-or-no even if damages remained unliquidated, Plaintiff's admissions in response to those RFAs were the first time in the litigation that she unequivocally confirmed she is pursuing "substantial" compensatory and punitive damages "far exceed[ing]" $75,000 as to the claims pending against XPO in the severed action. **Ex. 13**, p. 10.

### e.  XPO'S DISCHARGE OF DISCOVERY OBLIGATIONS <u>BEFORE</u> REMOVAL

34.     On October 1, 2025, XPO served supplemental discovery expressly stating that it was responding to "all of the directives contained in the [state court's] January 21, 2025 and April 25, 2025 Orders" and extending its Bates numbering from approximately XPO-001906 to XPO-005784, reflecting nearly 4,000 additional pages of production.  Beckmann Decl., ¶15, *XPO Supplemental Discovery Responses*, "**Ex. 14**".

35.     These supplemental responses are detailed and explanatory: they identify, by subject matter and Bates range, the full scope of XPO's production, including previously produced responsive documents, and explain the nonexistence of certain potentially responsive items.[2]

---

[2] For example, XPO describes in narrative form the Samsara telematics system and then ties that description to extensive new HOS logs for Lamb covering October 2023 through February 2025, additional coaching videos and safety dashboards for 2021–2025, XPO University training and quiz materials, handbooks, PTGs, and safety curriculum applicable to Lamb, additional SOS accident reports, the bill of lading for the subject load, declaration pages for multiple layers of liability insurance up to $250 million, Lamb's updated MVR and medical certificate, and a prior Rule 30(b)(6) deposition transcript in other serious-injury and death cases. The supplemental responses also provide narrative explanations confirming that the trailer at issue had no data-recording systems; that Samsara does

36.    Notably, more than a month prior to receiving these supplemental responses, on August 20, 2025, Plaintiff served an undated 30(b)(6) Notice for XPO requesting good dates and indicating the Plaintiff had also previously requested good dates. Beckmann Decl., ¶16, *Plaintiff's Email Regarding Undated 30(b)(6) Notice*, "**Ex. 15**". The notice also identifies 38 "topics" in name but then incorporates 152 to 188 (if subparts are counted) additional topics by reference to prior discovery demands, resulting in 190 to 226 discrete subjects.

37.    In any event, only after providing supplementation did XPO file its Notice of Removal on October 2, 2025, within thirty days of receiving Plaintiff's September 18, 2025 RFA responses, and 91 days after the July 9, 2025 Severance Order first created complete diversity. Dkt. 2, *XPO's Notice of Removal*, ¶¶ 1–3, 18–22.

## III.    LEGAL STANDARD

### a.  <u>GROUNDS FOR REMOVAL</u>

38.    A defendant may remove a civil action filed in state court if the federal district court would have had original jurisdiction. 28 U.S.C.A. § 1332; 28 U.S.C.A. § 1441. In a diversity case, the removing party bears the burden of establishing complete diversity and that the amount in controversy exceeds $75,000. *Mulcahey v. Columbia Organic Chemicals Co.*, 29 F.3d 148, 151 (4th Cir. 1994); *Dart Cherokee Basin Operating Co., LLC v. Owens*, 574 U.S. 81, 88, 135 S. Ct. 547, 553–54, 190 L. Ed. 2d 495 (2014).

[CONTINUED ON NEXT PAGE]

---

not retain historical "safety score" configuration or certain ephemeral alerts; and that only accident-related video clips exist and have been produced, while offering a supervised-access protocol  so Plaintiff's consultant can review sensitive telematics information without compromising fleet-wide safety, confidentiality, or system integrity.

### b. Temporal Restrictions on Removal & Bad Faith Exception

39.     "[A] defendant's 30-day removal clock does not begin until the basis for removal jurisdiction becomes 'apparent *within the four corners of the initial pleading or subsequent paper*.'" *Skidmore v. Norfolk S. Ry. Co.*, 1 F.4th 206, 210 (4th Cir. 2021) c*iting Lovern v. Gen. Motors Corp.*, 121 F.3d 160, 162–63 (4th Cir. 1997)[3] as well as *Hurley v. CBS Corp.*, 648 F. App'x 299, 304 (4th Cir. 2016) ("[U]ntil the defendant receives some indicia of removability, the 30-day clock does not begin to run."). [emphasis added]

40.     Courts in this circuit have held that § 1446(b)(3)'s 30-day period "is not triggered at the instant the case becomes removable, or even when the defendant has enough evidence to surmise that the case might have become removable; rather, an amended pleading, motion, order, or other paper must be "unequivocally clear and certain" before the clock starts. *See, e.g.*, *Buchanan v. APAC-Atl., Inc.*, No. 1:20-CV-00141-MR-WCM, 2020 WL 5742844, at *2 (W.D.N.C. Sept. 25, 2020)[4] *quoting US Airways, Inc. v. PMA Capital Ins. Co.*, 340 F. Supp. 2d 699, 703–04 (E.D. Va. 2004).

