# EXHIBIT 4

NORTH CAROLINA              IN THE GENERAL COURT OF JUSTICE
                              SUPERIOR COURT DIVISION
ROBESON COUNTY                 FILE NO. 24 CVS 000468
_____

CINDY SOLES SMITH, et al.,    ]
                              ]        TRANSCRIPT, Volume 1 of 1
                              ]           (Pages 1 - 82)
          PLAINTIFFS,         ]
vs.                           ]
                              ]        Wednesday, April 16, 2025
XPO LOGISTICS FREIGHT, INC.,  ]
et al.,                       ]
                              ]
          DEFENDANTS.         ]
_____


               Robeson County Civil Superior Court
                    April 14, 2025, Session
          The Honorable James G. Bell, Judge Presiding
                           Motions

APPEARANCES:

Will Owen, Esquire
Musselwhite & Branch
606 N. Elm Street
Lumberton, North Carolina 28358
(910) 738-5277
wowen@mmbglaw.com

Megan Stacy, Esquire
Devin Honbarger, Esquire
Gordon Rees Scully Mansukhani, LLP
150 Fayetteville Street, Suite 1120
(919) 787-4555
mstacy@grsm.com
dhonbarger@grsm.com

Court Reporter:
Sherri Sealey, CVR-CM
Official Court Reporter
(910) 734-4535

# I N D E X

_____

Motions                                                          03

1   **PROCEEDINGS OF WEDNESDAY, APRIL 16, 2025:**

2           *(Proceedings began in open court on Wednesday, April*

3           *16, 2025, at 9:50 a.m.  The following proceedings*

4           *were held in open court, in the absence of any*

5           *jurors.  Present at the bar were Mr. Will Owen,*

6           *attorney for the plaintiff; and Mr. Devin Honbarger*

7           *and Ms. Megan Stacy, attorneys for the defendants.)*

8           THE COURT: Okay. So I'm trying to find the motion. If

9   you've got a hard copy and you want to pass it up, it'll save

10  me 30 minutes of search.

11          MS. STACY: Absolutely, Your Honor. And we have

12  several motions on for hearing today. I've got copies of ours.

13          MR. OWEN: I have copies, as well. I've got a binder

14  I'll hand up that's got some of them. I've got two motions to

15  be heard. I'd like to be heard first, if I can. I'm happy to

16  pass up--I was going to start with the motion to quash.

17          MS. STACY: Absolutely. We'll talk about it.

18          MR. OWEN: Your Honor, may I approach?

19          THE COURT: Yes.

20          MR. OWEN: So we're going to--I've got two motions

21  that I'd like to be heard today, Your Honor. The first one is

22  the more simple one, the motion to quash a subpoena.

23          COURT REPORTER: Excuse me, I'm sorry. Can we put the

24  case on the record and introduce yourselves?

25          MR. OWEN: Good morning, Your Honor. Will Owen for the

1  plaintiff. This is the Estate of Mark Smith versus XPO

2  Logistics Freight, Inc., 24 CVS 468. I represent Cindy Smith,

3  seated to my left, with this claim.

4          MS. STACY: Good morning, Your Honor, Megan Stacy, and

5  my co-counsel, Devin Honbarger, here for the defendants

6  William Lamb and XPO Logistics. I have copies of our motion

7  for reconsideration, the memo, and some supporting materials

8  for you, as well, if I may approach.

9          THE COURT: All right. And this is the case where I

10  heard something before?

11         MR. OWEN: Correct, Your Honor.

12         THE COURT: Okay.

13         MR. OWEN: So what I handed up a moment ago, Your

14  Honor, as one of two motions that I'd like heard today, first,

15  is a motion to quash subpoena. The defendant XPO issued

16  several motions--I mean, several subpoenas to plaintiff, one

17  of which was directed to a private investigator, Erich

18  Hackney, with Hedgestone Consulting. Erich is an investigator

19  hired by us. He's not an expert witness. They're not entitled

20  to his file. It's work product. It was created for this case

21  by a private investigator.

22         We've actually voluntarily given them all statements

23  that Mr. Hackney has completed voluntarily, just to help

24  expedite this case. So we've given them everything that's in

25  any way related to a witness account of the accident.

1            So we just move to quash that subpoena, because

2    they're not entitled to the entire file because it would

3    contain work product, Your Honor. So that's really the basis

4    of that motion under Rule 45. So we'd ask that that particular

5    subpoena be quashed. We've already produced all documents

6    that, in any way, could be discoverable for Mr. Hackney.

7    That's really all I have in that regard. I don't know if

8    counsel wishes to be heard on that motion before I move on?

9            THE COURT: You want to respond?

10           MR. HONBARGER: Yes, Your Honor, Devin Honbarger for

11   the defendants. I would like to be heard on this, Your Honor.

12   We concede that some of the--you know, there's certainly going

13   to be some material in Mr. Hackney's file that would be

14   privileged. However, not all of the materials in that file are

15   going to be privileged.

16           As opposing counsel pointed out, they have produced,

17   I believe, it's 18--they are titled transcripts but they are

18   really interview notes, I guess. They are not word for word

19   interview transcripts like you would see at a deposition from

20   these witnesses that Mr. Hackney took.

21           What we would--what we're seeking are the recordings

22   of these statements or interviews, as you would. They produced

23   one recording with no--two recordings with no transcripts, and

24   then I believe it's 18 transcripts with no recordings. We

25   would just like to get the complete file or the complete

1    recordings and transcripts for all the witnesses.

2          In addition, any communications between Mr. Hackney

3    and these witnesses would not be privileged. It's not work

4    product, and it's not attorney-client privilege. He's not an

5    attorney, and the witnesses are third parties, Your Honor.

6          If the Court does find that any--you know, the

7    materials we're asking for is work product, which we would

8    argue that it is not, the work product privilege may be

9    waived, and in this case was waived, because he chose to

10   produce some of the items and some of the information that

11   we're asking for but not all of it, Your Honor.

12         MR. OWEN: Your Honor, we've produced that because it

13   was relevant to the case and they're not--I think that's what

14   they would be entitled to. I could have just maintained my

15   objection, but I chose to be, you know, a fair litigant and

16   produce those interviews because they are witnesses. A lot of

17   them are EMS providers, fire fighters, folks that were on the

18   scene. I voluntarily produced that to be a fair and

19   transparent litigant in this case. We shouldn't be punished

20   for that. The subpoena should be quashed, because that's not

21   the appropriate avenue for getting that material.

22         THE COURT: Can I take that under advisement?

23         MR. OWEN: Sure, Your Honor.

24         MR. HONBARGER: Sure, Your Honor.

25         MR. OWEN: The other matter that I've got before you,

1   Your Honor, is a motion for sanctions, if I may approach?

2           THE COURT: Yes.

3           MR. OWEN: This is a more detailed motion. I did

4   prepare a fairly detailed binder that I'd like to go with you-

5   -go through with you.

6           So let me just back up a little bit. So I represent

7   the Estate of Mark Smith. Seated to my left is Cindy Smith,

8   Mark's wife of 38 years. They were best friends, soul mates,

9   and this has been an absolute tragedy.

10          A little bit of background on the case just to

11  refresh the Court's recollection, Your Honor, October 11,

12  2023, in Robeson County, West 5th Street, 5th Street

13  Extension, and Highway 74 alternate, a--our client was

14  approaching on 74 heading towards Lumberton in the early

15  morning hours, approximately 7:00 a.m. The sun was still

16  coming up. There's an XPO Logistics tractor trailer being

17  operated by William Lamb, which left the terminal on 5th

18  Street Extension and then was taking a left onto Highway 74

19  near the Farmer's Market.

20          And Defendant Lamb, the driver, admits that he saw

21  the decedent approaching with his headlights on. He saw a

22  school bus approaching from his right. So he's got a school

23  bus coming on his right, he's got the decedent coming from

24  this left. That's not a controlled intersection other than a

25  stop sign.

1          Mr. Lamb, for some reason, chose to ease out into the

2   roadway with all that going on, and he chose to stop. And Mr.

3   Smith road under the trailer and was killed. It's an extremely

4   tragic case that happened several miles from this courthouse.

5   It's been absolutely tragic for the family and for Cindy who's

6   sitting here with me today, an entirely preventable accident,

7   and XPO admits that it was preventable.

8          But, in any event, we appeared before you in January

9   of this year after having exhausted every effort possible, in

10  my opinion, to get the discovery resolved in this case,

11  written discovery, that is.

12         If you look at the binder, Your Honor, you'll see

13  several items, but if we can go to number two--I'm sorry,

14  number one, I've got a--kind of a summary of what has

15  happened. So we served our initial discovery in June, June 5

16  of 2024, that was 315 days ago we served discovery. And then

17  we served a second set of discovery, just very specific

18  discovery, 176 days ago. And we, despite lots of letters back

19  and forth--which I've put a whole stack of letters in here for

20  you--we could not get XPO to produce certain documents and

21  certain--and answer certain interrogatories, despite all the

22  efforts that we took. Again, 315 days ago I served this.

23         And keep in mind, Your Honor, this case is set for

24  trial in 26 days. It's on the May 12 trial calendar as we

25  stand here today. So we can't move forward with this case

1    because I can't even get the discovery.

2          We appeared before you in January. XPO appeared

3    before you in January. They made these same arguments. I'm

4    talking about the same sets--the two sets of discovery, and

5    you ordered them to produce certain documents in respond to

6    certain interrogatories. It was very clear.

7          But as you'll see in my summary there's been a

8    continuous and willful violation of that order, and that

9    continues till this moment today.

10          If I can briefly go through this, so the hearing was

11   on January 13, Your Honor. I don't know if you recall that.

12   And then you issued an order that was dated January 21, 2025.

13   You gave them 30 days to comply with that order. It was very

14   clear. There was no ambiguity with the time frame.

15          So that deadline was February 21, 2025. They failed

16   to respond within that time frame, just utterly failed. There

17   was no attempts to extend the deadline, there was no attempts

18   to enlarge the deadline. There was nothing that was done in 30

19   days. That is clear.

20          Instead, on February 26--keep in mind that's five

21   days late--XPO serves an unsigned and unverified

22   supplementation to the order. It still hasn't been signed. The

23   attorney never signed it. There's no verification. I have no

24   idea who verified these responses. There's no one. So I'm

25   operating under a blank, basically, supplementation.

1       In following this order where you ordered them to

2  produce all these things, they gave me the document retention

3  policy, one reservation of rights letter from the insurance,

4  and one additional dec page.

5       Then they mentioned this motion for reconsideration,

6  which they have before you today. What's interesting is they

7  talk about the motion for reconsideration in this unverified

8  and unsigned pleading about it being filed, like it had been

9  filed in the past. It hadn't been filed. And I was looking for

10 it. I said, where is this motion you reference in your

11 pleadings. Well, the reason it wasn't in there because they

12 hadn't filed it.

13      So the motion for reconsideration was filed on

14 February 28. So they waited until another few days to file

15 this motion. They said it had already been filed. That was a

16 misrepresentation to plaintiff and to this Court.

17      They've since attempted to have this motion for

18 reconsideration heard, which you're going to have heard today.

19 I don't know what there is to reconsider, to be honest with

20 you. That should have been noticed before the 30 days ran, but

21 that was not done. We originally had this set in March, the

22 March 17 session. Judge Powers continued it till today to have

23 you hear this matter, Your Honor.

24      I'll try to be brief, but there's some things I've

25 got to get on the record in front of you, Your Honor. I'm on

1   number two on page three, liability insurance. Okay. I get

2   that XPO is a big company and they have a lot of insurance.

3   They, for some reason, don't feel like the Court's order

4   applies to them. They've just refused to give us the entire

5   tower of coverage. I don't care if it's a billion dollars.

6   We're entitled to see that, you know? I get it you're a big

7   company and you don't want people to know what your insurance

8   is, but when you're ordered to do something you've got to do

9   it.

