IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Civil Action No. 7:25-cv-01545-D-BM

CINDY SOLES SMITH, Administratrix of the
ESTATE OF MARK KEANNAN SMITH,

          Plaintiff/Counterclaim-
          Defendant,

v.

XPO LOGISTICS FREIGHT, INC.,

          Defendant/Counterclaim-
          Plaintiff.

**BRIEF IN SUPPORT OF MOTION TO
REVISE INTERLOCUTORY ORDER**

## I.    INTRODUCTION & SUMMARY OF THE ARGUMENT

1.    Prior to removal, the state court imposed sweeping issue sanctions that deem broad liability and fault facts established for all purposes and strike core defenses. Under 28 U.S.C. § 1450 and Rule 54(b), this Court may modify the order as justice requires, and the sanctions should therefore be narrowed to be proportional, just, issue-linked, and consistent with federal rules.

2.    Enforcing the April 25 Order ("Order") would be clear error that works manifest injustice. First, the discovery issues were discrete and limited, yet the Order leapt to sweeping "for all purposes" liability and gross-negligence findings and struck core defenses, without any explicit and clear warning in the predicate January 21 order. Second, the Order was driven by an imminent trial that is no longer relevant: XPO has now provided the compelled supplementation, and any timing-based prejudice has been eliminated through a new scheduling order. Third, "for all purposes" deemed facts are overbroad under Rule 37 because they can be used to bind even XPO's counterclaim, far beyond any (now remedied) prejudice from the discovery issues.

1

## II.    RELEVANT FACTS

### a.  THE ACCIDENT AND THE CLAIMS AGAINST LAMB AND XPO

3.      This wrongful-death action arises from an October 11, 2023 collision in Robeson County, North Carolina, when a vehicle driven by Mark Smith struck the side of an XPO tractor-trailer operated by William Lamb. Dkt. 2-5, *First Am. Compl.* ("FAC"), ¶¶ 1, 24–29.

4.      Plaintiff alleges that Lamb, while stopped at a stop sign at the intersection of U.S. 74 Alternate and West 5th Street Extension, observed Smith's vehicle approaching from his left and a school bus and another vehicle to his right, yet nonetheless pulled his tractor-trailer into the intersection and stopped, blocking all westbound lanes of U.S. 74 Alternate and causing Smith to collide with the trailer. FAC ¶¶ 24–28. Notably, in addition to the bus, the incident was captured on video by the Tractor's onboard camera. Dkt. 30-14, *XPO's October 1, 2025 Supplemental Responses,* p. 12, ¶ 13. Plaintiff seeks all available compensatory and punitive damages. FAC ¶¶ 35, 43, 49 & *Prayer for Relief*; *see also* FAC ¶ 43.[1] When answering, XPO filed a counterclaim for property damage to its tractor-trailer. Dkt. 3-1, *XPO's Answer and Counterclaim.*

### b.  STATE-COURT DISCOVERY DISPUTES AND ORDERS LEADING TO SANCTIONS

#### i.  FIRST MOTION TO COMPEL AND PREDICATE JANUARY 21, 2025 ORDER

5.      On January 2, 2025, Plaintiff filed a "Motion to Compel Against Defendant XPO" seeking to compel full responses and declaration pages for "the entire tower of liability insurance coverage." Dkt. 30-1, *Pl.'s 1st Mot. to Compel*, pp. 3–6, ¶¶ 11–13, 16, 23(c) & Prayer for Relief.

---

[1] Including: (i) medical & funeral expenses; (ii) the "present monetary value" of Smith to his beneficiaries, including "net income" earned during normal life expectancy and his services, protection, care, assistance, society, companionship, security, comfort, and advice; (iii) damages for pre-death pain, suffering, fear of impending death, and "pre-death terror"; and (iv) punitive damages for allegedly willful and wanton misconduct by Lamb and XPO.

2

6. At the January 13, 2025 hearing, Plaintiff emphasized that discovery was needed to prepare for a May trial setting and asked the Court to compel "complete" responses and production. Dkt. 30-3, *Jan. 13, 2025 Hr'g Tr.,* p. 8:1–7. Plaintiff specifically described its telematics requests as seeking data from an onboard camera/monitoring system that purportedly captures real-time driver behavior (e.g., hard braking, speeding, texting). *Id.*, p. 4:14–25.

7. XPO made clear that its concern was the sheer breadth and burden of Plaintiff's corporate-wide demands. Dkt. 30-3, p. 4:3–22; p. 5:10–16; pp. 6–7. XPO advised that it had served multiple supplements, held several meet-and-confers and exchanged letters, and was facing 38 ROGs, 74 RFPs, and 25 RFAs, explaining that its objections were directed to overbreadth and undue burden, not an unwillingness to produce relevant materials. *Id.*, p. 3:19–25; pp. 9–10.

8. XPO noted that the telematics demands were served in Plaintiff's second set of RFPs and that Plaintiff did not meet and confer on those requests before filing the motion; XPO stated it was "happy to talk" about telematics but objected to Plaintiff's requested scope and time range. Dkt. 30-3, p. 8:12–25.

9. More broadly, XPO disputed any suggestion it had failed to respond, representing that it had responded three times, held multiple conference calls, and exchanged letters, and that the dispute concerned the breadth and burden of Plaintiff's corporate-wide demands in a single-incident case (38 interrogatories, 74 RFPs, and 25 RFAs), including requests such as companywide 30(b)(6) transcripts. *Id.*, p. 9:1–25. XPO also noted that discovery remained open, the May trial date was one Plaintiff requested, and no depositions had yet occurred. *Id.*, p. 13:10–13.

10. Plaintiff's motion to compel was granted under N.C. Rule 37(a) and found that XPO's initial and supplemental responses "contained numerous improper objections" and "did not comply" with the North Carolina Rules of Civil Procedure. Dkt. 5-8, *Jan. 21, 2025 Order*, p. 1.

3

11.     The Court compelled full, complete substantive responses without further objection to Plaintiff's First set of ROGs,[2] first RFPs[3] and second RFPs.[4] The Court also compelled unredacted Rule 30(b)(6) deposition transcripts from XPO corporate designees in other litigation (past five years) involving serious injury/death and a left turn by an XPO driver. Dkt. 5-8, ¶ 2(s), p. 6.

12.     Although the January 21 order compelled supplementation, it did not give XPO any warning that noncompliance could result in dismissal, default, or other case-dispositive sanctions.

### ii.   SECOND MOTION TO COMPEL AND XPO'S MOTION TO RECONSIDER

13.     On February 26, 2025, Plaintiff filed a "Motion for Sanctions and Second Motion to Compel." Dkt. 30-2, *Pl.'s 2d Mot. to Compel*, pp. 6–8, ¶¶ 19–28. On April 16, 2025, the state court heard Plaintiff's motion for sanctions and XPO's motion for reconsideration of the January 21, 2025 order. Dkt. 30-4, *Apr. 16, 2025 Hr'g Tr.*, p. 3:1–7; p. 4:1–6; p. 18:8. Plaintiff described the collision as "an entirely preventable accident" and asserted that XPO admitted it was

---

[2] (i) A three-year list of serious-injury/death claims or lawsuits (ROG. 3); (ii) detailed information relating to telematics software (ROG 5); (iii) identification of any trailer recording/monitoring devices and associated data (ROG 6(c)–(d)); (iv) identities of relevant shippers/brokers (ROG 7); (v) Lamb's disciplinary/counseling history (ROG 14); (vi) training/education provided to Lamb (ROG 15); (vii) policies/manuals in effect for Lamb (ROG 22); (viii) identities of personnel involved in XPO's determinations regarding the crash (ROG 36); and (ix) identification of insurers/ the "entire tower" of liability coverage (ROG. 38). Dkt. 5-8, ¶ 2(a)–(i), pp. 2–4.