---

[3] "The interpretation that the grounds for removal must appear on the face of the initial pleading in order for the 30–day clock then to begin to run is also consistent with the statute's incorporation of the standards of Rule 11 of the Federal Rules of Civil Procedure. Under Rule 11, a defendant and his attorney who fail to make a reasonable inquiry into the legal and factual basis of an action prior to filing face sanctions. If a defendant were required to file a notice of removal within 30 days after the service of the initial pleading, even where that pleading did not reveal a ground for removal, he would often be faced with an intractable dilemma of either risking Rule 11 sanctions for noticing removal without making an adequate inquiry or forgoing removal altogether. The statute did not intend to put a defendant to this choice. *Cf. McKinney v. Board of Trustees of Mayland Community College*, 955 F.2d 924, 928 (4th Cir.1992) (describing the "Hobson's choice" faced by a later served defendant between foregoing removal or joining hurriedly in the petition of an earlier served defendant and facing Rule 11 sanctions)."

[4] "[T]he thirty-day removal period is not triggered at the instant the case becomes removable, *or even when the defendant has enough evidence to surmise that the case might have become removable*; rather, an amended pleading, motion, order, or other paper must be unequivocally clear and certain...." [emphasis added]

41.     Relatedly, North Carolina Rule 8(a)(2) explicitly prohibits the statement of an amount of money demanded: "the pleading shall not state the demand for monetary relief, but shall state that the relief demanded is for damages incurred or to be incurred in excess of twenty-five thousand dollars ($25,000)." N.C. Gen. Stat. Ann. 1A-1, Rule 8(a)(2); *Stokes v. Wilson & Redding L. Firm*, 72 N.C. App. 107, 117, 323 S.E.2d 470, 477 (1984).

42.     In North Carolina, this "four corners" rule operates alongside Rule 8(a)(2)'s bar on pleading a specific damages figure. In *Hall v. Hillen*, the Western District held that in a motor vehicle accident case where the complaint merely alleged damages "in excess of $10,000"[5] in the context of personal injury, pain and suffering, and lost wages, the defendant's thirty-day removal period did not begin to run until the plaintiff served a written statement of monetary relief sought in response to a Rule 8 request showing more than $75,000 in controversy, and that such a Rule 8 response qualifies as "other paper" under § 1446(b)(3). No. 2:13-CV-00042-MR-DLH, 2014 WL 839074, at *3–4 (W.D.N.C. Mar. 4, 2014) (relying on *Lovern*, 121 F.3d at 162 and *Bartnikowski v. NVR, Inc.*, 307 F. App'x 730, 734 (4th Cir. 2009)).

43.     *Hall* held that earlier communications and policy-limit demands exchanged with the defendant's insurer did not constitute "other paper" or trigger the thirty-day clock. *Hall*, 2014 WL 839074 at *2. Such pre-suit conduct is outside the scope of the statute and relying on it would invite the subjective-knowledge, mini-trial inquiry *Lovern* forbids. *Id.*

[CONTINUED ON NEXT PAGE]

---

[5] "Generally, the amount specified in the complaint will determine whether the jurisdictional amount is satisfied for purposes of removal." *Bartnikowski v. NVR, Inc.*, 307 F. App'x 730, 734 (4th Cir.2009). In North Carolina, however, "a plaintiff can plead for judgment in excess of a certain dollar amount, ... making it difficult to determine the exact amount in controversy" from the initial pleading. *Id.* Such is the case here where the Plaintiff, in accord with the ordinary practice in North Carolina state courts, merely alleges that his damages are in excess of $10,000.00. *Id.*" Hall v. Hillen, No. 2:13-CV-00042-MR-DLH, 2014 WL 839074, at *2 (W.D.N.C. Mar. 4, 2014)

### c. 4ᵀᴴ Circuit District Courts' Approach to the Bad Faith Exception

44. In diversity cases, § 1446(c) permits removal within one year after the commencement of the action, subject to a bad faith exception. § 1446(c)(1); *Chowdhury v. Merrill Lynch, Pierce, Fenner & Smith Inc.*, No. 3:21CV799 (DJN), 2022 WL 1105077, at *5 (E.D. Va. Apr. 13, 2022).

45. Congress drew a bright line for bad faith in § 1446(c): if "the plaintiff deliberately failed to disclose the actual amount in controversy to prevent removal," that conduct "***shall be deemed bad faith***" for purposes of the one-year bar.[6] In instances where this may not be explicit, the court must find that Plaintiff "has acted in bad faith in order to prevent a defendant from removing the action." § 1446(c)(1); *Mansilla-Gomez v. Mid-S. Erectors, Inc.*, No. 0:14-CV-00308-JFA, 2014 WL 1347485, at *2 (D.S.C. Apr. 3, 2014).

46. There is no controlling standard in the 4ᵗʰ Circuit for determining what implicit conduct might constitute bad faith. *See, e.g.*, *Gillis v. Bayview Loan Servicing, LLC*, No. 2:18-CV-57, 2018 WL 4183255, at *2 (N.D.W. Va. Aug. 15, 2018) citing *Johnson v. HCR Manorcare LLC*, No. 1:15CV189, 2015 WL 6511301, at *4 (N.D.W. Va. Oct. 28, 2015); *see also Shorraw v. Bell*, No. 4:15-CV-03998-JMC, 2016 WL 3586675, at *5 (D.S.C. July 5, 2016).

47. Nevertheless, many courts in this circuit have found the two-part test for forum manipulation articulated in *Aguayo v. AMCO Ins. Co.*, 59 F. Supp. 3d 1225 (D. N.M. Oct. 31, 2014) to be helpful in dealing with the "quintessential[ly] subjective standard language" of "bad faith". *E.g.*, *Mullins v. Rish Equip. Co.*, No. 2:21-CV-00347, 2021 WL 4448296, at *2–3 (S.D.W.