10          You ordered them to produce the entire tower of

11  coverage, not their interpretation of the coverage, not what

12  they think my case is worth, the entire tower. That was not

13  given to me. They've given me--first, they said there was 10

14  million in coverage, which is not true. They've given me--

15  after the order, they--actually, late after the order, they

16  gave me one additional layer. There's tons of layers. I know

17  this because I've communicated with other lawyers who have

18  cases against this company. They have lots of coverage, but

19  they, for some reason, don't think they have to give it to me

20  despite being ordered to do so. That's troubling to me, it's

21  troubling to my client, because that's specifically

22  discoverable in this case.

23          This is--what I have found, Your Honor, is a pattern

24  of abuse with this company, unfortunately. And I've--I'll give

25  you some examples. An active case down in Mobile, Alabama,

1  *Sonja Cofe* (phonetic) *versus Dwight Richard Westfall and XPO*
2  *Logistics*, they have a pending motion for sanctions, as well,
3  because they didn't give them insurance documents. This is not
4  the only case that they're doing this on. This is a pattern of
5  conduct.
6          Number three, preventability analysis, they gave me a
7  couple of pages, but they haven't fully answered who did the
8  preventability analysis, who was involved, what did you
9  review, and when did you review it.
10         These big companies, Your Honor, where there's a
11 truck accident, they have panels that look at these wrecks and
12 determine was it preventable or not. They did that in this
13 case, and they--this discovery has been served on them since
14 June. And I just got the preventability two pages that they
15 served on me, which I don't think is complete, after the
16 Court's order. So that doesn't make any sense.
17         You ordered them to produce a list of all serious
18 injury and death cases. They're going to argue they don't know
19 what the word "serious" means. I think we all know serious. If
20 you're suing XPO, you're making a claim against XPO, you know
21 what the injuries are. We all know what serious injuries are,
22 okay?
23         If someone's going to the chiropractor, you know,
24 neck and back hurts, I'm not looking for that. I'm looking
25 serious, catastrophic injury and death. They know exactly what

1    I'm talking about. The word "serious" is not ambiguous.

2            These trucks also have a lot of technology on them,

3    Your Honor. It's called telematics. They have video cameras

4    with A.I. that monitors the driver and monitors the road in

5    front of them.

6            Obviously, in a case like this, that information is

7    very critical. They have continuously failed to give me items

8    that they were ordered to produce that have directly to do

9    with this driver's behavior prior to the accident and after

10   the accident, frankly, because he still works there, and the

11   date of the accident.

12           They literally have videos that watch these drivers

13   and will tell them if they're speeding. They'll send them a

14   message and say, hey, on this day John Smith was speeding on

15   West 5th Street, he was going 55 in a 35. Then they go in

16   there and they coach them. They send them a message and say,

17   hey, next time don't speed on West 5th Street. There's

18   documents for all these things. Those are highly relevant to

19   my claims for negligent, hiring, retention, supervision. They

20   still just won't give them to me. And they haven't given me a

21   reason why.

22           Training materials, we just found out a few months

23   ago after the Court's order, late, that they have something

24   called the XPO University. It's not a school, that's their

25   own--I guess that's their trucking school. They call it a

1  university. They gave me a transcript with all the defendant's

2  classes that he's been to. You ordered them to produce all the

3  materials that was used to trained William Lamb. Why haven't I

4  received those? They have them. I know they have them. They

5  have to have them. If they don't have them, who does? It just

6  doesn't make sense.

7        So there's several other items. I'm not going to sit

8  here and go through every single one of them, but that's why I

9  prepared this extensive document to you.

10       Another one, the accident register, briefly, federal

11 law requires trucking companies to keep a list of all serious

12 claims and death, incidences for the last three years. They

13 were ordered to produce that. I have yet to see that. That's

14 something they have to have that's required by federal law.

15 It's not optional.

16       You ordered them to give me 30(b)(6) transcripts. You

17 even limited it to serious injury, death, and a left turn. No

18 head-on collisions, no right turns, no rear-ends, left turns.

19 I think that's pretty limited in scope. They don't think so,

20 and they're going to ask you to reconsider that, even though

21 there's no change in the law and no change in the facts.

22       All this information that we ask for is highly

23 relevant to our claims for negligence for the driver,

24 negligence for XPO, negligence in the training and

25 supervision. So that's why we haven't been able to move

1   forward with the case, despite this being set for trial in 26

2   days, because I can't take depositions and prosecute this case

3   without these documents. That's why I came to this Court in

4   January in got an order, so I could be prepared for trial. But

5   XPO has chosen a different path, and I don't know why. But we

6   have, at this point, Your Honor, you can look under page--tab

7   number three, that shows all the various letters I've written

8   to counsel since--I started dated it in August, talking about

9   discovery. That's one of the thickest parts of the binder.

10  These are all letters and emails sent to them. This is not

11  something I ran to the courthouse and did right away.

12          The most recent letter, March 17, that was the day we

13  were here in front of Judge Powers and it was continued, I

14  sent counsel a letter and basically advised her this order's

15  still in effect. I know you filed this motion for

16  reconsideration, which was late. That doesn't stop that order.

17  And I advised counsel that, you know, if continued, violations

18  are going to result in severe sanctions. And that's what we're

19  here today about in front of you today, Your Honor.

20          Rule 37(b) gives Your Honor a lot of discretion with

21  sanctions with discovery abuse. This is a pattern of abuse.

22  I've been dealing with it since June of last year. I don't

23  know any other way to deal with it than to put it in front of

24  the Court and give you the discretion. But Your Honor is--you

25  have a lot of power when it comes to sanctions and a lot of

1    discretion to deal with this type of behavior.

2          What we're asking for is that certain facts in our

3    answer be deemed established, which Rule 37(b) allows. And

4    I've laid this out on page seven, paragraph 24, paragraph 26,

5    paragraph 27, paragraph 31, paragraph 32, paragraph 34,

6    paragraph 45, 46 through 47 and 48.

7          These are specific items that I'm asking the Court to

8    deem admitted or deem established so that we can move forward

9    with this case. If they're never going to comply with a court

10   order, never going to give me the documents, I can't help Ms.

11   Smith. I can't present this case to a jury. I can't prepare.

12         So that's why we have sanctions. If you don't follow

13   orders, what's the point in getting an order if it has no

14   teeth. If there's no consequence for not following an order

15   what's the point in getting it. And that's kind of where I am.

16         And I also would ask that certain portions of their

17   answer be stricken. And I've laid those out for you, including

18   second, third, sixth, seventh, and eighth defenses. These are

19   related to contributory negligence and different things.

20         They actually sued my client, who's sitting next to

21   me, for damages to their tractor trailer for $3,000, $3,000

22   damages to their landing gear, and they sued my client for

23   that. They said, no, we're not responsible. Not only are we

24   not going to pay you a dime, you're going to pay us. That's

25   kind of the tone of this case.

1           You know, I've appeared before this Court for the

2    last decade, and I've never seen such. That's unfortunate.

3    But, Your Honor, I think that while these are severe

4    sanctions, there's more severe sanctions that you could

5    consider and use, including striking the entire answer. I'm

6    not asking for that. I'm asking for certain portions of the--

7    certain portions of our first amended complaint to be deemed

8    established, which is allowed under 37(b), and I'm also asking

9    for portions of their answer to--and I'm talking about when I

10   say "they," XPO Logistics Freight, they do represent Mr. Lamb,

11   as well, I'm asking for certain portions of their answer to be

12   stricken so we can move forward with this case. This would

13   allow us to move forward, basically, on damages, because I

14   need these documents. I need all the materials in order to

15   pursue the liability claim. And they're not going to give it

16   to me. They've already said they're not giving it to me.

17   They're going to ask for it to be reconsidered. There's

18   nothing to reconsider.

19          The only thing they do is violate the order. So we'll

20   address the reconsideration argument at some point, but I've

21   put a lot of detail into this binder. I've given carbon copies

22   to everybody. This lays out our argument. This is not

23   something I take lightly, Your Honor, and not something I

24   would ask for unless it was well deserved, but, unfortunately,

25   in this case, it is. Thank you.

1          THE COURT: All right.

2          MS. STACY: Good morning, Your Honor. Megan Stacy,

3     again, for the defendant, XPO. Thank you, Will. I think we can

4     certainly agree this is a tragedy, but we don't agree that

5     sanctions are warranted here.

6          Your Honor, we'll walk through a couple of points I'd

7     like to address before I'm speaking to our motion to

8     reconsider. It's directly related to Will's motion to compel,

9     so I think it makes sense to kind of address this in turn.

10         Will notes that he has exhausted every effort

11    possible. I would contend that XPO has done the same in terms

12    of conferral efforts. Will mentioned there's numerous letters

13    in his binder. XPO also responded to those letters, engaged

14    separately. I, in fact, tried to speak with counsel at the

15    last hearing, and he refused to speak with me in person. I was

16    trying to confer about some of the issues we were having with

17    production. So I don't know that every effort possible has, in

18    fact, been made, Your Honor.

19         The requests here were voluminous. We had 74 requests

20    for production, 38 interrogatories, and then a second set of

21    additional 15 requests for production along with 25 requests

22    for admissions. We had taken a close consideration of those

23    requests, have conferred with our client at length, all

24    different sectors of XPO. As Will mentioned, it's a big

25    company. And tracking all this information has been a labor

 1  but one we've certainly been willing to undertake. We

 2  understand the gravity of this case. We take the Court's order

 3  seriously. And I would love to address some specific

 4  provisions today to talk to you about some of the issues that

 5  we're seeing.

 6          The motion to reconsider, Your Honor, is with respect

 7  to that January order. And I've passed up a copy of it with

 8  the materials I handed to you earlier. There are 37 provisions

 9  in total. And, Your Honor, our motion for reconsideration

10  references only six of those provisions. I was not here for

11  that January hearing, but I've spoke with prior counsel, who's

12  no longer with Gordon Rees, and I've reviewed, of course, the

13  briefing and the order on that.

14          The first provision that we ask for Your Honor to

15  reconsider is 2A. And this directs XPO to provide plaintiff

16  with a list of all claims or lawsuits filed against XPO

17  involving serious injury or death for the past three years.

18          Your Honor, we've spoke with not only our client but

19  some claims professionals that our client works specifically

20  with to try and come up with some logistics about how to put

21  this list together. This is not something that XPO maintains

22  internally. It would involve the creation of work product with

23  their claims professionals and their legal team to pull this

24  information.

25          Will makes a big issue of how we define serious

1   injury. We're not trying to be cute or smart here, Your Honor.

2   It's a matter of how do we narrow down a significant amount of

3   claims to what is considered a serious injury. It's a labor

4   that's going to take some time to review these cases in

5   detail, make some kind of determination about what's serious,

6   about any guidance here, in the order, or an offer from the

7   opposing counsel to come up with maybe an agreed upon

8   definition. We're seeking some guidance there on how we can

9   comply with the court order, because we are struggling

10  currently with determining which cases would fall within this

11  provision under interrogatory number three.

12          The next provision that we request to be

13  reconsidered--okay, actually, Your Honor, we do offer in our

14  motion an alternative language for this order at 2A. It

15  currently, of course, refers to the serious injury. We request

16  that the provision be revised to require us to produce a list

17  of all claims or lawsuits filed against XPO involving death,

18  burns to over 50 percent of the claimant's body, or loss of

19  limb. And that is, of course, Your Honor, our attempt to

20  define serious injury and hopefully find some kind of common

21  ground with opposing counsel or at Your Honor's direction

22  about what serious injury means so we can make meaningful

23  efforts to go through these materials and produce them.

24          The next provision that request reconsideration of,

25  Your Honor, is 2P. And Mr. Owen references, as well, 2P

1    directs XPO shall produce all training materials, manuals,

2    policy instruction, etcetera, provided or used by its CDL

3    drivers, including Lamb. This would include safety training

4    videos, Powerpoint, other materials. It includes Lamb but also

5    includes drivers that are not William Lamb.