[3] (i) Document retention policies (RFP 2); (ii) declaration pages for all layers of liability coverage plus any reservation-of-rights letters/agreements (RFP 3–4); (iii) Lamb's driver qualification, investigation, history files (RFP 6), telematics data/videos/photos/coaching sessions for Lamb (RFP 35); (iv) dispatch records/content summaries relating to the crash (RFP 42); (v) preventability analysis/determination materials and conclusions (RFP 46); (vi) CDL-driver training materials (RFP 55–59); (vii) any XPO materials/presentations on safe CMV operation (RFP 61); and (viii) an unredacted Accident Register (49 C.F.R. 390.15) (RFP 65). Dkt. 5-8, ¶ 2(j)–(r), pp. 4–5.

[4] (i) Expansive telematics datasets, screenshots, comments, coaching notes, and events; (ii) identification/production concerning who monitored telematics and related settings; (iii) production of telematics-system admin username/password for consultant access limited to the crash/driver; and (iv) full-length, uncut, unredacted crash-date video footage. Dkt. 5-8, ¶¶ 3–4(a)–(j), pp. 6–8. Further, if XPO claimed something was not in its possession/control, it was to identify the document, custodian, efforts, and any destruction details and provide detailed privilege logs and submit disputed items for in camera review. *Id.*, ¶¶ 5–8, pp. 8–9.

4

preventable. Dkt. 30-4, p. 8:6–7. Plaintiff further stated that, with trial 26 days away, she could not take depositions or prosecute the case without the ordered documents. *Id.*, p. 8:15–25; p. 15:1–4.

14.     Plaintiff contended the January 21 order required compliance within 30 days and argued XPO did nothing within that window, then served an unsigned and unverified "supplementation" after the deadline; Plaintiff also stated XPO did not file its motion for reconsideration until February 28. *Id.*, p. 9:12–25; p. 10:5–16.

15.     Plaintiff maintained that XPO still had not produced, among other things, the full tower of liability coverage, the accident register, the serious injury/death list, preventability-analysis details, and various telematics and training materials, and characterized XPO's conduct as willful noncompliance. *Id.*, p. 11:10–21; p. 13:6–21; p. 14:1–6; p. 16:12–15.

16.     Plaintiff requested Rule 37(b) sanctions deeming specified allegations established and striking specified affirmative defenses, while stating she was not seeking to strike the entire answer. *Id.*, p. 16:2–19; p. 17:3–8.

17.     XPO responded that Plaintiff's counsel had refused to meet and confer in person at the last hearing, and that it had engaged in multiple conferral efforts and was working through voluminous demands (74 RFPs, 38 interrogatories, then an additional 15 RFPs and 25 RFAs) while counsel conferred with different sectors of XPO at length. *Id.*, p. 18:10–24.

18.      XPO noted that its production included Bates-numbered documents up to 1,906, including videos and other incident materials, personnel and training records for Lamb, maintenance and hours-of-service records, and ECM data, and it presented binders showing Bates ranges 1–851, 852–1,731, and 1,732–1,906.[5] *Id.*, p. 24:9–25; p. 25:20–25.

---

[5] Counsel represented that XPO had already produced core incident and operations materials, including accident videos and photographs, incident reports, drug test results, its document retention policy, maintenance records for the

19.     Counsel emphasized her desire "to dispel the notion that XPO has not taken its discovery obligation seriously," pointing to the aforementioned Bates ranges, including materials about William Lamb's personnel file and the subject truck. Dkt. 30-4, p. 29:5–12. Counsel added that "XPO doesn't play games," was "ready, willing, and able," and had "contributed significant resources" to comply, including "conferring … over the course of several months," with XPO "actively engaged" in trying to reach a sensible resolution. *Id.*, p. 29:11–17.

20.     In its February 28, 2025 motion for reconsideration, XPO did not ask the court to revisit the January 21, 2025 order in full, but instead requested reconsideration of six targeted provisions based on new information obtained through XPO's compliance efforts that would allow Plaintiff to obtain the evidence to which she is entitled under Rule 26 while avoiding compliance that would "work manifest injustice." Dkt. 7-2, *XPO Mot. for Reconsideration*, p. 3, ¶¶ 3–5.

21.     XPO further explained its points of relief during the April 16 hearing as follows:

- **Provision 2(a) (claims or lawsuits list)**: XPO proposed limiting the required list to "claims or lawsuits filed against XPO involving death, burns to over 50% of a claimant's body, or loss of limb." *Id.*, p. 6, ¶¶ 24–25. XPO argued that these items were not maintained in a single list and would require a burdensome, manual search effort across the company. Dkt. 30-4, pp. 19–20;

- **Provision 2(p) (training materials)**: XPO proposed limiting it to "all training materials, manuals, policies, directives, handbooks, rules or other training manuals provided or used by William Lamb," because the current provision sought corporate-wide materials untethered to the crash. Dkt. 7-2, p. 6, ¶¶ 26–27; Dkt. 30-4, p. 23:1–15. Counsel added that the complaint only alleges a failure to train Lamb and does not allege a broader pattern of conduct by XPO or allegations supporting punitive damages, so training materials for other drivers were irrelevant. *Id.*, p. 21:14–19.

- **Provision 2(q) (safe operation materials presented to Lamb)**: XPO proposed requiring production of "any document, article or presentation prepared and/or presented by any XPO representative to Lamb and relating to the safe operation of a commercial vehicle during the past five years." Dkt. 7-2, pp. 6–7, ¶¶ 28–29. During the hearing, it explained that for a massive organization it was insurmountable to identify what any representative had presented for any employee over that time period. Dkt. 30-4, p. 22:1–9. Limiting the production to documents, articles, or presentations prepared and/or presented by an XPO representative to William Lamb would narrow the scope to relevant materials that XPO could reasonably furnish. *Id.*, p. 22:10–19.

---

tractor-trailer, Lamb's personnel file (application, payroll, attendance), hours-of-service logs, the DVR report, and policies applicable to Lamb at the time of the accident. Dkt. 30-4, p. 24:9–21.

- **Provision 2(s) (other-litigation 30(b)(6) transcripts)**: XPO asked the court to omit the provision due to scope and burden and because it extended well beyond the subject collision. Dkt. 7-2, p. 7, ¶ 30. Counsel explained that XPO does not maintain those transcripts internally and has no XPO repository from which the transcripts can be pulled, and that locating them would require contacting third-party claims professionals for materials not in XPO's possession, a significant administrative task for which it would be nearly impossible to track down every such transcript with confidence. Counsel emphasized that this case concerns only the subject Truck and Lamb, and that transcripts from other cases were irrelevant. Dkt. 30-4, p. 23:1–16. Counsel noted that a Rule 30(b)(6) deposition was already scheduled for later that month, and that, due to nuance, many of Plaintiff's questions about internal XPO processes and terminology would be better addressed at that deposition, inviting Plaintiff to raise any questions she had at that time. *Id.*, p. 23:17–25.