---

[6] Congress added the bad-faith exception in 2011 to address exactly this sort of gamesmanship: "The [one year bar implemented in 1988], however, led some plaintiffs to adopt removal-defeating strategies designed to keep the case in state court until after the 1-year deadline passed. H.R. REP. 112-10, 15, 2011 U.S.C.C.A.N. 576, 580

13

Va. Sept. 28, 2021) ("I find that the test is a fair and articulable way to reason through a highly subjective and case specific inquiry."); *Massey v. 21st Century Centennial Ins. Co.*, No. 2:17-CV-01922, 2017 WL 3261419, at *5 (S.D.W. Va. July 31, 2017); *Brogan-Johnson v. Navient Sols., Inc.*, No. 5:21-CV-155, 2021 WL 4597661, at *3 (N.D.W. Va. Oct. 6, 2021).

48.     In the first step, "[t]he Court will…focus its inquiry on whether the plaintiff actively litigated against the removal spoiler in state court." *Aguayo*, 59 F. Supp. 3d at 1274. As to the second, "[i]f the plaintiff can establish that he or she actively litigated against the removal spoiler, the plaintiff is entitled to a rebuttable presumption of good faith." The defendant may attempt to rebut this presumption with direct evidence of bad faith. *Aguayo* at 1275.

49.     "To find in favor of the defendant, there must be 'strong unambiguous evidence of the plaintiff's subjective intent for which the plaintiff cannot offer any plausible explanation.'" *Mullins*, 2021 WL 4448296 at *3 *citing Ramirez v. Johnson & Johnson*, No. 2:15-CV-09131, 2015 WL 4665809, at *4 (S.D.W. Va. Aug. 6, 2015).[7]

**d.  WAIVER OF RIGHT TO REMOVAL**

50.     Even when removal is otherwise proper and timely, a defendant may waive the right to remove by its conduct in state court. Waiver, however, requires a "clear and unequivocal" intent to remain in state court and should be found only in "extreme situations." *Grubb v. Donegal Mut. Ins. Co.*, 935 F.2d 57, 59 (4th Cir. 1991).

51.     "[T]he mere filing in the state court of a pleading raising a defense which might be conclusive of the merits is insufficient for waiver. There must be further action on the part of the

---

[7] "If a defendant wants the removal to stick, then he or she should be able to show either: (i) that the plaintiff did not litigate at all, or engaged in a mere scintilla of litigation against the removal spoiler; or (ii) that the defendant has strong, unambiguous evidence of the plaintiff's subjective intent, for which the plaintiff cannot offer any plausible alternative explanation." *Citing Aguayo v. AMCO Ins. Co.*, 59 F. Supp. 3d 1225, 1277 (D.N.M. 2014)

defendant resulting in a decision on the merits of the defense to waive the right to remove." *Shanahan v. Steering Comm. of Microsoft Litig. Consortium*, No. 04-CV-461-BO1, 2004 WL 7330115, at *2 (E.D.N.C. Nov. 23, 2004) *internal quotes and citation omitted*; *Aerial Images, Inc. v. Anderson*, No. 5:99CV320-BO(3), 2000 WL 33682689, at *1 (E.D.N.C. Feb. 21, 2000) ("Waiver of the right to remove must be shown with clear and unequivocal intent."); *Wolfe v. Wal-Mart Corp.*, 133 F. Supp. 2d 889, 891 (N.D.W. Va. 2001) ("[Defendant] correctly notes that engaging in discovery and filing motions prior to a case becoming removable does not result in a waiver of a party's right to remove an action that later becomes removable.").

## IV.   ARGUMENT

### a. BAD FAITH IS THE ONLY PLAUSIBLE EXPLANATION FOR PLAINTIFF'S DAMAGES STONEWALLING AND, INDEPENDENTLY, HER USE OF LAMB AS A NON-DIVERSE SPOILER

52.     Courts applying § 1446(c)(1) in this circuit have repeatedly found bad faith when plaintiffs sit on damages information and then reveal a large demand only after the one-year deadline. *See, e.g.*, *Brown v. Wal–Mart Stores, Inc.*, 2014 WL 60044, at *2 (W.D. Va. Jan. 7, 2014) (bad faith where plaintiff failed to respond to settlement inquiry or discovery aimed at determining amount in controversy, then sent a $200,000 settlement demand after one-year mark); *Gissentanna v. Westport Operator, LLC*, 2025 WL 19815, at *1 (E.D. Va. Jan. 2, 2025) (bad-faith standard "automatically satisfied" upon a showing of deliberate nondisclosure under § 1446(c)(3)(B)). Refusal to engage in discovery is the most typical scenario for a finding of bad faith. *Hall v. Leisure Time Prod.*, 2014 WL 5019687, at *6 (E.D. Va. Oct. 7, 2014) ("The vast majority of cases that find that plaintiffs acted in strategic ways to deprive defendants of the ability to remove involve refusal to engage in discovery.").

53.     Here, Plaintiff did the same thing in September 2025. After the state court severed the XPO-only case and diversity arose for the first time, XPO expressly asked what amount she sought

15

from XPO alone. Rather than provide responsive information, Plaintiff merely reiterated an evasive prior Rule 8 response, completely ignoring the obvious fact that XPO was attempting to clarify the already muddied waters of the damages issues now that Lamb was no longer part of the case. Only when XPO served Requests for Admission that were essentially inescapable did Plaintiff finally admit that she is seeking "substantial" compensatory and punitive damages that "far exceed $75,000".