6            Your Honor, we've asked, in our motion, that this be

7    revised to include only materials that were provided or used

8    by the driver, William Lamb. William Lamb was the XPO employee

9    that was operating the truck that was involved in this

10   incident.

11           And, again, Your Honor, this is a matter of a big

12   company, and we think that only materials that would be

13   relevant are those that are--pertain to Mr. Lamb in

14   particular. We note that in the complaint, Your Honor, there

15   is no allegations of any patterns of conduct by XPO. There's

16   no allegations of any punitive damages. Plaintiff only alleges

17   that XPO failed to train William Lamb, himself. So the only

18   materials are relevant to this litigation would be those

19   materials that William Lamb received.

20           And I will note we produced some of those along with

21   a log of it and are tracking down some additional materials,

22   as well, but would just appreciate Your Honor's guidance on

23   the scope of, again, that's provision 2P in the Court's

24   January order.

25           The next provision, the third one we're requesting

1   reconsideration of, is 2Q. This directs XPO to produce any

2   document, article, presentation, prepared or presented by any

3   XPO representative relating to the safe operation of a vehicle

4   during the past five years. Your Honor, this has been quite a

5   task to track down, as well, again, a massive organization.

6   Any representative that has presented anything in the past

7   five years, it's an insurmountable task to come up with what

8   information we can produce in response to this in order to

9   comply with the order.

10          Your Honor, in our motion we suggest some alternative

11  language, that the Court's order instead directs XPO to

12  produce any documents, articles, or presentations prepared

13  and/or presented by any XPO representative to William Lamb, in

14  particular and relating to the safe operation of a commercial

15  motor vehicle during the past five years.

16          So, again, Your Honor, this would kind of limit the

17  scope of materials that would be responsive to this order so

18  we can have a task that we can get our hands around and

19  actually produce materials relevant to this litigation.

20          The next provision, Your Honor, this is number four,

21  2F. In 2F in the order directs XPO to produce all 30(b)(6)

22  deposition transcripts from corporate designees for XPO for

23  litigation within the last five years that involve the

24  following: serious injury or death and a left turn by an XPO

25  driver. Your Honor, we've first confirmed that our client does

1   not maintain these internally. There's no XPO repository of

2   30(b)(6) transcripts. So we're not able to pull it from

3   internal resources. This would involve, again, speaking with

4   third-party claims professionals, trying to narrow that down

5   to serious injury or death and a left turn, that's a

6   significant administrative task of materials that are not in

7   our possession and at the end of the day are not relevant to

8   this litigation. This litigation is about William Lamb. It's

9   about XPO's training of William Lamb, the hiring of William

10  Lamb. This is about the truck provided by XPO that was

11  involved in this particular accident. And transcripts from

12  cases for the past five years would have no bearing and no

13  relevance to this litigation, Your Honor. And I've drafted,

14  compliant for this order, is a significant burden and near

15  impossible to track down with confidence every single 30(b)(6)

16  deposition transcript from the past five years.

17          Your Honor, with a lot of these I will mention, as

18  well, that Mr. Owen has requested, you know, availability for

19  our representatives to be deposed. And I think a lot of these

20  inquiries are better addressed via a deposition. It's

21  questions about internal XPO stuff that has nuance. And we do

22  have a 30(b)(6) deposition scheduled for later this month. And

23  we have cooperated with counsel in getting that scheduled. We

24  invite him to ask our representative any questions that he may

25  have related to XPO that's relevant to this lawsuit.

1          Next, Your Honor, this is our fifth request. It's 4H,

2    4H directs XPO to produce all documents related to the safety

3    settings and any telematics transportation management system

4    or software as of the date of the incident, and that's October

5    11, 2023. We've requested that this language be limited to the

6    data for William Lamb, the accident itself, and the tractor

7    trailer that Lamb was operating at the time of the incident,

8    again, to reduce the scope.

9          Your Honor, I'll note that we have produced a

10   significant amount of telematics data. And I have a log in

11   front of me of XPO's document production to date. I know

12   opposing counsel, for reason I can understand, tries to

13   minimize the amount of materials that we've produced in this

14   case, Your Honor. We have documents that include Bates labels

15   up to 1906. These include videos, photographs, incident

16   reports, drug test results. We have our client assessment

17   retention policy. We have maintenance records for the truck.

18   We have personnel files for William Lamb, including his

19   application, payroll records, attendance. We have his hour of

20   service logs, the DVR report, certain policies XPO had in

21   effect that would have applied to Lamb at the time.

22          We have ECM data. That's another form of telematics,

23   as well, and several other policies and information have been

24   produced in an effort to comply with the Court's order. Again,

25   those materials total over 1,900 pages, to date, of materials

1  that we've turned over to plaintiff's counsel. That was number

2  five, Your Honor, for the telematics system.

3        Lastly, number six, request the Court reconsider

4  provision 4I. This request directs XPO to produce the

5  administrative user name and password for its telematics

6  software and safety management system that was being used by

7  XPO at the time of the incident.

8        Your Honor, this prevents some significant concerns

9  that are outlined in another document that I've passed up.

10 It's the affidavit of Thoran Nicolette (phonetic). He is the

11 director of safety for XPO Logistics Freight. And he is one of

12 the folks, Your Honor, I mentioned we've been conferring with

13 at length about how to comply with this order, what materials

14 are available, and making sure we take into consideration any

15 concerns that our client has about safety concerns,

16 confidentiality concerns, and things of that nature.

17       Now, the affidavit Thoran Nicolette (phonetic) is

18 very technical. I have a brief overview of it that I'm happy

19 to include to kind of cut to the chase on this. And, Your

20 Honor, a side, Thoran (phonetic) is who is being deposed later

21 this month. So Mr. Owen will have an opportunity to ask him

22 questions about when--about these different programs. And this

23 is something I was eager to speak with Mr. Owen about at the

24 last hearing, but we were, of course, unable to do so.

25       So there are three courses, a telematics status. Mr.

1   Owen mentioned that the truck come with a lot of technology.

2   That's true. XPO takes safety seriously. They have a lot of

3   monitoring systems. And we produced the data relative to

4   those, including the video footage from the day of the

5   incident. It's shows inside the driver's cab at the time of

6   the incident. There's three programs. It's Samsara, ECM, and

7   WABCO.

8           First, Samsara data, that's specific to trucks and

9   drivers. What we can pull there is land materials for the date

10  of the incident, information about the tractor, and that will

11  come in reports. The issue is with providing that user name

12  and password it would provide opposing counsel with full

13  access to unrelated and confidential information of other

14  drivers, other potential incidents. It would also provide them

15  access to a system that requires a lot of training to utilize.

16  XPO employees have to undergo significant training before they

17  can use this system, and that's to insure that none of the

18  data is inadvertently manipulated because that could create a

19  lot of issues and have some reverberating effects if that were

20  the case.

21          Thoran (phonetic) also notes in his affidavit that

22  there are currently some data issues with this software that

23  could cause misinterpretation of data. So we're requesting,

24  Your Honor, that we limit the data just to the subject

25  tractor, the subject driver, and that information over the

1  past year. So it's what I think is a reasonable time frame to

2  look at a year's length for the driver, and, again, for this

3  specific driver, this specific tractor. And that's the Samsara

4  data.        Next is the ECM data. That has already been

5  produced. We produced from May of 2022 to December of 2023.

6  This is specific to tractors. And opposing counsel has that

7  information in hand.

8           And, Will, that's, for reference, in case you're not

9  aware, that would include the DVIR and the ECM data, which I

10 noted on our index before has already been produced.

11          Lastly, Your Honor, the third category of telematics

12 data is WABCO. This is another area where we need some clarity

13 about the order.

14          So WABCO is a system where the data is integrated

15 into other systems. XPO, to the extent it gets data from

16 WABCO, it gets it directly from WABCO. It's not a system that

17 it accesses independently. In other words, XPO does not have a

18 user name or password for the WABCO system. We, instead, go

19 through that third party. It's specific to the tractors only.

20          And the issue with the request, specifically from

21 plaintiff's counsel for the WABCO data it requests the data

22 for trucks that are out of service in the whole fleet of XPO.

23 Again, we're dealing with a big company. That would require

24 every truck to be brought in, this data to be individually

25 pulled, the truck has to be brought out of service, drivers

1   have to miss out on their source of income while they're

2   waiting for the trucks to be serviced. There's a lot of

3   effects of compliance with this order that our client is

4   carefully considering and would appreciate your guidance, Your

5   Honor.

6           Particularly, we're requesting that it be limited to

7   this tractor that was involved in the incident. Our

8   contention, other tractors in XPO's fleet have no bearing on

9   this litigation. They weren't involved in this litigation.

10          Your Honor, those are the six points. Again, a quick

11  recap, the telematics system data, the user name and password,

12  safety settings. We talked about appropriate designee

13  transcripts, the safety presentations, again, that really big

14  category that we're having trouble trimming down, training

15  materials. We are fine turning those over for William Lamb. It

16  is an insurmountable burden to pull those over for the entire

17  company, and then the list claims and lawsuits. Of course,

18  Your Honor, we're looking for guidance on that definition so

19  we can comply.

20          Again, we have third party. We've already had them

21  going through the information, pulling this. It's a tedious

22  task. It's underway, but we need to be able to define serious

23  injury. It may be very clear to Mr. Owen, it may be clear to

24  Your Honor, but we would just appreciate having an agreed upon

25  understanding of what that means so we can insure we are

1   compliant with our order.

2          All right. Your Honor, we also have with us today

3   binders of XPO's production. This on the end?

4          MR. HONBARGER: Yes.

5          MS. STACY: I just want to dispel any notion that XPO

6   has not taken its discovery obligation seriously. Your Honor,

7   we had these printed out to show here's Bates 1 to 851, 852 to

8   1,731, and 1,732 to 1,906. This is the information about

9   William Lamb, his personnel file. This is the information

10  about the truck he was driving that was involved in the

11  incident. XPO doesn't play games here. We're ready, willing,

12  and able and, in fact, contributed significant resources to

13  comply with Mr. Owen's numerous requests, including conferring

14  with him over the course of several months, Mr. Owen was not

15  drafting letters that weren't responded to. We were actively

16  engaged in this process in trying to come to a resolution that

17  made sense for everyone.

18         Your Honor, Mr. Owen brought up some other case in

19  another state. I'm not sure how that's relevant, that he's

20  referring to a purported pattern of abuse by the company. Your

21  Honor, he mentioned the company had produced no insurance

22  information. Of course, here we've produced, I believe, 10

23  million dollars in coverage. We would, again, seek, the

24  Court's guidance on how much we need to produce. The entire

25  tower of coverage for a fledge company would involve policies

1  that could be unrelated to this claim. So we're looking for

2  some guidance on that.

3          And, Your Honor, Mr. Owen also mentioned our

4  counterclaim. It is one of my least favorite days when I have

5  to file something like that. And I want, Your Honor--you know

6  we have an obligation to represent our client and preserve

7  counterclaims. There is evidence in--of contributory

8  negligence. I'm very sorry that had to happen, sorry that Will

9  Owen felt that it was--that it went to this motion, but, Your

10  Honor, that--we don't think it's relevant here.

11          And I would appreciate, Your Honor, to hear from you,

12  some feedback on this, what you're thinking with respect to

13  any clarification that could be provided. And if that

14  clarification is provided, if we could have opposing counsel

15  identify specifically what he contends is still missing. And

16  the reason I request that, Your Honor, is I have a document

17  that I've gone through with my client, and over the course of

18  a few months, that has every request outlined that was at

19  issue in that order, what we've done to respond to it, Bates

20  references. And I want to know clearly so I can go back to XPO

21  and say this is what Will contends is still missing. He said

22  he didn't want to take the time to go through everything. Your

23  Honor, I request before sanctions are issued, if they are,

24  that we do take the time to go through and identify

25  specifically what Mr. Owen contends is missing, because I

1  think that's important here before we get to the next step.