- **Provisions 4(h) & 4(i) (telematics access/credentials provision)**: XPO proposed a limitation that XPO produce all Samsara, WABCO, and ECM data related to Lamb, the alleged incident, and the subject tractor-trailer. Dkt. 7-4, p. 7, ¶¶ 31–34. Counsel also explained that the January 21 order required XPO to provide Samsara usernames and passwords, and that doing so would provide access to information beyond the subject crash, including other drivers and other incidents, and would grant access to a system that requires substantial training and careful permissioning; counsel also raised data-integrity concerns with providing administrative access. Dkt. 30-4, p. 26:8–25.

22.     Relatedly, on March 12, 2025, XPO served an affidavit of Zoran Nikolic, Director of Safety at XPO, explaining that XPO has three sources of telematics data and describing the categories of information Samsara tracks. Dkt. 7-4, *Nikolic Aff.*, p. 2, ¶¶ 3–6.

23.     He further explained that Samsara data is specific to individual trucks and drivers and can be pulled by Mr. Lamb's name or the tractor's VIN, but that granting an outside consultant administrative access would expose sensitive and confidential information unrelated to Lamb and the subject tractor-trailer. Dkt. 7-4, pp. 3–4, ¶¶ 15–18.

24.     Notably, XPO's Samsara environment is customized for XPO and requires more than 80 hours of training and review of 150 personalized permissions during onboarding, and that an untrained user could create public-safety and data-integrity problems by editing driver logs, sharing management-only videos, or dismissing/coaching events. *Id.*, p. 4, ¶¶ 19–22.

25.     Additionally, Nikolic noted open Samsara "tickets" regarding data accuracy and XPO-specific terminology that could lead to misinterpretation by an outsider. *Id.*, p. 4, ¶¶ 23–24. XPO had already provided Plaintiff all ECM data for the truck involved. *Id.*, p. 4, ¶ 30; p. 5, ¶ 37.

26.     XPO noted that Mr. Nikolic was scheduled to be deposed that month and echoed the key points of his affidavit. Counsel explained that the tractor involved has multiple monitoring systems and that XPO had produced the relevant data and the in-cab video from the date of the incident. Dkt. 30-4, p. 25:17–22; p. 26:1–7. Counsel further explained that XPO does not have a username and password for the WABCO system and typically obtained related data from WABCO. Not only this, but the requested broader telematics pulls would be operationally burdensome, causing trucks to be taken out of service. *Id.*, p. 27:11–19; p. 27:20–25; p. 28:1–5.

27.     The Court's on-the-record involvement was largely limited to locating the motion materials and directing how counsel should proceed through the issues (e.g., whether to respond point-by-point), suggesting that counsel confer (including taking a recess), ultimately directing the parties to submit proposed orders. The Court did not issue an oral ruling or state any findings. *Id.*, p. 3:8–10; p. 42:1–5; p. 42:15–21; p. 43:6–13; p. 49:16–25; p. 50:1–13.

28.     Following the April 16 hearing, the parties submitted competing proposed orders for the court's consideration. Beckmann Decl. ¶¶ 2–3: *XPO's Proposed* Order, "**Ex. 1**"; *Plaintiff's Proposed Order*, "**Ex. 2**". XPO's proposed order would have found that XPO attempted in good faith to comply and confer and denied sanctions, while Plaintiff's proposed order sought sweeping sanctions. The April 25 order largely tracks Plaintiff's proposed order in substance and phrasing. *Compare* **Ex. 2** with Dkt. 8-5, *April 25, 2025 Robeson County Order*.

### iii.     THE APRIL 25, 2025 SANCTIONS ORDER

29.     Ultimately, the Court entered discovery sanctions against XPO, which included deeming Lamb's and XPO's negligence and gross negligence established, striking XPO's contributory-negligence, causation, and other core liability defenses, and required expansive supplemental discovery. Dkt. 8-5, pp. 11–18.

8

30.     The Court made the following findings:

- XPO served untimely discovery responses on August 6, 2024, and that XPO's responses contained "numerous improper objections," refusals to substantively answer, improper limitations, and that XPO withheld clearly responsive documents and materials. *Id.*, p. 2, ¶¶ 7–8;

- XPO's December 23, 2024 supplementation and responses to Plaintiff's Second RFPs contained "numerous improper objections," refusals to substantively answer, improper limitations, and that XPO withheld clearly responsive documents and materials without justification. *Id.*, p. 7, ¶ 23;

- As of the date of the order, XPO had refused to produce responsive and discoverable materials related to telematics systems, including from Samsara or Lytx. Dkt. 8-5, p. 7, ¶ 24;

- The January 21 order required compliance by February 21, 2025, that XPO served no additional discovery by that deadline, and that XPO did not timely move to enlarge time. *Id.*, p. 8, ¶¶ 30–32;

- XPO served "extremely limited and vague" supplemental responses on February 26, 2025, and that those responses were unsigned by counsel and unverified. *Id.*, p. 8, ¶¶ 34–36;

- XPO referenced a motion for reconsideration in its February 26 supplementation, but that motion was not filed until February 28, 2025. *Id.*, p. 9, ¶¶ 38–39; and

- The Court noted the case was set for trial on May 12, 2025 and found Plaintiff was "severely prejudiced" by the ongoing discovery misconduct. *Id.*, p. 10, ¶ 46.

31.     Although the court repeatedly mentioned Requests for Admissions to which XPO untimely responded with numerous objections, refusals to answer, and improper limitations, neither Plaintiff's written motions, the arguments made on January 13 or April 16 hearings, nor the Court's orders identify any particular request for admission (by number or substance) as deficient or seek relief tied to any specific admission.

32.     The Court stated it had considered all sanctions available under Rules 26(e), 37(b), and 37(d), and the Court's inherent power, including striking XPO's answer in its entirety, default judgment on liability, deeming RFAs admitted, and contempt proceedings, and ordered sanctions below as "necessary and appropriate," citing "irreparable prejudice." Dkt. 8-5, p. 11, ¶¶ 54–56.

33.     The Court then deemed the following established as fact "for all purposes in this Action, including dispositive motions and trial":

- That Lamb proceeded into the intersection and stopped his tractor-trailer directly in front of Smith, and that this was "negligent, careless, reckless and grossly negligent." Dkt. 8-5, p. 12, ¶ 56(a);

- That Lamb drove into a busy highway intersection and "suddenly stopped" while aware of Smith approaching from the left and a school bus approaching from the right, and that such conduct was "negligent, careless, reckless and grossly negligent." *Id.*, p. 12, ¶ 56(b);

- That Lamb was "distracted by a phone call" when the collision occurred, and that such conduct was "negligent, careless, reckless and grossly negligent." *Id.*, p. 12, ¶ 56(c);

- That Lamb violated XPO policies on distracted driving, and that such conduct was "negligent, careless, reckless and grossly negligent." *Id.*, p. 12, ¶ 56(d); and

- That XPO failed to properly train and supervise Lamb in accordance with industry standards, and its conduct was "negligent, careless, reckless and grossly negligent." *Id.*, p. 12–13, ¶ 56(e);

34.     The Court struck defenses from XPO's answer: Second Defense (contributory negligence), Third Defense (general negligence denial), Sixth Defense (general negligence denial), Seventh Defense (causation denial), and Eighth Defense (contributory negligence). Dkt. 8-5, p. 13, ¶ 56(f). It also stated that sanctions were the "only just and appropriate" sanctions, and that lesser sanctions were inadequate due to "Defendant XPO's continuing discovery abuse and misconduct, the needs of the litigation, and the critically relevant nature of the documents and information that have been intentionally and unjustly withheld." Id., p. 13, ¶¶ 57–58.