54.     Under any framing, including *Aguayo*, Plaintiff's all but explicit refusal to respond to the September 2025 Rule 8 request after diversity first arose would already be enough. No legitimate litigation interest is advanced by silence, and concealment of removability is the only thing this conduct accomplishes. It is a complete stonewall; powerful, unambiguous evidence that Plaintiff acted in bad faith 'in order to' prevent removal within the plain meaning of § 1446(c)(1). *Mullins*, 2021 WL 4448296 at *3; *Ramirez*, 2015 WL 4665809, at *4 (*citing Aguayo*, strong unambiguous evidence of subjective intent without plausible alternative explanation is sufficient by itself).

55.     However, the nature of the case at bar is even stronger than this due to Plaintiff's own nine-figure rhetoric, pursuit of tower insurance, and disclosure of annual earnings. On these facts, there is absolutely no bona fide reason to withhold an amount-in-controversy figure, so the Court can only conclude her silence serves but a single purpose: to block removal, which is precisely the bad-faith conduct § 1446(c)(1) was enacted to reach. *Id.*

56.     This is precisely the kind of conduct that is contemplated by the bad faith exception, and just as in cases where plaintiffs refused to stipulate under $75,000 and later revealed much higher demands, Plaintiff expressly refused in her RFAs to agree to any cap at or below $75,000, confirming that her nondisclosure was strategic, not inadvertent. *Brown*, 2014 WL 60044, at *2; *Gissentanna*, 2025 WL 19815, at *1; *Hall*, 2014 WL 5019687, at *6.

16

57.     Separate and apart from Plaintiff's damages concealment, the second *Aguayo* track, her treatment of Lamb as a non-diverse spoiler, independently establishes bad faith. Plaintiff's discovery emails and severance arguments confirm that this was no accident. In August 2024, she conditioned any protective order on an expansive "sharing" provision that would let her disseminate XPO's "Confidential Information" to lawyers in "similar ongoing or past personal injury or wrongful death lawsuits or claims against XPO," touting prior "sharing orders" in Robeson County and explaining that such provisions "keep[] large corporate defendants (such as XPO) honest" by enabling coordinated discovery across cases, using the unified Lamb/XPO action as a discovery hub while Lamb's citizenship kept the case non-diverse.

58.     At the June 30, 2025 severance hearing, after the one-year mark, counsel told the court there was "no issue that Lamb was acting in the course and scope of his employment with XPO," urged severance so he could "proceed against defendant Lamb separately," and said he did not want to "drag [Lamb] through the mud" with sanctions aimed at XPO, yet even after severance Plaintiff still served no new discovery on Lamb and never noticed his deposition. The pending criminal charges provided no real obstacle, if Lamb invoked the Fifth Amendment, Plaintiff could have obtained an adverse inference in the civil case, so there is no plausible benign explanation for keeping him in the case for sixteen months, barely litigating against him, using his presence to anchor broad discovery against XPO, and then jettisoning him only after the one-year deadline.

59.     On these facts, there is no plausible case-related explanation for Lamb's role. Plaintiff kept him in the unified case for more than a year to defeat diversity, did only token written discovery on him while using his presence to obtain expansive, shareable corporate discovery from XPO, then told the court at the June 30 severance hearing that she wanted to "proceed against defendant Lamb separately" and move toward trial during XPO's appeal, yet even after severance she failed to notice

17

his deposition or serve any new discovery, despite having tools (including an adverse-inference instruction if he invoked the Fifth) to litigate his liability; that pattern is irreconcilable with any genuine "necessary party" or trial-strategy rationale and leaves only one reasonable explanation, that Lamb was kept in the case for his citizenship, as a non-diverse spoiler, not because Plaintiff ever intended to pursue him to judgment.

60.     This pattern closely resembles conduct other courts have found to apply in the spoiler context. *See*, *e.g.*, *Lawson v. Parker Hannifin Corp.*, 2014 WL 1158880, at *6 (N.D. Tex. Mar. 20, 2014) (finding bad faith where the plaintiff "consistently failed to take steps to prosecute her claims against [the nondiverse defendant], including failing to serve him with discovery requests or noticing his deposition and failing to seek a default judgment" before dismissing him after the one-year deadline)[8]; *cf. Massey*, 2017 WL 3261419, at *3 (under *Aguayo*, a "mere scintilla" of litigation against a spoiler supports a finding of bad faith).

61.     Courts in this circuit have treated that precise omission, keeping a non-diverse defendant in the case for months but never even noticing his deposition, as a hallmark of bad faith. *See Johnson*, 2015 WL 6511301, at *5 (noting fact that party was deposed stood "in stark contrast" to other cases where a defendant's participation was far less substantial") *citing Lawson*; *Massey*, 2017 WL 3261419, at *3 (discussing *Lawson* and emphasizing that the plaintiff "never took or requested [the spoiler's] deposition" before dismissing him shortly after the one-year deadline).