2          MR. OWEN: Sure, I'm happy to do that, Your Honor.

3          THE COURT: Hey, do you guys want to, like, go in

4  chambers and talk about it or you'd rather do it on the

5  record?

6          MS. STACY: Would you like to do that, Will?

7          MR. OWEN: It doesn't matter. I mean, it's in my

8  binder. Whatever the Court would like, I mean, it's pretty

9  clear. I can go through it, you know, pretty quickly.

10          MS. STACY: Okay.

11          MR. OWEN: Because we're going to have to just come

12  out here and repeat it, so. She's asking me to do it, so---

13          MS. STACY: I'm optimistic that we can have a

14  conversation. I was last time that we---

15          MR. OWEN: Yeah, look---

16          MS. STACY: ---that, in person, that did not go well.

17  So I'm willing to try again, Will.

18          MR. OWEN: Your Honor, can I address the motion for

19  reconsideration first? She's asking a lot of different things.

20  Okay.

21          THE COURT: Yeah.

22          MR. OWEN: First of all, motions for reconsideration

23  are rarely granted. It's an extremely rare case where you see

24  a motion for reconsideration granted. You don't get a second

25  bite of the apple, okay? I've filed a motion to compel. The

1   motion to compel we had it heard before Your Honor. They had

2   counsel here. They could have made every argument before.

3          This discovery was served 315 days ago. The other set

4   of discovery--I've only served two sets--was served 176 days

5   ago. Why are we waiting until after the Court's order to file

6   these motions and seek this relief. That's not how this works.

7   If that were the law in this state, then you would just not

8   comply with an order and go file a motion for reconsideration,

9   and say, yeah, we'd like--we'd like to have that reconsidered.

10  That's not how it works.

11         In order to have a motion for reconsideration be

12  successful there's got to be newly discovered facts, a clear

13  error of law, prevent injustice, there's things that the Court

14  has to find. You don't get a second bite at the apple. And

15  that's what they're trying to do here. They want to come back

16  and say, well, we don't like the result of the first hearing,

17  we want--we want to re-litigate that. Well, the law, the case

18  doctrine, prevents that because we have to move these

19  controversies forward.

20         You already considered all these arguments, Your

21  Honor. And you ruled. They didn't like that ruling. And they

22  are here today to argue about it, but it's too late. That's

23  the law of the case. And their motion for reconsideration

24  should be denied.

25         She said earlier we didn't seek punitive damages.

1  That's not true. You look at number 12, Your Honor, clearly we

2  sought punitive damages for the conduct of the XPO and William

3  Lamb. It has to do with negligent training, retention, all the

4  things. And, you know, sometimes we amend pleadings. Sometimes

5  we find things in discovery that causes us to amend pleadings

6  to say, yeah, not only did they not train Lamb, they didn't

7  train a lot of drivers.

8         They seem really concerned about this list of claims

9  of serious injury and death. That gives me some pause, it

10 should give this Court pause that they have that many claims

11 in the last three to five years.

12         Also, I heard mentioned that they don't maintain or

13 they don't know where to find these deposition transcripts.

14 Well, if you look at their document retention policy, which is

15 under number eleven on my binder, page nine, litigation files

16 and court records, they themselves say that they keep them ACT

17 plus three years. That means while employed or active--so

18 while the employees are active--plus three years, depositions

19 ACT plus three years. And they say they can't find them. If

20 you don't have deposition transcripts from your designees who

21 has them? They have this stuff. They just don't want to give

22 it to me. And they just ignored your order, and they said,

23 well, let's go see if we can get it reconsidered and maybe

24 he'll work with us. That's too late. The train left the

25 station a long time ago. You just can't keep coming back and

1    coming back and coming back and re-litigating. We'll be stuck

2    in this same posture for another year, and Ms. Smith won't

3    have any justice in this case.

4            They talk about all the documents they produced.

5    That's a red herring, Your Honor. Yeah, it might be a lot of

6    pages, but is it relevant? Is it what we've actually--is it

7    what they've been ordered to produce? Absolutely not. If that

8    was what they had produced since the order maybe we'd have

9    something to talk about. They sure as heck hasn't told the

10   Court why they didn't comply with the order. I haven't heard

11   that.

12           Your Honor, looking for guidance on insurance. I

13   heard that. Let's see. If you look back at the Court's order,

14   I'm at the Court's order under page--under tab four. Let me

15   see how clear this was. Interrogatory number 38, XPO shall

16   identify and list the insured, insured and policy limits, for

17   any and all layers of liability coverage that does or may

18   provide coverage on behalf of XPO as of the day of the subject

19   crash. This includes excess layered liability coverage of any

20   kind that may provide coverage for this case.

21           I don't care what provides coverage for, you know,

22   commercial construction cases or anything like that. Including

23   disclosure that reveal and relate to the entire tower of

24   coverage. They know what the tower of coverage is. They just

25   don't want to give it to me despite being ordered to give it

1   to me. They've given no reason. They say that's not clear. I

2   think it's pretty clear. They need guidance on that? They need

3   guidance on the entire tower of coverage? I don't know how

4   else to say it. Give me the entire tower. I don't care if it's

5   a billion dollars. That doesn't matter. We're entitled to it.

6           So I don't know what it is that's not clear here.

7   They say they've given me all this telematics data. Your

8   Honor, they've given me some screen shots from the employee

9   file, which is a couple of pages. What I'm looking for there

10  is the--this is a very complex system that they purchased that

11  supposedly is made just for them. They took this complex

12  system and made it just for XPO. And what it has it has

13  settings in it, like, when you drive your car and you go over

14  a certain speed limit or brake too fast, they put all those

15  settings in there. When do we get alerts, that's what I'm

16  looking for, okay? I'm looking for very specific things.

17  They're worried about taking trucks off the road and these--

18  I'm not looking to take any trucks off the road. I don't care

19  what your drivers--driver's license number is. I'm not going

20  to go in there and click resolved when it's not resolved. It

21  would be a very qualified person doing this, okay? This is not

22  going to be your run of the mill expert that gets in their

23  system. It's going to be someone who had a PhD or is an

24  engineer or someone who's extremely, you know, qualified to do

25  it. We're not just going to send anybody in there.

1        So I don't know what clarity they are looking for,

2   Your Honor. I think the order was very clear. And the fact

3   that they're concerned about giving me lists of injury,

4   serious injury and death, or she said that half your body has

5   to be burned, what if your neck's broken? Isn't that serious?

6   I think it is.

7        What if you had a TBI, traumatic brain injury? Is

8   that serious? Yes.

9        So we need to see that. They haven't even tried to

10  comply. Go ahead and send me all the death claims. They didn't

11  do that either. They said, no, we don't want to send him

12  anything until we know.

13       The only person that's hurting is Ms. Smith. It's

14  hurting Ms. Smith. We have these rules for a reason, Your

15  Honor. The rules of civil procedure are very broad, and I'm

16  sorry that I served all this discovery on the defendant. We

17  have these rules for a reason. And, Your Honor, I don't know

18  what else to say. She said she wants to know exactly what has

19  not been produced. I'm happy to go through that. You want me

20  to go through it here or, I mean, we can talk off record, if

21  you want.

22       MS. STACY: I believe that's Your Honor's--I would

23  like to respond to---

24       MR. OWEN: Okay. Yeah, let me see if I've got anything

25  else. So, yeah, we have punitive damages. They say they

1  produced all this telematics. That's not true. The ECM data,

2  that's another red herring. There's been a lot of red herrings

3  thrown at the Court today. ECM is your engine control module.

4  I don't care about that. That's not telematics. Telematics is

5  watching the driver, watching their behavior, watching them

6  harshly brake, watching them speed. I don't care what the

7  engine control module shows. Red herring. There's a lot of red

8  herrings here.

9          We were very specific on what we wanted and what was

10  ordered. It wasn't given to us. They have this stuff. They'd

11  have to. If they don't have it who does? It's in their

12  company. So I just don't think they liked the conclusion that

13  was reached in the last hearing, Your Honor. They don't get to

14  come back and re-litigate that again, because it just invites

15  them to come back every time. We don't know. We don't know how

16  to comply. We can't understand.

17          Well, then, comply with what you can and don't wait

18  until the 30 days runs and then ask for forgiveness. If you

19  don't understand the order you should file something

20  immediately and enlarge that order. They should have enlarged

21  the time they were complying, immediately, within the 30 days,

22  and then they should have moved to reconsider if they thought

23  it should be reconsidered. They didn't do that. They said, no,

24  I ain't worried about the 30 days. Let that run. We'll file

25  some stuff, get it continued.

1       Here we are 26 days before trial and Ms. Smith is
2    being prejudiced severely. And that's unfortunate. We can sit
3    here and talk about documents all we want, but the only person
4    it hurts is Ms. Smith.

5       So that's my response for the motion for
6    reconsideration. I think it's very clear what they haven't
7    produced. I don't know why she wants me to go through that.
8    I'm happy to. It's voluminous.

9       MS. STACY: Thank you, Your Honor. I appreciate the
10   theatrics and Will trying to put words in XPO's mouth, but I
11   strongly disagree with the picture you're painting here.

12      Will, the reason you received those 1,906 documents
13   is because they were directly responsive to the request that
14   you issued. The reason you received ECM data is because you
15   requested it and because it's included in telematics data.

16      I know you reference red herrings a lot, but that
17   seems like one of them. You're receiving materials that you
18   requested in our effort to comply.

19      Will, you mentioned we sought relief from the order
20   before the order was entered. Your Honor, I don't know how
21   that's possible. This order is extremely rare. Will mentioned
22   that the relief that we're seeking is rare. It is provided for
23   by Rule 54(b). And our basis for it, there's three exceptions
24   under 54(b) is that there is new information that has been
25   discovered since entry of the order.

1        And, Your Honor, Will says he doesn't understand our

2   position. I'll outline it very briefly because I went through

3   it in detail earlier. During our efforts to comply with the

4   order, we discovered some of these issues. When we went to

5   enter search terms for serious injury, we found there's no

6   common understanding.

7        Will himself has added two additional categories of

8   serious injuries, a neck broken, and a TBI that he did not

9   previously mention. So we see this evolving standard of search

10  terms for serious injury. And the clarity we seek is to make

11  sure that we're complying with Will's request and the Court's

12  order.

13       Your Honor, Will mentioned he'll be sending someone

14  qualified to review this telematics data. I'm not sure who he

15  has in mind, but we'd, of course, appreciate receiving

16  information about his credentials and whoever he has

17  designated for that.

18       Your Honor, again, the request for--under Rule 54(b)

19  is because these arguments that we're making today were not

20  already made at the prior hearing. They are not outlined in

21  the brief for the motion. It's information that we've gleaned

22  during diligent efforts with our client to provide additional

23  materials to satisfy the Court's order and Will's request.

24       Just as it's rare to receive relief at times under

25  Rule 54(b), it's also very rare for a company to be ordered to

1  produce all 30(b)(6) deposition transcripts. Will cites the

2  document retention policy of three years for litigation

3  materials and contends that means that XPO has all the

4  deposition transcripts in, I guess, a file cabinet somewhere.

5       Your Honor, that's not the case. We work with XPO.

6  We're outside counsel. That's typically who maintains the

7  litigation files. Our client may have some materials that are

8  shared internally that just reports other privilege

9  information, but that wouldn't necessarily include all of the

10 documents from the case.

11      Your Honor, it's also rare for a company to be

12 ordered to produce information concerning all claims. Your

13 Honor, our clients are not scared of that. They just want to

14 insure compliance. I agree we can turn over some that are non

15 contested and then work through the definition for the others.

16 That's something, again, someone is currently working on it, a

17 third party going through this claims information in an effort

18 to comply.

19      And, lastly, Your Honor, in my years of practice I've

20 never heard of a company ordered to just turn over a user name

21 and a password to a proprietary system. It is, of course, a

22 significant concern to our client. And we would respectfully

23 request, you know, some clarification and reconsideration of

24 that provision so we can limit the materials to what's

25 relevant today, to Mr. Smith, to this accident, to the truck

1   that was involved in the accident, and our driver, William

2   Lamb. And, for those reasons, Your Honor, we ask you to

3   reconsider that January order.