35.     The order was "intended to expedite the litigation" and to "supplement and clarify certain provisions contained within the January 21, 2025 Order" that were raised at the Apr. 16 hearing. Dkt. 8-5, p. 18, ¶ 60. The Court then ordered further supplementation (while cabining the scope to Lamb, the subject crash, defined time windows, and defined insurance limits) including:

- **ROG 3**: list of claims/lawsuits involving "serious injury or death" for the past three years, with "serious" defined (fractures, TBI, burns, amputations, paralysis, spinal cord injuries, loss of vision, loss of use of an upper/lower extremity). *Id.*, p. 14;

- **ROG 5**: detailed description of telematics software used by XPO at the time of the crash. *Id.*, p. 14;

- **ROG 14 / 22**: disciplinary/counseling actions regarding Lamb (any time) and policies/manuals in effect for Lamb on Oct. 11, 2023, the date of the accident. *Id.*, p. 14;

- **ROG 36**: identities/dates/conclusions for the preventability review for the accident. *Id.*, p. 14;

10

- **ROG 38**: insurers/insureds/policy limits for all liability layers up to $250,000,000, including excess. *Id.*, p. 14;

- **RFP 3–4**: declaration pages for all liability layers up to $250,000,000 (including excess). *Id.*, p. 15;

- **RFP 6**: Lamb's DQ/driver investigation/driver history files and documents showing compliance with driver qualification laws. *Id.*, p. 15;

- **RFP 35**: all telematics data/videos/photos/coaching sessions involving Lamb from date of hire through present. *Id.*, p. 15.

- **RFP 46**: all documents relating to preventability analysis for the accident. *Id.*, p. 15;

- **RFP 55–59**: training materials used in "XPO University" that were provided to Lamb or used to train Lamb, including safety videos/PowerPoints or other demonstratives. Dkt. 8-5, pp. 15–16;

- **RFP 61**: documents/articles/presentations on safe commercial motor vehicle operation that were provided or offered to Lamb. *Id.*, p. 16;

- **RFP 65**: fully unredacted Accident Register (49 C.F.R. 390.15). *Id.*, p. 16;

- **RFP 66**: Rule 30(b)(6) transcripts in XPO's possession and control (last 5 years) meeting specified criteria (serious injury/death and left turn), produced unredacted. *Id.*, p. 16;

- **Second RFP 1–2**: telematics videos/datasets/photos/screenshots/comments/coaching notes/events relating to Lamb from hire (09/09/20) to present, plus documents identifying who monitored Lamb's telematics. *Id.*, p. 16;

- **Second RFP 4 & 9**: safety alerts logs and inbox notifications for Lamb for 6 months pre-crash through present. *Id.*, p. 17;

- **Second RFP 6**: Safety Score (or equivalent) and configuration page for 3 months pre-crash through present. *Id.*, p. 17;

- **Second RFP 8**: alert configuration page for telematics software for the accident date. Id., p. 17;

- **Second RFP 10–11**: documents relating to (i) telematics safety settings used for Lamb's commercial vehicle and (ii) safety settings in the telematics system/software as of the crash date. *Id.*, p. 17;

- **Second RFP 13**: administrative username/password for telematics software/safety management system for consultant access, expressly limited to data/information relating to (a) the crash and (b) Lamb, at a mutually agreeable location/time. *Id.*, p. 18; and

- **Second RFP 14**: complete full-length, uncut, unredacted crash-date video footage. *Id.*, p. 18.

36.     The Court imposed process requirements governing any claim that responsive materials were not in XPO's possession, custody, or control. Specifically, if XPO contended it did not have possession or control of responsive documents, it was required to identify the documents, identify the custodian(s), describe the efforts undertaken to locate the materials, and, if the

11

materials had been destroyed, identify when and by whom they were destroyed and the manner of destruction. Dkt. 8-5, p. 18, ¶ 61. It also required a privilege log for any withheld responsive documents and to submit disputed items for in camera review. *Id.*, p. 18, ¶ 62.

### c. XPO'S COMPLIANCE WITH THE APRIL 25, 2025 ORDER

37. On October 1, 2025, XPO served supplemental responses stating that it was responding to "all of the directives" in the January 21, 2025 and April 25, 2025 Orders and extending its Bates numbering from approximately XPO-001906 to XPO-005784 (nearly 4,000 additional pages). Dkt. 30-14, *XPO Supplemental Discovery Responses*.

38. The supplementation addresses each compelled response by identifying responsive materials by Bates range (including previously produced materials) or explaining, after reasonable inquiry, that requested materials do not exist or are not retained in the manner assumed. *Id.*, p. 1. For example, the supplementation identifies the transcripts at XPO-005722–005784 and catalogs Lamb-specific Samsara materials (including coaching videos, safety dashboards, DVIRs, and month-by-month HOS logs) by Bates. *Id.*, p. 18, ¶¶ 18–19.

39. The verified supplementation includes:

(i) the court-ordered serious-injury/death claims log; (ii) a detailed description of the telematics software used at the time of the crash and a substantive response regarding trailer devices/data; (iii) detailed shipper/load/route/dispatch information with supporting bills of lading and manifest documents; (iv) Lamb's disciplinary/coaching history, training/education, and the policies/manuals in effect for him on October 11, 2023; (v) the identities/date/conclusion of XPO's preventability review and all documents relating to the preventability analysis/review/determination for the October 11, 2023 crash (including incident materials, ECM data, and HOS logs); (vi) identification of insurers/insureds/policy limits and declaration pages for liability coverage through $250 million; (vii) document retention/record-retention policies; (viii) Lamb's driver-qualification and personnel materials (including updated MVR and medical examiner certificate); (ix) Lamb-specific telematics data, coaching videos/screenshot snippets where videos could not be downloaded, and related safety dashboard materials, together with explanations where Samsara does not preserve requested historical settings/notifications; (x) safe commercial motor vehicle operation materials provided or offered to Lamb; (xi) unredacted SOS reports serving as XPO's accident-register equivalent; (xii) unredacted Rule 30(b)(6) transcript(s); and (xiii) preserved crash-date video clips, with the explanation that Samsara does not continuously archive "full-length" footage. Dkt. 30-14, (First Interrog. Nos. 3, 5, 6(c)–(d), 7, 14, 15, 22, 36, 38; First RFP Nos. 2, 3–4, 6, 35, 42, 46, 55–59, 61, 65, 66; Second RFP Nos. 1, 2, 4, 6, 8–11, 14).