---

[8] Citing the following: "*In re Propulsid Prods. Liab. Litig.*, 2007 WL 1668752, at * 1 (E.D.La. June 6, 2007) (denying motion to remand where plaintiff failed to serve any discovery on non-diverse defendants, took no depositions of non-diverse defendants, and delayed dismissal of non-diverse defendants); *Davis v. Merck & Co.*, 357 F.Supp.2d 974, 978–79 (E.D.Tex.2005) (denying motion to remand where plaintiff failed to file a required expert report against a non-diverse defendant); *Elsholtz v. Taser Int'l, Inc.*, 410 F.Supp.2d 505, 506–07 (N.D.Tex.2006) (Means, J.) (denying motion to remand based on plaintiff's repeated requests for continuance of a plea to the jurisdiction hearing, failure to timely serve the diverse defendant, and non-suit of the non-diverse defendant after the expiration of the removal deadline); *Shiver v. Sprintcom, Inc.*, 167 F.Supp.2d 962, 963 (S.D.Tex.2001) (refusing to remand where defendant removed case outside one-year period when plaintiff nonsuited the only non-diverse defendant on the eve of trial)."

62. By contrast, *Aguayo* and cases applying it explain that any non-token discovery or other active litigation against the non-diverse defendant—most often, taking discovery such as a deposition—creates a rebuttable presumption of good-faith litigation. 59 F. Supp. 3d at 1275, 1282 (entitlement to presumption of good faith where Plaintiffs deposed non-diverse defendant before dismissing him); *Heacock v. Rolling Frito-Lay Sales, LP*, 2016 WL 4009849, at *4 (W.D. Wash. July 27, 2016) (plaintiff's deposition and two discovery requests to non-diverse party, "even if considered the 'bare minimum effort,' " sufficed as active litigation).

63. Plaintiff's fallback contention, that the combination of wrongful death, punitive damages, a six-figure wage earner, and counsel's own $100 million "exposure" comment made the jurisdictional amount "obvious" all along, actually *undercuts* any claim of innocent mistake: if Plaintiff truly believed the case plainly exceeded $75,000, yet twice refused to say so in response to formal Rule 8(a)(2) requests, the only reasonable inference is that the nondisclosure was strategic rather than inadvertent. *See* N.C. Gen. Stat. § 1A-1, Rule 8(a)(2); *Stokes*, 72 N.C. App. at 117, 323 S.E.2d at 477 (inserting a multi-million-dollar ad damnum violates Rule 8(a)(2)).

64. Moreover, the law looks not to what XPO subjectively "should have known" or might have pieced together from informal comments, but to what is objectively ascertainable from the four corners of the initial pleading or a later 'amended pleading, motion, order, or other paper' that makes removability "unequivocally clear and certain." This is precisely why Plaintiff's refusal to give a straight Rule 8 answer matters here. *See Lovern*, 121 F.3d at 162–63 (rejecting any inquiry into a defendant's subjective knowledge and requiring that grounds for removal be 'apparent within the four corners of the initial pleading or subsequent paper'); *Buchanan*, 2020 WL 5742844, at *2 (other paper must make removability "unequivocally clear and certain"); *Hall*, 2014 WL 839074, at *2 (Rule 8

19

statement, not informal communications, triggered removability; relying on pre-suit insurer demands would "invite the subjective-knowledge, mini-trial inquiry *Lovern* forbids").

65.    If Plaintiff can: (1) informally state that she sees "exposure as high as $100,000,000"; (2) disclose a $175,000 salary; (3) pursue sprawling sanctions and discovery for 16 months; and yet (4) twice refuse to say in a Rule 8 statement—*including in the newly severed, diverse XPO-only action*—that she seeks more than $75,000, and this does **not** count as "deliberately fail[ing] to disclose the actual amount in controversy to prevent removal," then § 1446(c)(1) has no real bite.

**b.    REMOVAL WAS TIMELY BECAUSE PLAINTIFF'S RFA RESPONSES WERE THE FIRST CLEAR AND UNEQUIVOCAL "OTHER PAPER" AND XPO REMOVED IN THIRTY DAYS**

66.    As set forth above, § 1446(b)'s 30-day clock starts only when removability is objectively ascertainable from the four corners of a plaintiff-generated pleading or "other paper," and not from a defendant's speculation or damages modeling. *See* 28 U.S.C. § 1446(b)(1), (b)(3); *Lovern*, 121 F.3d at 162–63; *Skidmore*, 1 F.4th at 210; *Walker*, 727 F.3d at 825; *Moltner*, 624 F.3d at 38.

67.    Moreover, until the Robeson County court granted Plaintiff's motion to sever Lamb on July 9, 2025, complete diversity did not exist and the unified action was not removable at all. 28 U.S.C. § 1441(b)(2). *Lovern* itself explains that the dismissal or dropping of a non-diverse defendant is a classic example of a later "order" or "other paper" that can make a previously non-removable case removable and start a new thirty-day period under § 1446(b)(3). 121 F.3d at 162.

68.    Further, courts applying § 1446(b)(3) in analogous circumstances have treated a severance order that drops the in-state defendant as the operative "order" triggering a fresh removal window as to the diverse defendant. *See*, *e.g.*, *Kiang v. Nationwide Life & Annuity Ins. Co.*, No. 3:23-CV-04861-JSC, 2023 WL 8018254, at *1–2 (N.D. Cal. Nov. 20, 2023) (denying remand where the defendant removed within thirty days of a state-court order severing the non-diverse defendant). The

20

same is true here: XPO's time could not even begin to run until after severance, and then only when Plaintiff's own litigation papers clearly revealed that the amount in controversy exceeded $75,000.