4           MR. OWEN: Your Honor, you want me to put on the

5   record what we're still missing? I'm looking at--it's tab one

6   on my binder that I prepared for this. This is not--again,

7   this is not something we take lightly. They didn't run to the

8   courthouse and do this. This is a long journey to get here.

9   We've given them a lot of chances.

10          In fact, I started this discovery 315 days ago.

11  They've had 315 days to figure out what the word "serious"

12  means. Have they ever asked me what that means? No. They're a

13  sophisticated company. They know what the word "serious"

14  means. At least try, at least try to comply. Don't wait until

15  after the order and then try--and then try to get it

16  reconsidered. It's too late. It's too late. Sorry.

17          But we'll just go through this briefly. So, liability

18  insurance, you've ordered them and I've just read it, there's

19  a request for--there's a request for production of documents

20  and there's an interrogatory that should both be complied with

21  with insurance, all layers of insurance. They have lots of

22  them. And I know they're withholding them. Why they're

23  withholding them? I don't know if we'll ever know, but it's

24  willful. Your Honor, there's no question about that. I know

25  they don't feel comfortable doing that.

1          THE COURT: So do want to--as you do these you want

2  them to respond?

3          MR. OWEN: I'd rather go through all of these,

4  actually after all of them.

5          MS. STACY: You're going to--list based on your---

6          MR. OWEN: Rest of them---

7          MS. STACY: ---do you want to go based off the order,

8  perhaps, would maybe---

9          MR. OWEN: We can do that, too---

10          MS. STACY: ---make more sense---

11          MR. OWEN: ---might be more, yeah.

12          MS. STACY: ---if that's okay.

13          MR. OWEN: Yeah, we'll find more deficiency. That's

14  great. All right. Let's go to the order, great, number four.

15          THE COURT: See, today's like a Monday for me because

16  I was in class the last two days. So I'm--my brain's kind of--

17  -

18          MR. OWEN: Yeah, I'll tell you what. Let us confer and

19  give the Court--you want us to confer and give the Court a

20  little break?

21          THE COURT: Yeah.

22          MR. OWEN: All right. Let's do that---

23          MS. STACY: Thank you, Your Honor.

24          MR. OWEN: ---just so we're not up here--I don't want

25  to argue with counsel. I'm not the type to argue, but it is

 1    what it is. Give us--can you give us ten minutes, Your Honor?

 2              THE COURT: Sure, yes.

 3              MR. OWEN: All right. Great. We'll go in the jury

 4    room.

 5              MS. STACY: Okay.

 6              THE COURT: Do you want me in there or just y'all two?

 7              MR. OWEN: No, it's fine, Your Honor.

 8              *(A recess was taken in this matter at 10:52 a.m.*

 9    *until* 11:49 *a.m.)*

10              THE COURT: All right. I'm ready.

11              MR. OWEN: Your Honor, we spent some time on this in

12    the jury discussing what was still outstanding from the order,

13    and I did my best to limit the scope. When they didn't

14    understand the word "serious," we added some additional

15    language that they may have, you know, such as fractures,

16    broken bones, catastrophic.

17              So we've attempted to confer, as much as we can,

18    about specific items where there was not clarity. However, you

19    know, and I told counsel this, they're still sitting here way

20    after we should be for some of these documents that should

21    have been produced a long time ago. And, unfortunately, we've

22    still got to move for sanctions on this, because otherwise I

23    can't risk for my client, you know, moving forward and not

24    getting the documents for another six months, another three

25    months, or here we are again for another motion to compel.

1  It's, like, I don't know what to do with that.

2       So we have tried everything, it seems, over the last

3  315 days since serving that discovery to get these items, but

4  I'm sure counsel will disagree. But, you know, I have an

5  obligation to Ms. Smith. I've been trying for almost a year to

6  get this stuff. You know, that's highly relevant and we

7  believe has been in the possession and control of XPO this

8  entire time.

9       If they didn't have--you know, if they didn't know

10 what certain words meant they should've reached out to the

11 Court or conferred with me in some way of getting clarity. We

12 did attempt to clarify things over the course of the last year

13 with counsel, right? We didn't just send each other nasty

14 letters and do those things.

15      I did speak to Le'Ron Byrd, who's no longer with

16 them, with this firm. And I had conversations with him. He's

17 not here today. He's no longer with that firm, but I can tell

18 the Court that we did have these conversations similar to what

19 we just had in that jury room. So I tried, Your Honor. I'm not

20 the type to come down here and ask for sanctions. This is not

21 normal for me, but in this particular case, dealing with this

22 particular entity, I see no choice but to move forward with

23 the establishment of certain facts and certain defenses being

24 struck. I'm not asking for everything to be struck. There's

25 still issues for a jury, including damages and punitive

1  damages, but we think there has to be an appropriate sanction.

2  Otherwise, this would encourage litigants to just violate

3  orders and say, oh, we didn't understand or we didn't know

4  what you asked for, what you want. That's just not our system.

5  Rule 37(b) is what it is, and it gives Your Honor a lot of

6  discretion. So we would ask for the same sanctions we asked

7  for before. I know they're severe. I get it. But so is losing

8  a spouse, you know, and I don't want that to be lost. Thank

9  you, Your Honor.

10          MS. STACY: Thank you. Your Honor, we certainly had a

11  productive conversation back there, truly. I have pages of

12  notes to take back and a lot of clarity on some of the items

13  that were outstanding.

14          I understand Will is representing there were some

15  prior conversations with other counsel. I'm not privy to

16  those. I know that I tried to confer as recently as last month

17  in this courtroom. And I think we had the conversation that I

18  had hoped to have back then today that will help us guide our

19  client in complying with this order. We do not believe

20  sanctions are warranted, because these notes illustrate that

21  there was some room for clarity here. And I can give you a few

22  examples.

23          As Will mentioned, talking about the claims, we have

24  search terms now that our client can go use that's, you know,

25  a massive database of claims defined by what Will is looking

1   for.

2          We have clarification on the different categories of

3   telematics data that Will is looking for. He referenced

4   another program today that was not previously bought up in

5   discussions, at least to my knowledge, that we now know to

6   consult with our client about.

7          We talked about personnel files, and Will mentioned

8   some documents that he would expect to see in there that

9   aren't. So we know what to go verify with our document--our

10  clients and if they're not there. We certainly haven't seen

11  them in the materials to date.

12         We limited what kind of training that Will wants,

13  what kind of materials. He referenced the XPO, the transcript

14  that we produced. And we've agreed to produce all the

15  materials identified on that transcript that are related to

16  safety or operating the vehicle that's relevant to this

17  lawsuit.

18         Your Honor, a lot transpired in that room that I

19  think is really helpful and gives me a lot of confidence in

20  our ability to comply with this order now that we've had an

21  opportunity to confer with opposing counsel and get some

22  clarity. And we, of course, invite Your Honor to weigh in. It

23  is your order, after all. If you have any other small

24  clarification that you would like to provide to us, as well.

25         We've also identified insurance coverage, the amount

1    we would be looking for, so we can make sure we're not

2    bringing irrelevant policies to the table, by also respecting

3    our role as defense counsel and not providing coverage

4    opinions to our client. We found a way to balance those

5    concerns.

6           We learned that ECM data today is not as important to

7    Will as some other forms of data. So we can go speak with our

8    safety director about getting that.

9           We talked about the 30(b)(6) transcripts, at length.

10   I gave opposing counsel some insight into our general

11   practice, whether clients end up with these, the fact that

12   there is no repository. And we've discussed an actual process

13   to identify those for opposing counsel so we can track those

14   down to the extent practical.

15          Your Honor, I think all of this illustrates that

16   there was a lot remaining to confer about with respect to this

17   order. And today has illustrated that. We did not willfully

18   fail to comply with your order, Your Honor. We've produced

19   materials over the course of several months and supplemented

20   numerous times, both in terms of our written responses and our

21   document production.

22          Your Honor, we ask that sanctions not be ordered in

23   this case. We don't believe there was--that they are warranted

24   because we have attempted to comply with this order and now

25   have the information that we need to effectuate that

1   compliance. Thank you, Your Honor.

2          THE COURT: All right.

3          MR. OWEN: Just briefly, Your Honor. I mean, the

4   sanctions deal with the conduct that already occurred. I get

5   that we conferred and there's some, you know, documents we can

6   get in the future, but I can't--that doesn't erase the past.

7   Unfortunately, there's got to be some consequences for that.

8   And I still need these documents even with the sanctions.

9   They'll still have to--you know, still got to put on a damages

10  trial.

11         What the sanctions would effectively do is to

12  establish negligence, okay, and it would be a damages trial at

13  that point. I still need the--I still need these documents for

14  damages. That's not something we take lightly. You still have

15  to prove your case. I have not asked for their entire answer

16  to be stricken. I don't think that would be appropriate, but I

17  do think that liability should be deemed established by these

18  allegations just because of, frankly, the utter nature of the

19  abuse, I mean, discovery abuse.

20         I'm not saying it was counsel that did it. It would

21  be her, your client. I mean, this is not the Estate of Mark

22  Smith versus Megan Stacy. This is the Estate of Mark Smith

23  versus XPO, right? And this order applies to them. So whether

24  their counsel or in-house or out-house, however it is, I'm

25  sorry you didn't comply. And there's consequences for that.

1    Thank you, Your Honor.

2         MS. STACY: And, briefly, Your Honor, again, Will

3    mentioned he's made all attempts. Had we had this conversation

4    last month we might not be before you today, Your Honor. So I

5    don't think it's reasonable for counsel to ignore my attempts

6    to confer and then come to the Court asking for sanctions when

7    we could have resolved this without Court intervention, that

8    we've passed the first submission, I will acknowledge, had to

9    be filed for this, Will, but we have made efforts to comply

10   and to confer with opposing counsel.

11        So, Your Honor, to the extent if you are inclined to

12   award sanctions, we would ask for less--something less than

13   striking our pleadings, our defenses, Your Honor. We think

14   that is an extraordinary remedy and that it's not warranted in

15   these circumstances. Thank you.

16        THE COURT: All right. So do you both want to present

17   proposed orders?

18        MR. OWEN: That's fine, Your Honor.

19        THE COURT: And you can send them to Miss Gwen on

20   Odyssey.

21        MR. OWEN: When do you want them?

22        THE COURT: Well, tomorrow is a day before Good

23   Friday, so let's go to next week, like what day next week,

24   maybe Wednesday at 5:00.

25        MR. OWEN: Wednesday at 5:00, Your Honor?

1           THE COURT: Yeah.

2           MR. OWEN: Let me see the date, so I can---

3           MR. HONBARGER: Should be the 23rd.

4           MR. OWEN: ---the 23rd by 5:00?

5           THE COURT: The 23rd, yeah.

6           MR. OWEN: And you want it emailed to Ms. Chavis?

7           THE COURT: Yes.

8           MS. CHAVIS: You have to go through Odyssey.

9           THE COURT: On Odyssey.

10          MR. OWEN: Go through Odyssey and you want me to also

11   email it or just go through Odyssey? Just go through the e-

12   portal?

13          THE COURT: Yeah.

14          MR. OWEN: Proposed order. Okay.

15          CLERK: If you send it, it will forward it to Ms.

16   Chavis.

17          MR. OWEN: Okay. I'll put it in Wednesday by 5:00.

18          *(Brief pause on the record)*

19          MR. HONBARGER: Your Honor, I think we only have one

20   more motion left for today, I believe, and that's the

21   defendant's motion to compel discovery from the plaintiff, if

22   you're ready for that. Do you need a copy of that motion, as

23   well, Your Honor, or do you have one?

24          THE COURT: You better give me one.

25          MR. HONBARGER: May I approach?

1          THE COURT: And on the motion to quash, you're both

2  going to send a proposed order on it, right?