12

40.     Further, to the extent that documents were already produced, did not exist, or were not retained in the manner assumed with respect to First Interrogatory No. 6(c)–(d), First RFP No. 35, and Second RFP Nos. 1–2, 4, 6, 8–11, and 14, XPO provided verified, item-specific explanations based on reasonable inquiry, identified the available responsive materials (including previously produced items) by Bates range, and explained where additional materials do not exist or cannot be retrieved in the form assumed. For example, XPO:

- Explained that, in response to First Interrogatory No. 6(c)–(d), the subject trailer was not equipped with any recording or monitoring devices (including no ABS module with data-logging capability, no EDR, and no GPS/satellite/cellular tracking or logging system), and therefore no trailer-originated telematics or video data existed to preserve or download, with any relevant operational data instead being generated by the tractor. Dkt. 30-14, p. 2, ¶ 3, ROG 6(c)–(d);

- Explained ESI limitations rather than merely assert that certain "safety inbox/alerts" materials are unavailable. In responding to the Court-compelled requests for telematics "alerts" and "notifications," XPO explains how Samsara's "Safety Inbox" functions and that certain notifications are ephemeral (i.e., not retained or archived in a retrievable form once addressed), and therefore cannot be produced in the manner Plaintiff assumed. *Id.*, p. 19, ¶ 23 (Second RFP 4). At the same time, XPO identifies and produces the available responsive telematics materials, such as Safety Dashboard and related records, by Bates range. *Id.*; and

- Addressed the Court's "full-length, uncut, and unredacted" crash-date video directive by explaining that Samsara does not continuously archive video footage, and that the cameras record only when triggered (e.g., when a g-force threshold is met) or when the driver manually activates the panic button. *Id.*, pp. 22–23, ¶ 29, Second RFP 14. XPO explains that Mr. Lamb did not activate the panic button on October 11, 2023, and that, after a "reasonable search and diligent inquiry," the only preserved Samsara video consisted of clips relating to the subject accident and one other safety event, which had already been produced at XPO-000052–57. *Id.*

41.     Finally, XPO submitted an affidavit from Riley Anderson, XPO's Manager of Safety, describing the safety, system-integrity, and confidentiality risks of providing administrative credentials to the Samsara telematics platform and reiterating that Samsara is a complex, customized administrative system with hundreds of interrelated settings. As such, XPO restricts administrative access to a small group of authorized safety personnel and requires extensive specialized training, ongoing oversight, and individualized permissions before any administrative access is granted. Dkt. 30-14, *Anderson Aff.*, pp. 24–25, ¶¶ 2–6.

13

42.     He further explained that untrained administrative access creates material risks of inadvertent changes or misuse that could alter compliance records or misrepresent driver activity, including the ability to edit driver logs, share management-only videos, or mark safety events as dismissed or coached, and that even a single change to an account-level setting could impair safety-event capture, alerts, or compliance logging across XPO's nationwide fleet, creating unacceptable public-safety, privacy/PII, regulatory, and spoliation concerns. Dkt. 30-14, pp. 25–26, ¶¶ 7–13.

43.     As a compromise in lieu of producing administrative usernames/passwords, XPO proposed a supervised-access protocol under which an XPO representative would operate Samsara at a mutually agreeable location/time while Plaintiff's consultant directs the queries (counsel present), with the review limited to (a) the October 11, 2023 crash and (b) William Lamb, and with relevant non-privileged exports provided afterward to preserve data integrity. *Id.*, pp. 21–22, ¶ 28, Second RFP 13; pp. 27–28, ¶¶ 14–17.

### d.   INAPPLICABILITY OF THE SANCTIONS TO XPO DRIVER WILLIAM LAMB

44.     On July 9, 2025, over XPO's objection and at Plaintiff's request, the state court granted Plaintiff's Motion to Sever and clarified that the sanctions applied only to XPO, not Lamb, directing the clerk to create a new civil action against Lamb while the original action continued solely against XPO. Dkt. 2, *XPO's Notice of Removal*, ¶ 17 (*Order Granting Mot. to Sever*, Dkt. 10-4); Dkt. 30-5, *Plaintiff's Motion to Sever*, p. 4, ¶¶ 25–27; p. 5, ¶ 33.

[CONTINUED ON NEXT PAGE]

## III. LEGAL STANDARD

### a. FEDERAL LAW GOVERNS AND THIS COURT MAY MODIFY PRE-REMOVAL ORDERS

45.    "All injunctions, orders, and other proceedings had in such action prior to its removal shall remain in full force and effect until dissolved or modified by the district court." 28 U.S.C.A. § 1450. Once removed, "it is settled that federal rather than state law governs the future course of proceedings, notwithstanding state court orders issued prior to removal. Section 1450 implies as much by recognizing the district court's authority to dissolve or modify injunctions, orders, and all other proceedings had in state court." *Granny Goose Foods, Inc. v. Bhd. of Teamsters*, 415 U.S. 423, 437 (1974).

46.    District courts recognize that § 1450 permits the federal court to dissolve or modify non-final state court orders after removal. *See The Historic Preservation Found. of N.C., Inc. v. Hardy*, No. 5:20-cv-00557-BO, Doc. 25 at 2 (E.D.N.C. May 6, 2021) (orders remain in effect "until dissolved or modified by the district court").[6]

### b. THIS COURT MAY REVISE INTERLOCUTORY ORDERS AS JUSTICE REQUIRES

47.    Rule 54(b) permits revision of any interlocutory order or decision at any time before entry of final judgment. Fed. R. Civ. P. 54(b). The Fourth Circuit recognizes that a district court may revise an interlocutory order when: (1) subsequent proceedings produce substantially different evidence; (2) there is a change in applicable law; or (3) the prior decision reflects clear error causing manifest injustice. *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017).

---

[6] *See also* S*ED Holdings, LLC v. 3 Star Props., LLC*, No. 4:17-CV-01655, 2018 WL 11429878, at *15 (S.D. Tex. Mar. 8, 2018), *aff'd sub nom. Matter of 3 Star Props., L.L.C.*, 6 F.4th 595 (5th Cir. 2021) ("Upon removal, this Court has the power to modify orders issued during proceedings in state court" *citing Granny Goose*); *Rellas v. Lee Cnty. Port Auth.*, No. 2:18-CV-220-FTM-38CM, 2018 WL 3361885, at *2 (M.D. Fla. July 10, 2018).

48.     Clear error imposes a high burden, and where an interlocutory order was entered by one judge and later reviewed by another, the latter should be hesitant to overrule an earlier determination. *Carlson*, 856 F.3d at 325. But Rule 54(b) preserves the Court's ability to correct course before final judgment where appropriate. *Id*.

c.   DISCOVERY SANCTIONS MUST BE JUST, PROPORTIONAL, AND ISSUE-LINKED

49.     "Rule 37(b)(2) contains two standards—one general and one specific—that limit a district court's discretion. First, any sanction must be "just"; second, the sanction must be specifically related to the particular 'claim' which was at issue in the order to provide discovery. While the latter requirement reflects the rule of *Hammond Packing*, *supra*, the former represents the general due process restrictions on the court's discretion." *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707, 102 S. Ct. 2099, 2107, 72 L. Ed. 2d 492 (1982).