69.     Neither the seriousness of the alleged injuries nor the presence of punitive-damages allegations relieved Plaintiff of the burden to provide clear notice that more than $75,000 was in controversy. *Lovern* and *Skidmore* make plain that the removal clock is not triggered by what a defendant might "subjectively" infer from scattered facts or could have discovered through independent investigation; it starts only when removability is apparent on the face of a plaintiff-generated pleading or paper. *Lovern* at 162 (declining to "require courts to inquire into the subjective knowledge of the defendant" and instead "requiring that those grounds be apparent within the four corners of the initial pleading or subsequent paper"); *Skidmore* at 210.[9]

70.     Under *Lovern* and *Hall*, a defendant's knowledge that a previously non-removable case might someday be worth more than $75,000 does not trigger any duty to remove. And once the state court entered the July 9, 2025 Severance Order creating a distinct XPO-only action with complete diversity, XPO did exactly what *Lovern* and *Skidmore* contemplate: it sought a clear plaintiff-generated "other paper" specifically in the severed action to establish the amount in controversy for a case that only involved XPO for the first time.

71.     When the complaint leaves damages unspecified, the removing defendant must ultimately "establish the jurisdictional amount by a preponderance of the evidence," but may not satisfy that burden by "pull[ing] numbers from thin air." *Bartnikowski* 307 F. App'x at 734, 737.

---

[9] Plaintiff's reliance on *Marler v. Amoco Oil Co., Inc.*, 793 F. Supp. 656 (E.D.N.C. 1992), is misplaced. *Marler* predates the Fourth Circuit's adoption of an objective "four corners" test in *Lovern* and *Skidmore* and turned on detailed pre-suit demand letters that "[left] little doubt" the jurisdictional amount was met in an already diverse case. Here, by contrast, the case was non-removable until Lamb was severed, and Plaintiff twice refused in formal Rule 8 responses to state even that she sought more than $75,000, making it impossible for XPO to "ascertain" removability until her September 18, 2025 RFA admissions.

Further, district courts have repeatedly rejected the notion that equivocal or conflicting information about the amount in controversy triggers the removal clock. *See*, *e.g.*, *Castle v. Doe*, No. 3:16-CV-18, 2016 WL 2636301, at *2 (N.D.W. Va. May 6, 2016) (plaintiff's refusal to stipulate below $75,000 "does not establish the requisite amount in controversy"); *Gramc v. Millar Elevator Co./Schindler Enters.*, 3 F. Supp. 2d 1082, 1084 (E.D. Mo. 1998) (showing, including plaintiff's refusal to stipulate and an RFA response refusing to admit or deny that damages might exceed $75,000, plus only about $7,500 in medical bills and a $50,000 demand, insufficient to establish the jurisdictional amount).

72.     Having twice refused to provide any Rule 8 written statement of the monetary relief sought while supplying vagaries and innuendo as to her potential damages, Plaintiff left XPO with no way to obtain a clear, record-based jurisdictional figure except by forcing the issue through targeted RFAs in the severed XPO-only action. Under *Lovern* and *Hall*, the removal clock turns on what is "apparent within the four corners" of a pleading or "other paper," not on what a defendant might infer from informal remarks or incomplete data, and courts in this circuit have applied that rule by looking to written, record-based case documents, such as Rule 8 statements, rather than off-the-record "stray" communications. *See Lovern*, 121 F.3d at 162–63; *Hall*, 2014 WL 839074, at *2; *Lee Elec. Constr., LLC*, 2003 WL 21369256, at *3 (M.D.N.C. June 10, 2003) (if ambiguous, even a demand letter attached to the complaint cannot satisfy *Lovern* or place the burden on a defendant to determine damages because amount in controversy is unclear).[10]

---

[10] "Although the demand letter and the amount it requested is referenced in the factual allegations of the Complaint, it is not referred to either in the claim for relief or in the prayer for relief. It is not clear if the amount demanded in the demand letter is the same amount requested in the demand for relief, or if the amount has changed since the suit was filed. ***Requiring further inquiry by Eagle would be placing the burden on Eagle, the defendant, to determine the damages. As a result it is not clear from the face of the complaint that this action was properly removable because the amount in controversy is not clear***…Eagle filed a timely Request for Statement of Monetary Relief Sought. In response, Lee stated that it was seeking monetary relief in the amount of $37,215.00, exclusive of lost profits that had not been calculated, and treble damages. The response is considered an "other paper" for purpose of § 1446(b)." [emphasis added]

73.     To say that XPO should have treated counsel's off-the-record "exposure" estimates or raw earnings figures as starting the clock would require the Court to reconstruct what XPO "should have known" from scattered clues ambiguated by the evasive Rule 8 responses and to resolve factual disputes about their meaning. This is precisely the subjective-knowledge, mini-trial inquiry that *Lovern* and *Hall* reject. *Lovern*, 121 at 162–63; *Hall*, 2014 WL 839074, at *2.

74.     *Bartnikowski* confirms that a removant cannot satisfy its burden by "pull[ing] numbers from thin air," 307 F. App'x at 737, and *Castle* and *Gramc* confirm that equivocal refusals to stipulate or ambiguous damage hints do not clearly establish the jurisdictional amount or start the § 1446(b)(3) clock. Plaintiff cannot obscure the amount in controversy by stonewalling Rule 8 and then fault XPO for not divining removability from innuendo.