3          MS. STACY: Yes.

4          MR. OWEN: Yes, we'll send a separate order for that.

5  Will that simplify it, Your Honor?

6          THE COURT: Yeah, yeah.

7          MR. OWEN: The motion to quash, list of sanctions. Do

8  you want a separate one for reconsideration, as well?

9          THE COURT: Yeah, yeah, let's do that.

10          MR. OWEN: Three different orders.

11          THE COURT: Yeah. I don't want to confuse myself.

12          MS. STACY: Understood. Thank you, Your Honor.

13          MR. OWEN: So there's going to be a total of four

14  orders, I guess, four potential orders. All right.

15          MR. HONBARGER: May I approach, Your Honor?

16          THE COURT: Yes.

17          MR. HONBARGER: Do you have a copy, Will?

18          MR. OWEN: I'll take another one, it's fine.

19          MR. HONBARGER: I can look and see if I've got another

20  one. Let me see if I've got another one.

21          MR. OWEN: It's okay.

22          THE COURT: This is the defendant's motion to compel,

23  right?

24          MR. HONBARGER: That's right, Your Honor. And if

25  you're ready, may I proceed, Your Honor?

1          THE COURT: Yes.

2          MR. HONBARGER: I won't belabor a lot of the points,

3    because we literally just argued a motion to compel on the

4    other side of this. So I think we're aware of most of the

5    groundwork and the rules here.

6          Many of the same things that Will brought up also

7    apply here. We've issued these discovery requests, which

8    contain interrogatories, requests for production of documents,

9    many, many months ago.

10         There have been several responses. And we've met and

11   conferred several times. There has been supplemental and

12   amended responses to production from the plaintiff. And we've

13   also met/conferred after each of those.

14         The unfortunate part is, through all of this work,

15   they are still seriously lacking in substantive responses to

16   interrogatories and documents that we need to present our

17   defense in this matter.

18         I've laid out in the motion--I've got a chart here

19   that lays out exactly which interrogatory and which requests

20   are at issue. The summaries are just that. They are just

21   summaries. So that's not exactly what the request said. That's

22   not exactly what the response is. That's just my summary of

23   them.

24         But what we're arguing here about is we need full and

25   complete answers or responses to interrogatories number two,

1  three, four, five, eight, twenty-five, twenty-six, twenty-

2  nine, thirty, thirty-four, forty-one, and forty-four. All of

3  those were incomplete or just a complete failure to respond.

4          Of the interrogatories we did not get a response at

5  all on thirty-four, or there was an objection with no

6  substantive response. And then the rest of them were

7  deficient.

8          For the request for production, we're looking at

9  numbers one, two, three, six, nine, eleven, seventeen,

10  eighteen, twenty-one, twenty-two, twenty-six, and twenty-

11  seven.

12          Of those, four of them, eighteen, twenty-one, twenty-

13  two, and twenty-six were completely non responsive, whether it

14  was an objection where we didn't get any documents produced.

15  And the rest of them were deficient, which I'll talk about

16  briefly.

17          As Will mentioned, this is set for trial in May, but

18  we need these documents and this information to prepare for

19  that trial. We served our first set back in April of 2024.

20  Counsel did request a thirty-day extension. We granted that.

21  That made the responses due on June 10. Like I said, we've

22  received some supplements and some responses, multiple letters

23  in good faith trying to resolve these and the issues go

24  unresolved. I'm happy to walk through each of those if the

25  Court would like me to.

1      Would you like me to go through each one individually

2  and talk about what we requested, what we produced, and what

3  we're still looking for?

4      THE COURT: That's fine.

5      MR. HONBARGER: Okay. I'll start with interrogatory

6  number two. And, again, I'm summarizing here. Basically, we're

7  looking for identities of everyone with knowledge or

8  information concerning the incident and lawsuit and to see his

9  injuries and all alleged damages.

10     The plaintiff, through the various responses, has

11 identified several witnesses, four witnesses, and they've

12 identified personnel from the fire department and various

13 other emergency agencies.

14     What is important here is what it's missing. They

15 have failed to identity anyone with knowledge of the

16 decedent's finances and income. Related to--specifically,

17 there was employment, the Great Southeastern--National

18 Reinforcing Systems. They provided nobody that could talk to

19 or provide documents or information about his income,

20 benefits, and employment from those two entities.

21     They've mentioned the North Carolina State Highway

22 Patrol is involved in this accident. They have not identified

23 anybody from that agency. And a key one here is Airlife 2, as

24 I understand, was a medivac helicopter responded to this

25 accident. No one has been identified from them. And from what

1   we've gathered from the witness statements that we talked

2   about earlier from their private investigator is that the

3   personnel from Airlife 2 are the ones who really know and made

4   a determination of time of death. And they would be the ones

5   to know about, you know, any pain and suffering that took

6   place between when they got there and the time of death.

7          Again, identified nobody with knowledge of the

8   decedent's past medical treatment and history. Obviously, that

9   is important to us to determine--obviously, we know the

10  decedent, unfortunately, passed away here, but we've got to

11  figure out if he had any preexisting conditions that would've-

12  -there's not a better way to put this--that would have any

13  bearing on his life, you know, but for this accident.

14         They have not identified--they've identified one

15  person who examined the body, and that's the medical examiner.

16  They have not identified everyone else who has examined the

17  body or any observations that they made from those

18  examinations.

19         They--the documents they have produced mentioned a

20  few medical professionals, but they have not been properly

21  identified. We have no contact information for these

22  individuals, treating physicians and things of that nature.

23         They've also mentioned witnesses who took and posted

24  videos to Facebook. We don't have any copies of any photos or

25  witnesses taking--or videos taken by witnesses. Those are what

1  we're looking for, for interrogatory number two, the identity

2  of all those folks I just mentioned.

3        Interrogatory number three, we're looking for the

4  identities of all individuals who were present at the scene.

5  Again, they've named some folks here, but, as I just

6  mentioned, they have failed to identify anyone from the

7  highway patrol, anyone from Airlife 2, anyone from UNC-South--

8  UNC-Health Southeastern that were present at the accident.

9        They have not identified the witnesses who took

10 videos or posted to Facebook about the accident. We believe

11 that they are aware of all this information and should

12 identify those individuals.

13       Interrogatory number four, we are asking to identify

14 all expenses for care, treatment, hospitalizations, funeral

15 expenses, and the related documents for decedent. What we got

16 was a general--about $11,000 response. They did supplement and

17 produce the funeral bill. It says they have requested and

18 would eventually produce medical bills and records, but we

19 have not gotten any of those.

20       So we request they produce or identify all the

21 medical expenses for care, treatment, hospitalization, the

22 related documents, bills, invoices, treatment records for all

23 of the treatment. We're aware of at least Southeastern

24 Regional Medical Center, UNC-Health Southeastern, Robeson

25 County EMS, and Airlife 2 that are missing.

1          Interrogatory number five, we request a description

2    of the support, society, companionship, comfort, protection,

3    care, assistance, guidance, and offices--provided by the

4    decedent, and all the related documents. They're seeking to

5    recover damages for all of those things. And we're looking for

6    the identity of all of the documents and witnesses who can

7    talk about these things.

8          They did describe, at length, the familiar

9    relationship between the decedent and those in his family, but

10   their answer is still deficient because they did not identify

11   any lost income documents I spoke about before from the

12   employers.

13         They didn't identify any documents related to any of

14   the claims. They mentioned that there was counseling. They

15   didn't identify any documents for those counselors who did

16   that. We're looking for those.

17         Also, looking, like I mentioned, for pay stubs,

18   bonuses, employee benefits provided by the company. All of

19   these things would be relevant to the damages they're seeking,

20   W2s. I know that even as lately as yesterday we received an

21   additional W2. And we're still missing W2s and tax returns for

22   the year of 2023.

23         We haven't received any bank and credit card

24   statements. We need to identify bank and credit card

25   statements for any of the care, expenses, counseling, things

1    like that of the decedent and for any of the family members as

2    well as any purchases made by decedent on the day of the

3    incident. Obviously, that would go to show the timing, where

4    he was, when he was there, that led up to the incident, any of

5    those that may have observed him, his state prior to the

6    incident. We ask them to identify all of those individuals and

7    documents.

8            They have identified, I believe, the CPA, Mr. Charles

9    K. Edwards, but they have failed to identify any documents

10   that he has, other than the tax returns and the W2s. We

11   understand that a CPA would have all of the income documents.

12   And those are relevant, obviously, to the loss of income

13   claims.

14           Interrogatory number eight, we've asked for a

15   description of decedent's employment with National Rebar,

16   Incorporated, and then with I believe it was Great

17   Southeastern Forming, as well. They provide a generalization

18   of his pay per week, base pay of $1800 per week, and that he

19   would receive various bonuses and incentives. They didn't tell

20   us what those bonuses and incentives are, how much they were

21   for, when he received them, on what dates, what the parameters

22   are for whenever he received a bonus or not or how much that

23   they would be. We would ask him to identify all that

24   information and any of the relevant documents that

25   substantiate their claim for loss of income.

1          Interrogatory number twenty-five, identify all the
2   polices of liability insurance which covered the decedent
3   and/or the vehicle the decedent was operating at the time of
4   the incident. We are--we were provided with the identity of
5   the insured, the Carrier, Westfield. And they agreed to
6   produce the declaration page, but they have not done so. We
7   would ask them to identify and produce the declarations page,
8   what the policy limits are, and things of that sort.
9          And also any other--that was their auto policy. We
10  request any umbrella policies, health insurance policy, or any
11  other liability insurance policies that would provide
12  coverage.
13         Interrogatory number six--twenty-six--I apologize--
14  it's also about insurance. I think I just touched on that.
15  Also providing funds for funding litigation if there are any.
16         Plaintiff stated decedent had Blue Cross Blue Shield
17  of North Carolina, but they failed to identify the policy
18  number, the declaration page, the limits, or any related
19  documents. Again, all they told us about is the Westfield
20  policy, up until recently.
21         Interrogatory number twenty-nine, a description of
22  the decedent's employment history for the last ten years
23  including the names, addresses, telephone numbers of all
24  employers, description of the positions held, the dates that
25  he held such positions, names of supervisors. In their

1 response all they told us was the two employers, National

2 Erectors and Great Southeast Forming. They stated the

3 decedent's involvement, but they did not state who his direct

4 supervisors were for each employer. They did not state his

5 time of employment, income throughout the past--I believe it

6 was ten years, yes, ten years. They didn't identify any, as I

7 discussed, any parameters for bonus, incentives, and benefits.

8 We'd ask that they identify all of that information, the

9 direct supervisors, and things of that nature that, obviously,

10 was relevant to whether he would receive income continuously

11 going forward and whether they should be compensated for any

12 loss there.

13         Interrogatory number thirty, identify the purpose of

14 the decedent's travel at the time of the incident, his

15 location of departure, intended destination, expected time of

16 arrival, whether the trip involved his employment, identify

17 all related documents. We did get a copy, or a recording, I

18 apologize, of a gentleman that I understand the decedent was

19 meeting, but they have failed to identify exactly where he was

20 headed, what times he was anticipated to arrive there, what

21 times he was expected to be home, things of that nature.

22         He also failed to identify which of those two

23 employers he was making this particular trip for, what items

24 that he would have picked up, how--they said that he picked up

25 materials for work, but what were these materials, what were

1  the weight of them, where were they kept, was it in the cab,

2  was it in the bed, things of that nature.

3          They didn't identify any evidence related to stops

4  the decedent made along the way. They didn't identify any GPS

5  data that may have been kept on his cell phones. They had

6  identified initially just one cell phone, and then in their

7  recent supplemental responses just within a couple of weeks

8  ago they identified a second cell phone, which is the first

9  time we're hearing of this.