50.     This Circuit has "developed a four-part test for a district court to use when determining what sanctions to impose" under Rule 37(b)(2)(A). *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001). Specifically, a district court is required to consider: "(1) whether the non-complying party acted in bad faith, (2) the amount of prejudice that noncompliance caused the adversary, (3) the need for deterrence of the particular sort of non-compliance, and (4) whether less drastic sanctions would have been effective." *Id.*[7]

51.     Where a sanction approaches dismissal or default in practical effect, careful scrutiny is required, and the Fourth Circuit has emphasized the importance of warning the offending party for failure to comply. *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36, 40

---

[7] *See also Anderson v. Found. for Advancement, Educ. & Emp't of Am. Indians*, 155 F.3d 500, 504 (4th Cir. 1998); *Beach Mart, Inc. v. L&L Wings, Inc.*, 784 F. App'x 118, 123–24 (4th Cir. 2019).

(4th Cir. 1995); *Choice Hotels Int'l, Inc. v. Goodwin & Boone*, 11 F.3d 469, 473 (4th Cir. 1993); *Lolatchy v. Arthur Murray, Inc.*, 816 F.2d 951, 953 (4th Cir. 1987).

52.     "Even in those cases where it may be found that failure to produce results in the discovering party's case ***being jeopardized*** or prejudiced, it is the normal rule that the proper sanction 'must be no more severe...than is necessary to prevent prejudice.'" *Taylor v. Specialty Mktg., Inc.*, 985 F.2d 553 (4th Cir. 1993). Rule 37 sanctions must comport with due process. *Id.* [emphasis added; internal citations omitted]

[CONTINUED ON NEXT PAGE]

17

## IV.    ARGUMENT

53.    This motion does not ask the Court to reweigh every state-court finding. It asks the Court to apply the governing federal Rule 37 framework, including *Belk*, to ensure that any sanction is just, proportional, and specifically related to the discrete discovery disputes actually litigated, and to revise the April 25 order accordingly.

54.    *Belk* requires consideration of bad faith, prejudice, deterrence, and the effectiveness of less drastic sanctions. As shown below, those factors do not support maintaining merits-dispositive sanctions, particularly where the disputes were bounded and the claimed trial-preparation prejudice has been addressed through supplementation and a new scheduling order.

### a.    THE APRIL 25 ORDER ERRONEOUSLY LEAPT FROM DISCRETE TECHNICAL DISCOVERY DISPUTES TO MERITS-DISPOSITIVE SANCTIONS WITHOUT REQUIRED WARNINGS

55.    Continued enforcement of the April 25 Order would work a manifest injustice because, despite the January 21 order's lack of any "explicit and clear" warning that noncompliance could trigger merits-determinative sanctions, the April 25 Order deems negligence and gross negligence established "for all purposes" and strikes core defenses, functioning as a practical default on liability. *Hathcock*, 53 F.3d 36, 40 (4th Cir. 1995) ("In particular, this court has emphasized the significance of warning a defendant about the possibility of default before entering such a harsh sanction.") citing *Choice Hotels*, 11 F.3d at 473 (fairness required "explicit and clear" notice when court intended noncompliance with imposed conditions to result in dismissal with prejudice).[8] Continued enforcement would therefore be clear error causing manifest injustice under Rule 54(b). *Carlson*, 856 F.3d at 325.

---

[8] See also *Lolatchy*, 816 F.2d at 954 Fn. 2 (vacating default; emphasizing lack of prejudice and defendants' lack of personal responsibility, and noting the absence of an explicit warning as a salient distinction from cases upholding default).

56.     Further, Rule 37 limits sanctions to those that are "just" and specifically related to the claim or issue implicated by the outstanding discovery. *Ins. Corp. of Ireland*, 456 U.S. at 707. *Belk* requires consideration of bad faith, prejudice, deterrence, and the effectiveness of less drastic sanctions. 269 F.3d at 348.  Here, the January 21 order compelled topic-specific supplementation, yet the April 25 order imposed sweeping, merits-determinative findings and struck core defenses.

57.     The disputes were not "the whole case." They centered on limited categories: telematics platform mechanics (access, settings, alerts/notifications, and export formats); defined preventability materials; and Lamb and incident-specific training and insurance materials. The April 25 order's overbreadth is reinforced by how it was entered:  the court made no on-the-record findings at the April 16 hearing, directed competing proposed orders, and then entered an order that largely tracks Plaintiff's proposed submission, underscoring the absence of issue-by-issue tailoring and express Rule 37/*Belk* analysis required for merits-dispositive sanctions.

58.      The April 25 Order also confirms the bounded nature of the issues because it rewrote key January 21 directives to be Lamb and incident-specific, time-limited, and capped in scope. That narrowing underscores why the remedy should be bounded as well.

59.     As such, any noncompliance justifies only targeted, issue-linked remedies. They do not justify predetermining negligence and gross negligence "for all purposes" across the case or striking the defenses that frame liability, causation, and comparative fault. Whatever the state court concluded about conduct, Rule 37 still requires that any sanction be "just" and specifically related to the claim or issue implicated by the discovery order. *Ins. Corp. of Ireland*, 456 U.S. at 707. And even where some prejudice exists, the "normal rule" is that the sanction must be no more severe than necessary to prevent prejudice to the movant. *Taylor*, 985 F.2d 553.

19

60.     The telematics issue underscores the point. This was a dispute about scope, format, and access to a complex safety-management platform, including whether an outside consultant should be given administrative credentials, and what settings, alerts, and historical notifications can be pulled and in what form. XPO also pointed out that the telematics demands came from Plaintiff's second set of requests and had not been the subject of a meet-and-confer before the first motion, while stating it was willing to discuss telematics but objecting to the proposed scope.

61.     Yet the deemed-fact provisions go well beyond those categories, deeming phone-call distraction, policy violations, and gross negligence established, without tying those ultimate merits findings to any identified discovery request, issue-specific prejudice, or curative need.

62.     On the broader discovery record at the time, XPO made repeated conferral efforts and provided rounds of supplementation and made a substantial production of 1,900 pages before the sanctions along with incident materials and video. Additionally, a Rule 30(b)(6) deposition as well as that of XPO's safety director had been scheduled to address Plaintiff's concerns. Further, the verified supplementation repeatedly cites earlier Bates ranges for the core crash evidence.[9]

63.     XPO is not asking this Court to relitigate the state court's discovery-conduct findings. The narrower point under Belk is that the record reflects ongoing conferral and supplementation, not obstruction or destruction, which underscores why merits-dispositive sanctions are not "just" or issue-linked under Rule 37.

64.     *Belk's* first factor asks whether the noncomplying party acted in bad faith. Because the sanction here is outcome-determinative in practical effect, the Court should address that factor

---

[9] Including Lamb's personnel/qualification materials (XPO 000058–198), the accident video clips (XPO 000052–57), the load paperwork (manifest/BOLs XPO 001892–001906), and the incident/preventability file (photos, reports, ECM/DVIR/HOS records, and SOS report, XPO 000002–001814; XPO 001884–001887).

expressly and based on record evidence. *See Sampson v. City of Cambridge*, 251 F.R.D. 172, 181 (D. Md. 2008) (adverse inference required at least willful loss or destruction of relevant evidence; bad faith not required; negligence insufficient). Nothing about a relatively narrow dispute over discrete discovery categories, against a backdrop of conferral and ongoing supplementation, supports leaping to "for all purposes" negligence/gross-negligence findings.