75.     Plaintiff's September 18, 2025 RFA responses were therefore the first "other paper" that objectively established removability within the meaning of § 1446(b)(3). In response, Plaintiff admitted that she is "seeking substantial compensatory and punitive damages that far exceed the sum of $75,000.00" in the severed XPO action and that she would not stipulate to any cap at or below $75,000. **Ex. 13**, p. 10. XPO then timely filed its Notice of Removal on October 2, 2025, within thirty days of receiving that "other paper" and less than a year after the July 9, 2025 Severance Order first created a removable, diverse action against XPO. Dkt. 2 ¶¶ 1–3, 18–22; 28 U.S.C. § 1446(b)(3).

76.     Buried deep within an extensive string cite to non-controlling cases outside of the 4th Circuit, Plaintiff cites one North Carolina District Court case: *Pigg v. Progressive Cas. Ins. Co.,* No. 3:06 CV 125-H, 2006 WL 1789145, at *4 (W.D.N.C. June 27, 2006). There, the record already included more than $300,000 in medical bills, roughly $45,000 in anticipated home modifications, a $687,554.53 settlement offer from the liability carrier, and a complaint seeking a declaration that the insurers were liable up to the full limits of two policies ($1,000,000 and $750,000). *Id.*

23

77. On those facts, the court simply held it would "go squarely against the evidence" on the specific record of medical bills, home modifications, settlement offer, and policy limits[11] that was already available when the complaint was filed to pretend the amount in controversy was less than $75,000; Pigg thus involved a fully quantified, above-threshold record, not a plaintiff who twice refused to give a Rule 8 amount until after the one-year bar.

### c. XPO DID NOT WAIVE ITS RIGHT TO REMOVE, AND REMOVAL WAS NOT A PLOY TO EVADE STATE-COURT DISCOVERY ORDERS OR SANCTIONS

78. Waiver of the right to remove is disfavored and occurs only in "extreme situations" where the defendant's conduct shows a "clear and unequivocal" intent to remain in state court. *Grubb*, 935 F.2d at 59; *Shanahan*, 2004 WL 7330115, at *2; *Wolfe*, 133 F. Supp. 2d at 891; *see also Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 186 and 188 (4th Cir. 2017) (waiver where removant waited six months *after* case removability arose and filed a demurrer, engaged in extensive written/deposition discovery, and moved for summary judgment *before* seeking removal).

79. For the first sixteen months of this case, XPO had nothing to waive because Plaintiff and Lamb were both North Carolina citizens. XPO's conduct during that period, answering, asserting a routine counterclaim, engaging in discovery, opposing sanctions, and seeking appellate review of the April 25 sanctions order, was classic defensive litigation in a forum Plaintiff chose, not a "clear and unequivocal" election to forgo a removal right that did not yet exist. *See Wolfe*, 133 F. Supp. 2d at 892–93 (pre-removability discovery and motions do not waive removal; waiver found only where defendant sought summary judgment in state court after case became removable).

---

[11] No demand was ever made to XPO, and the mere fact that Plaintiff sought tower-level insurance information did not establish the amount in controversy: "When a claim is being made on an insurance policy, 'the amount in controversy is the value of the underlying claim, not the face amount of the policy.'" *Pigg*, 2006 WL 1789145, at *3 (*quoting Darbet, Inc. v. Bituminous Casualty Corp.*, 792 F.Supp. 487, 489 (S.D.W.Va.1992)); *see also Allstate Ins. Co. v. Brown*, 736 F.Supp. 705, 707 (W.D.Va.1990) ("[w]here the insured does not seek to recover the maximum under the policy, the court cannot rely exclusively on the policy limit as the measure of the amount in controversy").

80.     The waiver authorities Plaintiff cites, including *Aqualon Co. v. Mac Equip., Inc.*, 149

F.3d 262, 264–65 (4th Cir. 1998), and *Va. Beach Resort & Conf. Ctr. Hotel Ass'n Condo. v. Certain*

*Interested Underwriters at Lloyd's*, 812 F. Supp. 2d 762, 764–66 (E.D. Va. 2011), actually underscore

how narrow waiver is. *Aqualon* describes it as limited to "extreme situations" in which a defendant

takes "some substantial defensive action in the state court before petitioning for removal." *Id.*

81.     *Virginia Beach* applied that standard to hold an insurer had waived where, again, *after*

the case became removable, it voluntarily filed a declaratory-judgment counterclaim in state court

before removing, thereby clearly submitting to the state court's jurisdiction. 812 F. Supp. 2d at 764–

66.[12] *See also Curl v. Beltsville Adventist Sch.*, No. GJH-15-3133, 2016 WL 4382686, at *5–6 (D.

Md. Aug. 15, 2016) ("most obvious example" of waiver is removal after an unfavorable state-court

*merits* ruling, but denying remand and holding no waiver where motion to dismiss or for summary

judgment in state court filed and case removed one day later, before any state-court ruling issued).

82.     Further, the sequence of events after severance confirms that XPO did not waive its

removal right or use removal as a ploy to evade discovery obligations. Although XPO could have

removed immediately after Plaintiff's September 18, 2025 RFA responses, it chose to honor its

outstanding discovery obligation by serving a detailed, 29-page supplemental discovery response that

explicitly identified all responsive documents by Bates number with narrative explanations, and by

adding nearly 4,000 pages of production. **Ex. 14**.