10         Obviously, these cell phones are going to be very

11  important to our defense. We have a witness statement that

12  they produced that said the decedent was not paying attention,

13  was looking down, texting, or was otherwise distracted for an

14  extended period of time, like, leading up to this impact. That

15  was their--their own private investigator's witness statement

16  from a witness at the scene--I believe his name was Mr. Hunt--

17  who witnessed this accident. That was his statement. We need

18  to get the cell phone data to corroborate that statement and

19  present our defense.

20         That would also include text messages from both of

21  those cell phones, any emails--they had failed to identify the

22  decedent's email accounts and any emails sent or received by

23  the decedent on the day of the incident, failed to identify

24  bank statements and accounts held by the decedent, or any

25  purchases made by the decedent, failed to identify any toll

1  receipts or parking receipts, if there are any. Obviously,

2  that would help paint the picture of what happened and the

3  timing of this incident.

4          Interrogatory number four, the identity of every

5  communication, whether oral or written, you've had regarding

6  the incident, and the identity of all documents that relate to

7  your responses. They completely refused to answer this

8  interrogatory. What we're really looking for here is just

9  simply non privileged communications that the plaintiff or the

10 decedent had regarding the incident and any related documents.

11 That is, you know, the day of the incident and since then,

12 whether it be to third parties, witnesses, posts on Facebook,

13 things of that nature. We'd ask that they identify all of

14 those communications.

15         Interrogatory forty-one, identify all applications

16 and services installed on the decedent's cell phone, included

17 but not limited to email accounts, social media platforms,

18 cloud services, location tracking services, backups,

19 synchronizations, device sharing, settings, and the related

20 documents.

21         Again, as I mentioned, there's two cell phones here,

22 Your Honor. We need to know if those cell phones had their

23 location services enabled, whether there was any GPS data,

24 whether he was tracking his route or not, the timing of his

25 route, and, most importantly, based on the witness statements,

1  text messages sent or received by the decedent and emails sent

2  and received by the decedent. We need to be able to obtain

3  both of these cell phones and download the data off of them

4  and review that data for our defense.

5       We'd ask that they identify the phone numbers of both

6  of those cell phones, the carriers of both of those cell

7  phones, and who the owner is. Our internet searches show that

8  from the one number they provided that that number was, in

9  fact, owned by the decedent, but we need them to identify the

10 owners of that information and who has access to cell phone

11 data.

12      Interrogatory number forty-four, identify all persons

13 who have been engaged and consulted regarding retrieval

14 analysis, preservation of data from the decedent's cell phone.

15 They have--they did not respond. They didn't identify anyone

16 who has attempted to obtain these cell phones or attempted to

17 download any of the data from either of these cell phones.

18 They haven't even identified the cell phone number for the

19 second one or where that cell phone is located. We would ask

20 them to identify all of that information.

21      That's it for the interrogatories. For request for

22 production one, all documents identified and referred to or

23 relied upon in plaintiff's responses to defendant's

24 interrogatories. I think we pretty much just covered what

25 we're looking for there. I'm happy to go back through that

1   again, but that's just covering all the documents we just

2   discussed.

3          Request for production number two, all documents that

4   support the allegations described in the complaint,

5   plaintiff's claims against the defendant, plaintiff's request

6   for damages. Again, they provided a response, said see

7   attached. They provided a supplemental response stating they

8   produced responsive documents, but they did add some towing

9   documents. They added Lumberton EMS radio recordings,

10  Lumberton Rescue recordings. And then they finally produced

11  the recorded interview of Mr. Jeremy Bloom. That was the

12  gentleman I spoke about that met with the decedent on the day

13  of the accident.

14         However, there's a long list of documents that are

15  missing. You'll just have to bear with me. We have no

16  documents regarding the repair or disposition of the

17  decedent's vehicle, you know, what happened with that vehicle,

18  was it destroyed, is it still being kept, has it been sold.

19         We have no documents relating to the decedent's

20  previous medical history, no documents regarding any post-

21  incident medical treatment. All we have is the basic reports.

22  We don't have any treatment notes or anything like that. We

23  understand from some of the statements, you know, treatment

24  was provided at the scene, but we don't know to extent what

25  treatment was provided at the scene. We need the treatment

1  records and notes--treatment records, photos. We've got most

2  of the photos from the accident scene that were provided, but

3  we have no photos, reports, or treatment records from Airlife

4  2 or from Lumberton Rescue, Robeson Rescue specifically. We

5  have the other agencies' response.

6          We understand there's crash data on the cell phones.

7  I know I've, ad nauseam, talked about these cell phones. But

8  one of these cell phones, at least, made an automated phone

9  call to 911. It was an Apple IPhone, and they will make an

10 automated call when they--an accident is detected. We would

11 like them to produce the crash data from that cell phone,

12 which would have prompted and led to that automated 911 call.

13 Text messages, phone calls, GPS data, emails, and data from

14 all applications on the decedent's cell phones.

15         Fire department radio recordings, we've got the radio

16 recordings from the EMS department except for Airlife 2 and

17 the rescue departments, but we have none for the fire

18 departments. We understand that they do have those records and

19 should produce them.

20         We talked about, with our motion to quash, the

21 records that Mr. Hackney--so I won't go--belabor those points.

22 I think we've pretty much addressed those in the motion to

23 quash, but we have requested those documents and believe that

24 they should be produced. I had a--via subpoena--this would be

25 a discovery request to the plaintiff.

1          Documents regarding the decedent's employment

2   including but not limited to contracts for employment, pay

3   stubs, bonus payments, other payments to the decedent,

4   benefits provided for all--you know, ten years prior to the

5   incident. Like I said, we've gotten W2s, I believe, from 20--

6   for the previous five years, I think, is what we agreed to.

7   We're still missing W2s and tax returns for 2023, but we have

8   not received any pay stubs or bonus payments, checks, and

9   things like that, evidence of payments made.

10          Decedent's bank and credit card statements,

11  decedent's checks, invoices, ledger, statements, documents

12  related to the rental income. So, according to the tax

13  returns, he had various sources of income, not just W2 income,

14  but I understand he has rental properties. We need to see the

15  statements regarding the income received from each of those

16  rental properties and any statements or records that will

17  reflect the decedent's actual involvement in managing those.

18  Obviously, the real property is still going to produce income,

19  even in the unfortunate death of the decedent. It obviously

20  goes to the damages.

21          Again, all documents provided to the CPA, Charles K.

22  Edwards. We have received none, except for the W2s and the tax

23  returns.

24          Correspondence with the CPA, evidencing income,

25  discussing income, talking about sources of income, whether

1   those would be anticipated for the next tax year, things of

2   that nature, all the correspondence with the CPA for the years

3   requested are not privileged and should be produced.

4          All videos taken by witnesses or emergency services.

5   I believe we have two dash cam videos, but from those dash

6   cams there was multiple agencies, probably at least ten

7   vehicles that responded, each of those should have a dash cam

8   photo or video. It should be produced by the plaintiff.

9          Social media posts, if there are any, by Ms. Smith

10  and family and friends, and specifically the witnesses where

11  they talk about them taking video and posting to Facebook.

12         The witness interviews that I talked about with Mr.

13  Hackney and the motion to quash, they produced eighteen

14  transcripts, so they say, but, again, they're more like notes.

15  And we understand that there were recordings taken for each

16  one of those--produced recordings of each witness statement.

17         Request for production number three, all documents

18  and medical records related to any care, triage, evaluation,

19  examination, treatment, transport, or hospitalization of the

20  decedent after the incident. We understand that the decedent

21  did pass away at the scene, but there was treatment rendered

22  at the scene, and the decedent was transported from the scene

23  after the fact. And we should get all of those medical records

24  related to that treatment.

25         Again, they've only produced a kind of response

1   notes. We don't have any treatment notes or medical records.

2   That would include, obviously, the on-scene medical treatment

3   and evaluation, the treatment records, the notes, photographs.

4   We do have the reports.

5         We have no documents, like I said, from Airlife 2 or

6   Robeson Rescue. Those are very important and we need all of

7   those documents.

8         Also, the Airlife radio recordings, the helicopters

9   and the FAA would record all the transmissions by them so that

10  it would--it would be transmissions to and from the

11  headquarters and possibly with the FAA talking about how

12  immediate this call is, whether it was immediate, whether it

13  wasn't, whether the decedent was alive or whether the decedent

14  was not alive. They should produce all of those recordings.

15        Request for production number six, we ask for

16  responses of foreign requests and subpoenas. We understand the

17  plaintiff has issued two subpoenas and that they were working

18  on domesticating one foreign subpoena. That went specifically

19  to Schneider National Care, Inc. They have failed to produce

20  any documents they received in response to their subpoena to

21  Schneider National Care, Inc., if any. So if they did receive

22  those, they should produce those records. If they did not

23  receive any, they should tell us that they didn't receive any.

24        Request for production number ten, all statements,

25  transcripts, and recordings from the witnesses. I've already

1   belabored that point, so I'll skip those.

2        Request for production number eleven, all financial

3   records. I've belabored most of these points. I'll just make

4   sure we're not missing anything here.

5        Oh, the one additional thing that I haven't mentioned

6   previously on this one was they have a forensic expert and

7   economist, a J.C. Poindexter, they agreed to produce his

8   report but have not done so. We would ask that they produce

9   that report. I think I've touched on all the other items I

10   would mention there for that one.

11        Request for production number seventeen, all

12   documents related to any efforts made by any preserved texts,

13   evidence related to the incident including without limitation,

14   chain, and custody records, evidence log, documentation of

15   evidence collection and storage procedures. They responded by

16   saying that the plaintiff does not have any physical evidence

17   in their possession that would require custody protocols or

18   storage procedures, but they didn't identify what evidence he

19   had in your possession. They should have to produce all of the

20   evidence that they've collected from the decedent's truck or

21   otherwise. They did say that, I believe it was, plaintiff's

22   son removed some items from the truck, but they didn't say

23   exactly what items were removed. They said it was a duffle bag

24   and, you know, contained various items, clothing, toiletries,

25   things of that nature, but we're entitled to know exactly what

1  they took and get a list of that, whether it included this

2  second cell phone that's missing or not.

3        They should have to produce all the items that were

4  taken from the truck in addition to any notes, emails, text

5  messages, correspondence regarding the removal of items from

6  the truck between the plaintiff and any of her family members

7  and anybody else.

8        Request for production number eighteen, all documents

9  related to any financial transactions, payments, disbursements

10  made, sent or received by plaintiff in connection with the

11  incident, including invoices, receipts, bank statements,

12  accounting records. I think we've mostly talked about these

13  already. Let me make sure I'm not missing anything here.

14        I think we've pretty much covered those. I think the

15  only ones that might be missing would be the invoices and

16  payments for any treatment records of the family members

17  claiming any loss of services or things like that. They talked

18  about in one of their responses, you know, the close

19  relationship, I understand, and that counseling was received.

20  And we're entitled to receive the documents from those

21  counseling payments and things like that.

22        Request for production number twenty-one, all emails,

23  text messages, phone logs, and other electronic communication

24  sent or received by the decedent. We've limited this to just

25  within three hours prior to the incident. We're not looking

1  for a whole big time frame there, but, obviously, any of those

2  emails, text messages, phone logs, phone calls, any other

3  messaging apps, things like that would be highly relevant, you

4  know, especially those made during his trip and whether he was

5  distracted or not.

6          We ask that they produce all of those responsive

7  documents. None have been produced. We haven't received a

8  single email, text message, or anything like that.

9          We did receive the partial phone log from one of the

10  employers, but we have received nothing from the plaintiff.

11  And that phone log excluded the date of the incident. It did

12  not include the day of the incident.

13          Request for production number twenty-two, all records

14  related to the evaluation, treatment, and/or assessment--we

15  need vigilance here--explaining any mental health, trauma,

16  stress, or other psychological impacts related to the

17  incident. The plaintiff responded and said they've requested

18  these records and would produce them. They supplemented and

19  said that they still do not have them but will produce them

20  when they obtain them. No documents, no responsive documents

21  have been produced. We would ask that they produce those

22  treatment records and documents.