65.     Even if discovery was incomplete or delayed, Belk requires the Court to consider the amount of prejudice any noncompliance caused the adversary. *Belk*, 269 F.3d at 348; *Taylor*, 985 F.2d 553. Here, a "gross negligence" finding "for all purposes" is not a tailored response to any discrete shortfall; it is a culpable mental-state determination about driver and company that goes far beyond any dispute over telematics and, with the collision captured on video, telematics is at most an additional data source.

66.     Rule 37 sanctions must deter abuse, and severe sanctions must remain available when warranted. *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 643 (1976). But deterrence, standing alone, does not justify maintaining sanctions that are more severe than necessary to prevent prejudice to the movant or that bear no reasonable relationship to the discrete discovery dispute. *Taylor*, 985 F.2d 553; *Food Lion, Inc. v. Cap. Cities/ABC, Inc.*, 165 F.R.D. 454, 457 (M.D.N.C. 1996) ("A sanction must bear a reasonable relationship to the behavior being punished").

67.     If the concern was delay, incomplete production, or insufficient verification, deterrence could be fully served by sanctions calibrated to that conduct, fees/cost-shifting and compliance-directed orders with an express warning of escalating consequences, without deeming negligence and gross negligence established "for all purposes." This is especially true when, as

here, there was only a single violation of the Court's orders. *See, e.g.*, *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1465 (10th Cir. 1988).[10]

68.     As such, the April 25 order does not "fit" the discovery issues actually litigated: it uses Rule 37 to decide liability and gross negligence "for all purposes" without warning and based on discrete disputes over specific production categories and mechanics. That relief is not "specifically related" to the discovery dispute and does not bear a "reasonable relationship" to the conduct being addressed. *Ins. Corp. of Ireland*, 456 U.S. at 707; *Food Lion*, 165 F.R.D. at 457. Even where some prejudice exists, the sanction must be "no more severe than is necessary to prevent prejudice," a standard the Court's sanctions cannot satisfy. *Taylor*, 985 F.2d 553.

69.     Further, Plaintiff requested Rule 37(b) sanctions aimed at deemed allegations and stricken defenses while expressly stating she was not seeking to strike the entire answer. The April 25 order nonetheless imposed a sweeping "for all purposes" merits package and struck core defenses that ordinarily frame liability, causation, and comparative fault issues for adjudication.

70.     Notably, the order also criticized Requests for Admission in general terms without identifying any particular admission, by number or substance, requiring a targeted remedy, further underscoring the absence of the issue-specific tailoring Rule 37 demands. That overreach is also especially apparent here given (i) the Court's own narrowing of key January 21 directives, rewriting them to be incident- and Lamb-specific, time-limited, and capped, and (ii) the later clarification that the sanctions apply only to XPO, not Lamb.

---

[10] "We have therefore been reluctant to affirm on the basis of isolated instances of noncompliance or where the district court's findings did not make specific reference to fault by the parties or intentional conduct by their attorneys, and did not explain why lesser sanctions would be ineffective."

71.     Those steps confirm the operative disputes were confined to defined categories, yet the sanctions operate as an across-the-board merits determination in the XPO case as if the merits had been adjudicated. That disconnect reinforces why the sanctions are overbroad and untethered to the actual dispute, and why continued enforcement would work a manifest injustice. *Ins. Corp. of Ireland*, 456 U.S. at 707; *Food Lion*, 165 F.R.D. at 457; *Taylor*, 985 F.2d 553.

72.     Deterrence is a legitimate Rule 37 consideration, but it does not justify maintaining merits-determinative sanctions once any trial-preparation prejudice has been cured and lesser, compliance-directed sanctions would suffice. *Taylor*, 985 F.2d 553; *Food Lion, Inc.*, 165 F.R.D. at 457; *Ins. Corp. of Ireland*, 456 U.S. at 707 (1982); *Carlson*, 856 F.3d at 325. Here, deterrence can be fully served through fee-and-cost shifting tied to the discrete categories that were litigated, rather than maintaining merits-dispositive relief that now operates only as punishment.

**b.   The Order's Imminent-Trial Prejudice Rationale has Been Cured by Verified Compliance and the Issuance of a New Scheduling Order**

73.     The sanctions' most consequential justification was timing. The court emphasized that trial was set for May 12, 2025 and concluded that Plaintiff was "severely prejudiced" by discovery disputes that supposedly prevented trial preparation. That premise no longer applies: XPO served verified, order-directed supplementation on October 1, 2025, and the current scheduling order sets discovery to close November 2, 2026, with no trial date currently set.

74.     Prejudice under Rule 37 is assessed in the case's current posture, and the Fourth Circuit's "normal rule" is that any sanction must be no more severe than necessary to prevent that prejudice. *Taylor*, 985 F.2d 553. Moreover, Courts in this circuit routinely recognize that prejudice from timing and incomplete production can be cured by reopening or extending discovery rather than imposing merits-ending sanctions. *James v. Se. Grocers LLC*, No. 2:18CV01031-RMG-

23

MGB, 2019 WL 7195598, at *5 (D.S.C. Oct. 21, 2019), *report and recommendation adopted*, 2019 WL 5957019 (D.S.C. Nov. 13, 2019); *Havtech, LLC v. Tobey-Karg Sales Agency, Inc.*, No. CV CCB-22-1051, 2023 WL 5671605, at *2 (D. Md. Sept. 1, 2023).

75.     Equally important, the record now contains "substantially different evidence" on the very discovery categories that were said to impair trial preparation. *Carlson*, 856 F.3d at 325. On October 1, 2025, XPO served verified supplemental responses and production expressly responding to "all of the directives contained in the Court's January 21, 2025 and April 25, 2025 Orders." Dkt. 30-14, p. 1. Those verified supplements provide detailed, category-by-category responses and identify responsive materials by Bates range across the core sanction topics: telematics, preventability materials, and Lamb-specific training and insurance categories. *Id.*

76.     On telematics, XPO identified Samsara as the telematics platform used at the time of the collision and described what Samsara generates and retains. *Id.*, p. 2. XPO supplemented with Bates-identified productions of the accident clips, coaching and Safety Dashboard materials, and extensive Samsara HOS logs and related telematics records. *Id.*, pp. 12–13, 18–20.

77.     Critically, XPO provided item-specific explanations where Plaintiff had demanded categories that the platform does not retain in the manner assumed: (i) Samsara does not continuously archive video footage and instead preserves clips only when triggered by defined events; (ii) certain "safety alerts" and notifications are ephemeral and not archived; and (iii) historical "safety score" settings and configuration pages are not preserved and cannot be reconstructed because the system does not keep historical configuration logs. *Id.*, pp. 12–13, 19–23. Those explanations cure any claim of prejudice from "missing" data.

78.     XPO's supplemental record also resolves the other compelled categories tied to Plaintiff's trial-preparation rationale. XPO identified the individuals involved in the preventability

analysis, the date of review, and the "preventable" determination, and pointed to produced SOS/accident-detail materials. *Id.*, pp. 9, 13. XPO produced or identified by Bates range the insurance materials (including declaration pages) and extensive Lamb-specific training and policy materials. *Id.*, pp. 9–11, 4–8, 14–17.