---

[12] "The plaintiff asserts that "a counter claim is not a defensive pleading" but instead an "offensive pleading," and that the "long standing law of the Fourth Circuit" mandates waiver. Pl.'s Reply Br. in Supp. of Mot. to Remand 2–3, ECF No. 16. The case law, however, does not reflect this distinction between "defensive" and "offensive" pleadings when making a determination of waiver. *See, e.g.*, *Aqualon*, 149 F.3d at 264 (characterizing counterclaims and cross-claims as "permissive substantive defenses"). The more proper inquiry is laid out expressly by the Fourth Circuit in *Grubb*, namely whether the defendant demonstrated "a 'clear and unequivocal' intent to remain in state court. Grubb, 935 F.2d at 59 (quoting Rothner, 879 F.2d at 1416)." *Virginia Beach*, 812 F. Supp. 2d at 765.

25

83.     Plaintiff's suggestion that XPO "experimented" in state court until it got "bad answers" and then removed ignores that: (1) removal did not even become a possibility until July 9, 2025; (2) at that time it still lacked any plaintiff-generated paper making the amount in controversy "unequivocally clear and certain"; and (3) it removed within two weeks of Plaintiff's first jurisdictional admission on September 18, 2025, after fulfilling the very discovery obligations Plaintiff says it sought to evade.

### d.  PLAINTIFF IS NOT ENTITLED TO FEES AS REMOVAL WAS OBJECTIVELY REASONABLE

84.     Plaintiff is not entitled to fees under § 1447(c) because XPO's removal was objectively reasonable. For all the reasons set out above, this case was non-removable until severance created a diverse XPO-only action. Further, Plaintiff twice refused in Rule 8 statements (including one directed solely to the severed case) to provide an amount in controversy, and only later admitted in RFAs that she seeks damages that "far exceed $75,000." After that admission, XPO promptly removed while continuing to comply with existing discovery orders, including a nearly 4,000-page supplemental production. As such, reasonable lawyers can disagree about how § 1446 applies here.

[CONTINUED ON NEXT PAGE]

## V. CONCLUSION

85. Defendant has met its burden to show the propriety of removal in all respects. XPO did exactly what § 1446 requires. This case was non-removable for sixteen months because Plaintiff chose to sue a non-diverse driver, then did virtually nothing to prosecute him while training all fire on XPO. Once Plaintiff obtained severance and created a diverse XPO-only case, XPO sought jurisdictional clarity the only way North Carolina procedure allows, through Rule 8 and then narrowly tailored RFAs, and removed within thirty days of Plaintiff's first sworn admission that she seeks "substantial" compensatory and punitive damages that "far exceed $75,000" from XPO.

86. On these facts, the one-year bar cannot be invoked: Plaintiff deliberately withheld the amount in controversy to prevent removal, conduct that § 1446(c)(3)(B) itself "deems" bad faith. XPO's removal was timely, not waived, and, at minimum, objectively reasonable. The Court should therefore deny Plaintiff's motion to remand and her request for fees.

This 24th day of November 2025.

GORDON REES SCULLY MANSUKHANI LLP

By: *Robert W. F. Beckmann*
Robert W. F. Beckmann
N.C. State Bar No.: 63232
Austin R. Kessler
N.C. Bar No. 55732
Devin Honbarger
N.C. Bar No. 59513
150 Fayetteville Street, Suite 1120
Raleigh, North Carolina 27601
Telephone: (919) 787-4555
Facsimile: (919) 741-5840
E-mail: rbeckmann@grsm.com
E-mail: akessler@grsm.com
E-mail: dhonbarger@grsm.com
*Counsel for Defendant XPO Logistics Freight, Inc.*

27

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR REMAND**, including all referenced exhibits and other documents, with the Clerk of Court for the Eastern District of North Carolina by using the CM/ECF system, which will send notification of such filing to the following counsel of record:

| | |
|---|---|
| J. William Owen<br>Musselwhite, Musselwhite, Branch & Grantham, P.A.<br>P.O. Box 1448<br>Lumberton, NC 28359<br>wowen@mmbglaw.com<br>***Counsel for Plaintiff Cindy Smith, Administratrix of the Estate of Mark K. Smith*** | Troy D. Shelton<br>Dowling PLLC<br>3801 Lake Boone Trail, Suite 260<br>Raleigh, NC 27606<br>tshelton@dowlingfirm.com<br>***Counsel for Counterclaim-Defendant Cindy Smith, Administratrix of the Estate of Mark K. Smith*** |

This 24th day of November 2025.

GORDON REES SCULLY MANSUKHANI LLP

By: *Robert W. F. Beckmann*
Robert W. F. Beckmann
N.C. State Bar No.: 63232
Austin R. Kessler
N.C. Bar No. 55732
Devin Honbarger
N.C. Bar No. 59513
150 Fayetteville Street, Suite 1120
Raleigh, North Carolina 27601
Telephone: (919) 787-4555
Facsimile: (919) 741-5840
E-mail: rbeckmann@grsm.com
E-mail: akessler@grsm.com
E-mail: dhonbarger@grsm.com
***Counsel for Defendant XPO Logistics Freight, Inc.***