23          Request for production number twenty-six, produce a

24  copy of the complete estate file for the decedent. They have

25  not produced any responsive documents here. They did agree to

1   produce it once they received it, but they have not produced

2   that. We'd ask that they produce the entire estate file.

3          And I believe this is the last one, request for

4   production number twenty-seven, it's just kind of a catch all

5   to the extent, you know, that we haven't covered anything else

6   and also relating to any of the other requests for

7   interrogatories. I believe I've touched on every single

8   document that we believe is still outstanding and that they

9   have not produced specifically. We would just ask the Court to

10  grant this motion to compel for those specific items.

11  Obviously, I just went through very quickly our motion, but

12  our motion pretty much lays out everything that this missing

13  in black and white here. If you would, just give me one second

14  to consult my notes to make sure I did not leave anything out.

15          *(Brief pause on the record)*

16          MR. HONBARGER: Obviously, they--all these materials

17  are relevant. If they have any objection to relevancy or

18  anything like that, I'm happy to address those. I'm happy to

19  answer any questions the Court may have as it's related to any

20  of the documents or information that we've requested. And I'm

21  happy to explain why each one of those is relevant to the

22  claims and the defenses, if the Court needs that from me.

23          A high level overview of what's missing, we're

24  missing medical records of the decedent both prior to and

25  treating on the scene. We're missing medical records for those

1  claiming damages based on the relationship, the counseling

2  records and things like that. We're missing records from

3  emergency services, and, most importantly, from Airlife 2.

4  We're missing documents evidencing decedent's finances,

5  incomes, benefits, and employment. We--first, we had no

6  documents there. We have a handful of W2s and we have a

7  handful of tax returns, and that is it.

8           We probably most importantly are missing any cell

9  phone records, any data from the cell phones, any data or

10 evidence, documents, correspondence, text messages, emails,

11 things like that from the decedent, especially on the day of

12 the incident.

13          We're missing various witness statements, recordings,

14 interview recordings.

15          I believe that is all. Thank you, Your Honor. I'm

16 happy to answer any questions. That's all.

17          THE COURT: Anything?

18          MR. OWEN: I'm worn out, Your Honor. Your Honor, I

19 think it's important to kind of take a step back and see who

20 it is I represent. I represent the grieving wife and widow of

21 Mark Smith. They're not a big entity that has all these

22 documents. FAA recordings? How would we have that?

23          We reached out to Airlife. They have no documents.

24 We've reached out to Southeastern. They have no records. He

25 was deceased. And I will stand here today, Your Honor, and say

1   I've produced every single document in our possession and

2   control that's not privileged, nothing, absolutely nothing.

3          So if it hasn't been produced, either I don't have

4   it, my client doesn't have it, or it doesn't exist. And I

5   don't know what else to say.

6          Cell phone data, we've not touched a cell phone nor

7   do we have a cell phone from this accident. There's still a

8   criminal charge pending against the driver for misdemeanor

9   death and failure to yield. It's been going on for a while,

10  been continued numerous times. That's who has the cell phone,

11  Lumberton P.D., not me. I represent Cindy Smith. I don't have

12  all these documents.

13         Yeah, it sounds great, give me this, give me that,

14  give me--I don't have it. She doesn't have it. We can't be

15  compelled to give something we don't have.

16         We've been very responsible litigants. And what he

17  leaves out is the massive amount of discovery we've given

18  them. We voluntarily produced all these statements from Erich

19  Hackney. We didn't have to do that. I could have easily said

20  objection, it's work product, go get your own witness

21  statements, but we chose to be responsible and give it away,

22  okay?

23         So we've done that, and we've been very responsible

24  with our responses. We've met every deadline, and I'm not

25  under an order to compel. I'm not a big company, neither is

1   Ms. Smith. We don't have a repository of all this stuff. She's

2   doing her best to get by. She's grieving. The last thing she

3   needs to be worried about is FAA recordings from a helicopter

4   that tried to pick up her husband. We don't have it. Why would

5   we have it? It's not our responsibility. If they want to get

6   it, get a subpoena. Go get it. Go get it in discovery. We

7   don't have it. There's nothing to compel.

8          There's no medical bills, none. There's no medical

9   records. We've given all those. Recordings from the fire

10  department, again, why would Ms. Smith have that? If we have

11  it, we'll give it to you. You can get it, too. It's public

12  record. Your truck was involved in this accident. Go get it.

13  Why do I have to get it? Why does she have to get it? It

14  doesn't make any sense.

15         Bank statements, it has nothing to do with income.

16  Where you spend your money is private. Where Mark went and got

17  Starbucks, and they went to a dinner on date night, has

18  nothing to do with this accident.

19         W2s do, tax returns do, and that's what we've

20  produced. And we've done it as quickly as we can. You know Mr.

21  Edwards--I don't know if you're familiar with him--his wife is

22  very sick, has Alzheimers, he's not there very often. So

23  yesterday or two days ago we got some of these W2s that they

24  asked for, and I produced them within 30 minutes of getting

25  them, immediately.

1        We're not withholding anything, Your Honor. I'm not

2   going to sit here and go through all of them, but every single

3   thing he lists that says they don't have we also don't have it

4   either. There's a reason why we haven't produced it, because

5   if we did we would have given it to him.

6        To the extent that we, you know, need to produce

7   something, we would do it. There was no counseling. I know she

8   thought about going to counseling. That's a sensitive subject.

9   There are no records for counseling because she didn't go.

10        We will supplement our responses where it's

11  appropriate under the law. I'm not going to sit here and waste

12  the Court's time, Your Honor.

13        We talked a lot about red herrings. This motion to

14  compel is exactly that. Here I am moving for sanctions a month

15  ago. And, sure enough, rather than supplementing their

16  responses, the Court basically gave them 30 days before this

17  hearing today. You know how many documents I've gotten since

18  March 17? None. Maybe one--maybe one transcript from XPO

19  University, maybe. They should have been attempting to comply

20  with your order, when, in fact, they say you know what, let's

21  file a motion to compel against Ms. Smith. Let's muddy the

22  waters a little bit. That's what they're trying to do here,

23  Your Honor.

24        So we'd ask that it be dismissed. And I have nothing

25  further. Thank you.

1          MR. HONBARGER: If I may, Your Honor. First of all, he

2     ended with talking about the motion we spent half this day

3     arguing. Their motion to compel has no bearing on whether this

4     motion to compel should be granted or not. The two are not

5     linked in any way. These are separate motions. And him

6     referencing those is inappropriate. It has no bearing on

7     whether they should produce documents.

8          We've produced documents. We will continue to produce

9     documents and comply with whatever order this Court issues as

10    we have already. I agree, you know, if there's documents in

11    the possession of third parties, we're happy to go and get

12    those by subpoena or otherwise. I'm asking for documents in

13    the possession of the plaintiff. The plaintiff has produced

14    numerous documents from some entities but not others. I find

15    that hard to believe that they did all this work to get all

16    these records from these entities but then there's a couple

17    missing.

18         There was a helicopter that responded to this

19    incident. They won't roll an ambulance out to a scene without

20    a document to show for it. You're telling me they sent a

21    helicopter and there's no documents evidencing that a

22    helicopter was sent to the scene of the accident? I believe

23    there was documents to evidence whether or not a helicopter

24    was sent to this accident scene. I believe that those are in

25    possession of the plaintiff.

1       Same for Robeson Rescue, they did produce documents

2   from the other entities. Robeson Rescue is going to have those

3   same documents that they produced for these other entities.

4   And I believe if the plaintiff has those, as well, they should

5   be produced.

6       I have an index of their production. We brought,

7   obviously, a copy of ours. I have their production, and I have

8   a log of it. And I'm happy to sit here with counsel and he can

9   show me where these documents to request are in this

10  production. They are not there. We can sit here and go page by

11  page and look at this log and can show me where they're at. He

12  has not objected to relevancy of most of these items. It's not

13  contested. There are some--he talked about the bank account

14  statements and purchases. As I explained, we're not looking

15  for all of, you know, throughout history of the decedent's and

16  her life. We're looking for the day of the incident to show

17  where he was, when he was there. We're trying to put together

18  a time line that, obviously, is important and relevant to this

19  matter.

20      You know, was he driving for hours and hours. You

21  know, was he in a hurry, things like that. Those bank

22  statements and the time stamps on them, those receipts, will

23  show that.

24      For the cell phones, we are requesting the cell

25  phones themselves. We understand that one cell phone is in

1    possession of Lumberton P.D., and we're trying to get that.

2    We've issued a subpoena, and we're working with them to get

3    those.

4           This second cell phone, they still have not said

5    where this second cell phone is. They are required to tell us

6    where the second cell phone is. Under the rules they're

7    required to, the carrier, the phone number. Where is the

8    second cell phone. They said he had one. That's all that

9    they're saying.

10          And even if they don't have the cell phones

11   themselves, the data they will have access to from the account

12   page, if, yeah, I've got Verizon. If I log into my online

13   Verizon account I can see every phone call I've made, I can

14   see my text messages. I can see my usage, the gigabytes of

15   data that I've used. They have access to that information

16   whether or not they have that physical cell phone in their

17   hand.

18          I think I've covered all. Let me just look at my

19   notes here. Your Honor, again, I'm happy to walk through the

20   log of their production and go page by page and have opposing

21   counsel show me where the documents that I just laid out there

22   are missing are located. They are simply not there, and they

23   do have those documents and should produce them. Thank you,

24   Your Honor. Nothing further.

25          MR. OWEN: As an officer of this court, I will say,

1  under oath, we aren't withholding their documents, Your Honor.

2  That should answer his questions. Thank you.

3          THE COURT: All right. So I told you Wednesday by 5:00

4  p.m. for proposed orders.

5          MR. OWEN: Thank you, Your Honor.

6          THE COURT: All right. Thank you both.

7          MR. OWEN: Just to be clear, you want four separate

8  orders?

9          THE COURT: Yes, four.

10          MR. OWEN: Motion to quash, motion for

11  reconsideration, motion for sanctions, and motion--their

12  motion to compel. Thank you, Your Honor.

13          MS. STACY: Thank you, Your Honor. Appreciate your

14  time.

15          THE COURT: If you need Miss Gwen's information, you

16  need to---

17          MR. HONBARGER: No, I just have one more question. You

18  had a second motion to compel, right?

19          MR. OWEN: It's all---

20          MR. HONBARGER: Logged in---

21          MS. STACY: Yeah.

22          MR. OWEN: ---kind of--yeah, I mean---

23          MR. HONBARGER: ---okay. I just want to make sure that

24  I've---

25          MR. OWEN: It's the documents we've talked about.

1          MR. HONBARGER: So we'll do one order for the

2    sanctions and the compel together?

3          MR. OWEN: That's right.

4          MS. STACY: Yeah.

5          *(End of proceedings at 12:42 p.m.)*

6    _____

7          *(END OF TRANSCRIPT)*

NORTH CAROLINA                IN THE GENERAL COURT OF JUSTICE
                                  SUPERIOR COURT DIVISION
ROBESON COUNTY                     FILE NO. 22 CVS 1328

_____

CINDY SOLES SMITH, et al.,     ]
                               ]
                               ]
          PLAINTIFFS,          ]
vs.                            ]
                               ]
XPO LOGISTICS FREIGHT, INC.,   ]
et al.,                        ]
          DEFENDANTS.          ]
                               ]

_____

     I, Sherri A. Sealey, CVR-CM, the officer before whom the
foregoing proceeding was taken, do hereby certify that said
transcript is a true, correct, and verbatim transcript of said
proceeding. I further certify that I am neither counsel for,
related to, nor employed by any of the parties to the action
in which this proceeding was heard; and further, that I am not
a relative or employee of any attorney or counsel employed by
the parties thereto, and am not financially or otherwise
interested in the outcome of the action. This the 24th day of
September, 2024.

                         _____
                         Sherri A. Sealey, CVR-CM