79.    The supplemental record further undercuts any claim that prejudice from the administrative-credentials dispute remains. XPO explained, supported by multiple affidavits, that providing administrative credentials to a third-party consultant would expose safety-critical, proprietary, and privacy-protected information and could jeopardize fleet-wide monitoring and compliance. Dkt. 30-14, pp. 24–28. Further, XPO offered a safe, alternative protocol: a knowledgeable XPO representative would operate the platform in real time while Plaintiff's consultant directs the review under an agreed protocol, with counsel present and with non-privileged exports provided afterward. *Id.*

80.    To the extent the April 25 Order is interpreted to require turnover of administrative usernames and passwords, the Court should revise that narrow access directive to permit this supervised-access protocol in lieu of producing administrative credentials. That is a less drastic, case-fitting mechanism that directly addresses Plaintiff's concern without risking system integrity, further demonstrating that any arguable prejudice can be remedied through targeted measures.

81.    With no imminent trial and verified compliance, the April 25 Order's most extreme provisions no longer serve a curative purpose. Under *Belk*, prejudice and the availability of less drastic sanctions are required considerations; and under *Taylor*, sanctions must not be more severe than necessary to prevent prejudice. *Belk*, 269 F.3d at 348; *Taylor*, 985 F.2d 553. Further, maintaining "for all purposes" deemed liability and gross-negligence findings and defense-striking

25

relief after the timing-based prejudice has been cured would be a clearly erroneous use of Rule 37 causing a manifest injustice. *Carlson*, 856 F.3d at 325.

### c. THE "FOR ALL PURPOSES" DEEMED FACTS ARE UNJUSTIFIABLY BROAD UNDER RULE 37 BECAUSE THEY OVERREACH BY BINDING XPO'S COUNTERCLAIM

82.     The April 25 order does not merely impose a discovery remedy; it deems sweeping fault-related facts established "for all purposes." That phrasing matters because the case includes XPO's counterclaim. A Rule 37 sanction must be calibrated to the prejudice it cures and tied to the specific discovery dispute. Here, any alleged prejudice from delay or incompleteness went to Plaintiff's preparation of her affirmative case, not the defense of XPO's counterclaim. The sanctions therefore reach beyond any cognizable prejudice and operate as a merits determination that effectively binds the counterclaim, rather than a tailored cure.

83.     Deterrence is a core purpose of Rule 37 sanctions, and severe sanctions must remain available when warranted. But deterrence does not require eliminating XPO's counterclaim here; deterrence can be served through meaningful monetary or compliance-directed sanctions. And where prejudice is timing-based or remediable, less drastic measures, like extending or reopening discovery, are recognized in this circuit as effective cures, making a merits-binding "for all purposes" sanction unnecessary. *James*, 2019 WL 7195598, at *5; *United States v. Stokes*, No. 3:05CR334, 2006 WL 1319709, at *4 (W.D.N.C. May 10, 2006).

84.     The verified supplemental record confirms why "for all purposes" deemed merits facts, especially ones binding the counterclaim, operate as punishment rather than cure. The sanctions are not calibrated to any remaining prejudice or the separate step of binding XPO's counterclaim. Deeming XPO grossly negligent "for all purposes" operates as a complete bar to its property damage counterclaim, and the sanctions therefore improperly adjudicate XPO's affirmative claim.

26

## V.    CONCLUSION

85.    The January 21, 2025 Order compelled supplementation but gave no "explicit and clear" warning that noncompliance could result in case-dispositive issue or pleading sanctions. *Choice Hotels*; *Lolatchy*. Yet the April 25 order deemed XPO's negligence and gross negligence established and struck its core defenses, relief untethered to the narrow disputes actually litigated and far more severe than necessary to cure any prejudice. *Ins. Corp. of Ireland*; *Food Lion*; *Belk*; *Taylor*.

86.    The April 25 order was also driven by an imminent trial, but that timing-based prejudice has been cured: XPO has provided the compelled discovery, and the case is proceeding under a new scheduling order with discovery open through November 2, 2026. Maintaining the "for all purposes" merits findings and defense-striking relief after that cure would be a clearly erroneous use of Rule 37 that works manifest injustice. *Carlson*. Deterrence can be fully served through fee-and-cost shifting tied to the discrete categories litigated.

87.    Accordingly, XPO respectfully requests that the Motion be granted in full. Specifically, XPO respectfully requests that the Court revise the April 25, 2025 Order by vacating Paragraphs 56(a)–(f), and any other portion that effectively strikes, limits, precludes, or nullifies any defense, denial, or claim, thereby reinstating XPO's Second, Third, Sixth, Seventh, and Eighth Defenses. XPO further requests that the Court amend Paragraphs 57 and 58 to withdraw any "only just and appropriate" determination as to those vacated sanctions, substitute a proportional fee-and-cost award tied to the discrete discovery categories at issue (amount to be determined on submission), clarify that nothing in the Order establishes liability or fault "for all purposes," precludes XPO from contesting liability, causation, or fault, or binds XPO's counterclaim and further clarify/modify Second RFP 13 to permit supervised access in lieu of producing usernames and passwords.

[SIGNATURE TO FOLLOW]

This 27th day of January 2026.

GORDON REES SCULLY MANSUKHANI LLP

By: /s/*Robert W. F. Beckmann*

Robert W. F. Beckmann
N.C. State Bar No.: 63232
Austin R. Kessler
N.C. Bar No. 55732
Devin Honbarger
N.C. Bar No. 59513
150 Fayetteville Street, Suite 1120
Raleigh, North Carolina 27601
Telephone: (919) 787-4555
Facsimile: (919) 741-5840
E-mail: rbeckmann@grsm.com
E-mail: akessler@grsm.com
E-mail: dhonbarger@grsm.com
*Counsel for Defendant XPO Logistics Freight, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **BRIEF IN SUPPORT OF MOTION TO REVISE INTERLOCUTORY ORDER**, with the Clerk of Court for the Eastern District of North Carolina by using the CM/ECF system, which will send notification of such filing to the following counsel of record:

| | |
|---|---|
| J. William Owen<br>Musselwhite, Musselwhite, Branch & Grantham, P.A.<br>P.O. Box 1448<br>Lumberton, NC 28359<br>wowen@mmbglaw.com<br>***Counsel for Plaintiff Cindy Smith, Administratrix of the Estate of Mark K. Smith*** | Troy D. Shelton<br>Dowling PLLC<br>3801 Lake Boone Trail, Suite 260<br>Raleigh, NC 27606<br>tshelton@dowlingfirm.com<br>***Counsel for Counterclaim-Defendant Cindy Smith, Administratrix of the Estate of Mark K. Smith*** |

This 27th day of January 2026.

GORDON REES SCULLY MANSUKHANI LLP

By: /s/ *Robert W. F. Beckmann*
Robert W. F. Beckmann
N.C. State Bar No.: 63232
Austin R. Kessler
N.C. Bar No. 55732
Devin Honbarger
N.C. Bar No. 59513
150 Fayetteville Street, Suite 1120
Raleigh, North Carolina 27601
Telephone: (919) 787-4555
Facsimile: (919) 741-5840
E-mail: rbeckmann@grsm.com
E-mail: akessler@grsm.com
E-mail: dhonbarger@grsm.com
***Counsel for Defendant XPO Logistics Freight, Inc.***

29