IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:25-cv-01545-D-BM

| | |
|---|---|
| CINDY SOLES SMITH, Administratrix of the ESTATE OF MARK KEANNAN SMITH,<br><br>       Plaintiff,<br><br>   v.<br><br>XPO LOGISTICS FREIGHT, INC.,<br><br>       Defendant. | RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO RECONSIDER STATE COURT ORDER |

      XPO's reconsideration motion confirms what Plaintiff explained in her motion to remand: XPO is desperate to find a forum that will overlook its discovery shenanigans. The motion tries to rewrite the significant procedural history to avoid the consequences of XPO's obstruction and misconduct.

      XPO failed entirely in state court. It was ordered to comply with its discovery obligations, then sought reconsideration, which was denied. ECF No. 16-39. XPO was then sanctioned for ignoring the superior court's order. ECF No. 16-40. XPO appealed to the North Carolina Court of Appeals and sought a stay pending appeal. ECF Nos. 16-46, 16-49. The superior court denied a stay, and then the Court of Appeals denied a stay. ECF Nos. 16-58, 16-63.

      Seeing ominous portents, XPO abandoned its state-court appeal and removed this case to federal court. XPO now treats its removal as an "appeal" to state court,

asking this Court to reconsider—reverse—the superior court's sanctions order. ECF No. 38.

Reconsideration, however, is not appropriate. The standard for reconsideration in a normal case is already high—the targeted order must be "dead wrong." That standard is even higher when a federal district court is asked to reconsider a discretionary order entered by another judge in state court.

XPO can't meet that standard. The state court made explicit findings on every one of the *Belk* factors. ECF No. 16-40. The court found that XPO acted in bad faith—a finding XPO doesn't dispute. *Id*. at 8, ¶¶ 23-46. The court found that XPO prejudiced Plaintiff by delaying the case and withholding discovery that Plaintiff needed to meet her burden of proof. *Id*. at 12, ¶ 55. The court explained that XPO's misrepresentations and withholdings necessitated deterrence. *Id*. ¶ 54-56. And the court forewent the most severe sanctions—default—choosing instead a lesser sanction that was precisely linked to the wrongfully withheld discovery. *Id*. ¶ 54.

The state court's order was not dead wrong or an abuse of discretion. Reconsideration should be denied.

## BACKGROUND

This action arises from the death of Plaintiff's husband of 37 years, who was tragically killed when a distracted XPO driver made an extremely dangerous left turn directly in front of the decedent, resulting in a collision. ECF No. 16-5, p. 2-6, ¶¶ 9-29. XPO's driver, William Lamb, was charged with misdemeanor death by vehicle and failure to yield right of way—which remain pending in Robeson County. ECF No. 26-16.

XPO is one of the largest trucking and transportation conglomerates in the world, with annual revenues exceeding $8.7 billion dollars. As of 2025, XPO employed over 14,000 commercial vehicle operators. Given its sheer size and sophistication, XPO created their own training program called "XPO University" where it provides detailed training to truck drivers. ECF No. 30-14, p. 14. XPO also utilizes advanced safety technology to train, monitor and "coach" its 14,000 CDL operators, through telematics systems, such as "Samsara"—which continuously monitors drivers for unsafe behaviors, such as speeding, distracted driving and the like. ECF No. 16-32. XPO's Samsara telematics program also tracks information relating to distance detection, harsh events, and inward camera obstruction. *Id*. at ¶ 6.

Since filing suit in state court in February 2024, XPO has sought to evade accountability, including its outright refusal to provide critical and discoverable telematics data to Plaintiff. ECF No. 16-20, ¶ 23-46. XPO stonewalled discovery, violated court orders, and earned scathing sanctions from the state trial court for its "continual, intentional and egregious" misconduct. *Id*.

On June 5, 2024, Plaintiff served separate sets of discovery on Lamb and XPO, which consisted of Plaintiff's First Set of Interrogatories, Requests for Production of Documents, and Requests for Admission. ECF No. 26-4; ECF No. 16-24 at 15-45. On June 27, 2024, XPO and Lamb moved for an extension of time to respond to Plaintiff's initial set of discovery. ECF No. 16-12. The clerk extended the response deadline to August 5, 2024. ECF No. 16-13.

3

Despite the deadline, on August 6, 2024, Defendant XPO and Lamb served untimely responses to Plaintiff's initial discovery request. ECF No. 26-4. Since Lamb was an employee of XPO, many of the requested documents, data, and training materials were in the possession and control of XPO and not in the possession and control of Lamb, individually. ECF No. 26-7. Accordingly, the ensuing discovery dispute was primarily between Plaintiff and XPO, Lamb's employer. The same attorneys represent Lamb and XPO.

On August 6, 2024, counsel for Plaintiff sent a detailed letter to counsel for XPO advising counsel of the consequences of its untimely discovery responses and requested prompt supplementation without objection to both sets of discovery requests. ECF No. 26-4. On August 22, 2024, counsel for Plaintiff sent another letter to counsel for XPO about the numerous improper objections and past-due discovery and again requested complete responses on or before August 30, 2024. ECF No. 26-5.

On August 30, 2024, counsel for XPO requested from Plaintiff an informal extension of time to fully respond to Plaintiff's initial discovery requests. ECF No. 26-6. Counsel for Plaintiff allowed this extension and voluntarily enlarged the deadline to September 3, 2024 for XPO to respond to the initial discovery served by Plaintiff 90 days earlier. *Id.*

On September 3, 2024, XPO served its first supplemental response to Plaintiff's initial discovery requests. But despite the multiple conferral attempts, the responses still contained multiple improper objections and refusals to substantively respond. ECF No. 26-7. On September 4, 2024, counsel for Plaintiff again advised

counsel for XPO of the discovery deficiencies, including the production of XPO's insurance policies, declaration pages, training materials, the employee handbook and basic shipping documents (e.g., bill of lading and manifest). *Id.* For reasons unknown to Plaintiff, XPO produced none of these routine, discoverable transportation documents.

On October 10, 2024, counsel for Plaintiff again sent counsel for XPO a detailed correspondence which requested supplemental discovery responses which were squarely related to Plaintiff's claims within 15 business days. ECF No. 26-8. Plaintiff made clear that she would have to seek the trial court's intervention if substantive responses were not timely received. *Id.* On October 22, 2024, counsel for Plaintiff served her Second Request for Production on XPO, which specifically related to telematics software used by XPO at the time of the fatal collision. ECF No. 26-19.

On November 1, 2024, as a final show of good faith and cooperation, counsel for Plaintiff sent counsel for XPO detailed correspondence and agreed to voluntarily limit the scope of her request for supplementation with an updated due date of December 2, 2024. ECF No. 26-10. After multiple additional requests for further extensions of time by XPO, counsel for Plaintiff voluntarily agreed to new due date of December 23, 2024, for all outstanding supplemental discovery responses, since that date correlated with XPO's due date for its responses to Plaintiff's Second Request for Production of Documents. ECF No. 26-11. The telematics data being sought by Plaintiff in her Second Request for Production of Documents related to Lamb specifically. ECF No. 26-12.

On December 23, 2024, XPO served its responses to Plaintiff's November 1, 2024 detailed request for supplementation and served its responses to Plaintiff's Second Request for Production of Documents. ECF No. 26-12. XPO's supplementation and responses to Plaintiffs Second Request for Production of Documents contained numerous improper objections, refusals to substantively answer and improper limitations of their response. *Id*. As it had done before on multiple occasions, XPO again withheld basic, responsive documents from Plaintiff without justification. *Id*.

On December 24, 2024, counsel for Plaintiff advised counsel for XPO that the responses were deficient, and Plaintiff would be filing a motion to compel. *Id.*, ¶ 4.

On January 2, 2025, Plaintiff filed a Motion to Compel Against XPO, which was heard on January 13, 2025. ECF No. 16-21. On January 21, 2025, the trial court entered an Order compelling XPO to respond fully without objection to certain discovery requests within 30 days from the entry of the Order. ECF No. 16-23. The trial court unambiguously ordered production and supplementation no later than February 21, 2025. *Id*. ¶¶ 2, 4.

XPO ignored the state court order. It did not serve any discovery by the February 21 deadline. ECF No.16-40, ¶ 30. Nor did XPO seek an extension. *Id*. ¶¶ 31-32.

Counsel for Plaintiff emailed XPO's counsel on February 24, 2025 and advised that they were violating the Court's January 21, 2025 Order and asked counsel to "state their intentions prior to Plaintiff moving for sanctions and further moving to compel." *Id*. ¶ 33. On February 26, 2025, past the deadline set by the trial court, XPO

served extremely limited and vague supplemental discovery responses, which were not signed by counsel or verified by anyone at XPO, in violation of the North Carolina Rules of Civil Procedure. *Id.* ¶¶ 34-36.

In XPO's limited supplemental responses dated February 26, 2025, XPO stated that it had "filed Motion for Reconsideration that includes request for the Court to reconsider [certain] provisions of the Order." *Id.* ¶ 38. However, the Motion for Reconsideration referenced in the supplemental responses was not actually filed until two days later on February 28, 2025. *Id.* ¶ 39.

On February 26, 2025, Plaintiff filed a motion for sanctions for violating the first order compelling discovery, as well as a motion for a second order compelling discovery. ECF No. 16-24.

In correspondence dated March 17, 2025, 24 days after the mandatory deadline set by the January 21, 2025 Order, counsel for Plaintiff unequivocally warned counsel for XPO that the January 21, 2025 Order "was not tolled" by the purported reconsideration motion, and that the "ongoing violation of the Court's Order would likely result in *severe sanctions* under Rule 37(b)." ECF No. 26-14, ¶ 2.

Meanwhile, XPO's discovery abuses required a continuance of the trial date. Trial was originally set for May 12, 2025 and Plaintiff wished to proceed, but the setting was continued given XPO's discovery gamesmanship. ECF No. 16-40, ¶ 46.

On April 16, 2025, Plaintiff's motion for sanctions and second motion to compel discovery was heard by the Honorable James Gregory Bell. Judge Bell heard arguments from counsel and considered extensive written materials, including

7

Plaintiff's hearing binder, which included a detailed analysis of XPO's ongoing and intentional discovery misconduct. That binder has not previously been filed with this Court, but is being filed as an exhibit to this brief. *See* Ex. 1., Plaintiff's April 26, 2025 Hearing Binder. XPO has faced similar sanctions in other cases where it intentionally withheld highly relevant and discoverable materials. *Id.* at 157-162. This point was pointed out to the superior court and as a recurring deficiency in XPO's conduct of litigation. ECF No. 30-4 at 12-13.

Having witnessed firsthand the ongoing discovery misconduct, the trial court sanctioned XPO in an Order dated April 25, 2025. ECF No. 16-40. The trial court found that "XPO has continually, intentionally and egregiously violated its obligations to Plaintiff and to this Court under the North Carolina Rules of Civil Procedure." *Id.* ¶ 43. The court also found that "XPO has exhibited a deliberate and calculated pattern of doing so, despite many attempts by Plaintiff's counsel to resolve these discovery issues and deficiencies without judicial intervention." *Id.* ¶ 44. The trial court determined that "Plaintiff is unable to fairly and fully prosecute her various claims without the critical and relevant materials being intentionally and unjustly withheld by XPO." *Id.* ¶ 45. As a sanction, the Court established certain facts in the litigation as true for purposes of trial. *Id.* ¶ 56.

The Sanctions Order also granted Plaintiff's Second Motion to Compel and the trial court reiterated that XPO was to produce very specific and highly relevant documents and data being withheld from Plaintiff. *Id.* ¶¶ 59-64.

Rather than complying with the interlocutory sanctions order, XPO filed a notice of appeal to the North Carolina Court of Appeals, but only for itself and not Lamb. ECF No. 16-47. XPO then attempted to further delay and obstruct Plaintiff's discovery efforts by filing a sweeping motion for a "global stay of all proceedings" in the trial court—for both XPO and Lamb. ECF No. 16-49. The trial court denied the motion for a global stay. ECF No. 16-58. XPO then filed a motion for a temporary stay and petition for a writ of supersedeas with the North Carolina Court of Appeals, which that Court denied. ECF No. 16-63.

Thus, XPO's appeal only had the effect of staying a trial against XPO in the case. ECF No.16-58, ¶ 36.

On June 5, 2025, Plaintiff moved to sever the claims against Lamb and XPO, since only XPO was a party to the appeal and not Lamb. ECF No. 16-52, ¶¶ 18-20. This procedure allowed Plaintiff to continue to prosecute her wrongful death case against Lamb while XPO's interlocutory appeal was pending. *Id.* ¶¶ 32-33. It would also allow Lamb to be separated from the fact-established sanctions that were imposed against his employer for XPO's own discovery misconduct. *Id.* ¶¶ 10, 20-26. The trial court found that the sanctions were not directed to Lamb and that Lamb himself was being prejudiced by the conduct of XPO and that a jury would likely be confused about to whom the sanctions and established facts apply. ECF No. 16-59, ¶ 32.

On July 8, 2025, the trial court ordered that the case against XPO remain under the original civil file number *Estate of Mark Keannan Smith v. XPO Logistics*

*Freight, Inc.* (24CV000468-770) and severed the case against Lamb. ECF No. 16-59. The trial court ordered that the case against Lamb continue under a separate civil file number, *Estate of Mark Keannan Smith v. William Bratty Lamb* (25CV003758-770). *Id.*

The trial court found that "XPO should not be able to further delay and obstruct the administration of justice and Plaintiff's rights to discovery and ultimately a trial by jury as to Defendant Lamb, who is a separate and distinct party from Defendant XPO." ECF No. 16-59, ¶ 30. The trial court also reasoned that "XPO's continuing failure to comply with the Rules of Civil Procedure and the Orders of this Court has resulted in substantial and prejudicial delay to Plaintiff." *Id.*, ¶ 9. Lastly, the trial court found that "Plaintiff and Defendant Lamb would be prejudiced at trial without severance." *Id.* ¶ 32.

## ARGUMENT

### I. The Sanctions Order Is Not "Dead Wrong."

The standard for reconsideration in this Circuit is very high. That is doubly true when district courts are asked to reconsider state-court orders.

After removal, prior state-court orders "shall remain in full force and effect until dissolved or modified by the district court." 28 U.S.C. § 1450. This Court must give the state-court order the same "force and effect" it "would have had in state court." *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70 of Alameda Cnty.*, 415 U.S. 423, 436 (1974).

Ordinarily, district courts should not welcome motions to reconsider state-court orders. By treating state-court orders as "effective in federal court" after

removal, "the interests of judicial economy are promoted and the parties' rights are protected." *Jones v. Sears Roebuck & Co.*, 301 F. App'x 276, 285 (4th Cir. 2008) (citing *Granny Goose*, 415 U.S. at 435-36). As Wright and Miller explain, "there is much to be said for deferring to state-court rulings on substantive matters, particularly when state law governs. This approach will discourage removals based primarily on the strategic desire for reconsideration of an unfavorable ruling." 18B Charles A. Wright et al., *Federal Practice and Procedure* § 4478.4 (3d ed. Westlaw 2025); *Historic Pres. Found. of N.C., Inc. v. Hardy*, No. 5:20-CV-557, 2021 WL 1821701, at *3 (E.D.N.C. May 6, 2021) (refusing to reconsider state-court order after removal).

Even if XPO were not targeting a state-court order, its burden would be incredibly high. There are three grounds that can warrant reconsideration of an interlocutory order, only one of which XPO argues here: "clear error causing manifest injustice." *U.S. Tobacco Coop. Inc. v. Big S. Wholesale of Virginia, LLC*, 899 F.3d 236, 257 (4th Cir. 2018) (quoting *Carlson v. Bos. Sci. Corp.*, 856 F.3d 320, 325 (4th Cir. 2017)).

In *U.S. Tobacco*, the Fourth Circuit reversed an order by Judge Boyle that reconsidered an order entered by Judge Fox, holding that Judge Boyle abused his discretion in doing so. *Id.* When, as here, one judge is asked to reconsider an order entered by another judge, the standard for reconsideration is very high. *Id.* ("Moreover, where, as here, the order was entered by one judge and then reviewed by another, the latter judge should be hesitant to overrule the earlier determination." (cleaned up)). It's not enough that the order targeted by the reconsideration motion

11

just be wrong: "As we have noted on more than one occasion, a prior decision does not qualify for the third exception by being just maybe or probably wrong; it must strike us as wrong with the force of a five-week-old, unrefrigerated dead fish. It must be dead wrong." *Id.* at 258 (cleaned up) (quoting *TFWS, Inc. v. Franchot*, 572 F.3d 186, 194 (4th Cir. 2009)).

Because the order targeted by the reconsideration motion was a discretionary discovery order, the burden on XPO is even higher. Trial courts "enjoy nearly unfettered discretion to control the timing and scope of discovery and impose sanctions for failures to comply with its discovery orders." *Hinkle v. City of Clarksburg, W.Va.*, 81 F.3d 416, 426 (4th Cir. 1996). The state court here made factual findings on the relevant factors challenged by XPO; those findings should not be lightly cast aside.

XPO's motion is little more, in reality, than a request for de novo review of the state-court sanctions order, which doesn't approach the high bar for reconsideration. This Court can deny it outright. *See Santos v. M.A.C. Grading Co.*, No. 7:19-CV-219-D, 2020 WL 12815230, at *1 (E.D.N.C. Oct. 16, 2020).

## II. XPO Received As Much Warning as It Was Entitled to.

The superior court had ordered XPO to respond to Plaintiff's discovery requests by a set deadline. Instead of complying, XPO blew past the deadline and filed a motion to reconsider *after* the deadline. Only then did Plaintiff file a motion for sanctions.

XPO now argues that it didn't get enough warning that it could be severely sanctioned for ignoring court orders. Br. at 18. The Fourth Circuit has recently described XPO's exact argument as "inane." *CFPB v. Nexus Servs., Inc.*, 156 F.4th

443, 456 n.10 (4th Cir. 2025). In *CFPB*, the district court sanctioned the defendant with a default judgment. *Id.* at 456. The defendants were sanctioned because of their "knowing noncompliance with numerous orders of the court." *Id.* The Fourth Circuit affirmed because it saw no reason why defiance of court orders should be tolerated. *Id.*

On appeal, the defendants had argued that the district court erred by imposing a default judgment without a prior warning, relying on *Hathcock v. Navistar International Transportation Corp.*, 53 F.3d 36 (4th Cir. 1995). *Id.* at 456 n.10. That was a serious misreading of *Hathcock*: "The Nexus defendants *inanely* suggest that, prior to imposing the sanction of default judgment, the district court was required to explicitly warn them that noncompliance with prior court orders could result in default." *Id.* at 456 n.10 (emphasis added). The court rejected that argument because "our precedent directly refutes this contention. Instead, we have recognized that 'an explicit warning is not always necessary because a party is already put on notice of the possibility of default by the terms of Federal Rule of Civil Procedure 37.'" *Id.* (quoting *Mey v. Phillips*, 71 F.4th 203, 218 (4th Cir. 2023)).

Here, XPO relies on *Hathcock* for the same proposition that *CFPB* rejected. Br. at 16-17, 18. Like the federal rules, Rule 37 of the North Carolina Rules of Civil Procedure gives clear notice that a party who has already been ordered to comply with discovery requests may be harshly sanctioned for continued defiance. *Compare* N.C. R. Civ. P. 37(b)(2), *with Smith v. Devine*, 126 F.4th 331, 342 (4th Cir. 2025) ("If a party 'fails to obey an order to provide or permit discovery,' Rule 37 of the Federal

Rules of Civil Procedure authorizes a court to impose sanctions, including default judgment." (quoting Fed. R. Civ. P. 37(b)(2)(A)). Those sanctions include just what the superior court imposed here: "[a]n order that the matters regarding which the order was made or any other designated facts shall be taken to be established for the purposes of the action in accordance with the claim of the party obtaining the order." N.C. R. Civ. P. 37(b)(2)(a). If XPO lacked warning, it must not have read the rules.

XPO also overlooks that the state court had imposed sanctions not only under Rule 37, but also under its inherent authority. ECF No. 16-40 at 12 ¶¶ 49, 54, 56. For inherent-authority sanctions, the only notice required is the notice that sanctions may be imposed and an opportunity to respond before the sanctions decision is made. *Rangarajan v. Johns Hopkins Univ.*, 917 F.3d 218, 226 (4th Cir. 2019). The motion for sanctions gave XPO notice, and the hearing on the sanctions gave XPO the opportunity to be heard.

Finally, XPO ignores the parties' communications. After XPO failed to comply with court's order, Plaintiff's counsel emailed XPO's counsel, explaining that he would be seeking sanctions, and asking whether XPO intended to comply. ECF No. 16-24 at 301.

XPO, therefore, received at least as much warning as it was entitled to.

## III. Under the *Belk* Standard, the State Court Order Is Not Dead Wrong.

XPO's brief sets out the four-factor standard for appellate review of discovery sanctions imposed under Rule 37(b). But the brief fails to examine each factor. An examination of these factors, and the cases applying them, show that the state court order was an appropriate exercise of the court's discretion.

Case 7:25-cv-01545-D-BM    Document 41    Filed 02/13/26    Page 14 of 26

### A. XPO acted in bad faith.

The first *Belk* factor asks whether XPO acted in bad faith. Nowhere in XPO's brief does it dispute this finding. The state court found as a fact that XPO acted in bad faith, in multiple ways:

- "XPO failed to serve *any* additional discovery whatsoever" by the deadline set in the order compelling discovery. ECF No. 16-40 at 9 ¶ 31.

- What XPO produced after the court-ordered deadline was grossly inadequate. *Id.* at 9-10.

- "The Court finds and concludes that XPO has continually, intentionally and egregiously violated its obligations to Plaintiff and to this Court under the North Carolina Rules of Civil Procedure." *Id.* at 11 ¶ 44.

- "The Court further finds and concludes that XPO has exhibited a deliberate and calculated pattern of doing so, despite many attempts by Plaintiff's counsel to resolve these discovery issues and deficiencies without judicial intervention and despite the January 21, 2025 Order." *Id.* ¶ 45.

- The Court found that XPO intentionally lied to Plaintiff's counsel about the existence of "highly relevant and discoverable materials." *Id.* at 11-12.

These findings are a far cry from the "technical discovery disputes" that XPO tries to reframe the case as being about. Br. at 18.

Although these findings amply show bad faith, the *Belk* standard only requires fault, and not the higher burden of bad faith. *Clady v. Stewart*, No. 5:21-CV-169-D,

2022 WL 1123791, at *1 (E.D.N.C. Apr. 14, 2022) (Dever, J.). Noncompliance with court orders is sufficient for bad faith anyway. *Loney v. Datamax Corp.*, No. 7:13-CV-226-H, 2015 WL 1000776, at *2 (E.D.N.C. Mar. 5, 2015).

### B.    XPO irreparably prejudiced Plaintiff.

Sanctions were also proper because XPO has withheld necessary discovery and delayed this litigation. XPO's misconduct, therefore, prejudiced Plaintiff.

#### 1.    XPO prejudiced Plaintiff by delaying this case.

When a litigant's misconduct delays litigation, that prejudice's the other litigant's right to have a trial on her claims without delay. *Loney*, 2015 WL 1000776, at *2. In *Loney*, that prejudice led Judge Howard to dismiss the entire lawsuit due to the plaintiff's discovery misdeeds.

Here, the state court specifically found that a trial date had been set for May 12, 2025, and XPO's misconduct "severely prejudiced" Plaintiff's rights. ECF No. 16-40 at 11 ¶ 46.

XPO argues that there's no longer a trial date set, so there's no problem with its disobedience of the discovery order. That argument overlooks the procedural history of this case. The reason that there couldn't be a trial in May 2025 was because of XPO's discovery misconduct. Had XPO obeyed, this case would already be over. XPO should not be allowed to benefit from the consequences of its own misconduct.

#### 2.    XPO prejudiced Plaintiff by withholding discovery materials that Plaintiff needs to prove her case.

Prejudice also "includes an inquiry into the materiality of the evidence [the defendant] failed to produce." *Mut. Fed. Sav. & Loan Ass'n v. Richards & Assocs.,*

*Inc.*, 872 F.2d 88, 92 (4th Cir. 1989). In other words, are the materials wrongfully withheld relevant to the plaintiff's claims?

Here, too, the trial court made numerous findings:

- "The irreparable prejudice to Plaintiff's claims caused by the ongoing violations of the Court's January 21, 2025 Order squarely relate to various claims asserted by Plaintiff in the First Amended Complaint." ECF No. 16-40 at 12 ¶ 55.

- "The Court finds and concludes that Plaintiff is unable to fairly and fully prosecute her various claims without the critical and relevant materials being intentionally and unjustly withheld by XPO." *Id.* ¶ 45.

- "XPO's violations of the January 21, 2025 Order resulted in the withholding of information, documents, materials, and files that are highly relevant towards necessary elements of proof for claims asserted by Plaintiff in her First Amended Complaint." *Id.* ¶ 47.

The state court even gave examples of what those relevant materials were: "insurance coverage, telematics data, prior serious injury and death claims/lawsuits, training materials, preventability analysis materials, among others." *Id.* ¶ 48. Consider the following chart, which illustrates the materiality of many of the wrongfully withheld documents. The chart ties the facts deemed admitted and the defenses struck with the discovery requests that had not been adequately answered:

| Description of discovery request not answered | Relevant allegation or defense | Relevant fact deemed established or defense struck |
|---|---|---|
| Training manuals, materials and presentations provided to William Lamb at the "XPO University" or otherwise provided to William Lamb by XPO.<br><br>ECF No. 16-21 at 4-6. | <u>Allegations</u>: ECF No. 16-5 at 13-15.<br><br>Negligent hiring, negligent training, negligent supervision, negligent retention, and negligent supervision of Lamb (and others).<br><br><u>Defenses</u>: ECF No. 16-7 at 8.<br><br>XPO's asserts general negligence denials of *all* of Plaintiff's allegations.<br><br>XPO alleges that "at *all* times its actions were lawful and conducted in accordance with all applicable duties, laws and regulations." | Lamb violated XPO policies relating to distracted driving and cell phone distractions. ECF No. 16-40 at 13, ¶ d.<br><br>Lamb's conduct in pulling directly in front of decedent was negligent, careless, reckless and grossly negligent. ECF No. 16-40 at 13, ¶ a-b.<br><br>XPO failed to properly train and supervise Lamb in accordance with industry standards. ECF No. 16-40 at 13, ¶ e.<br><br>Struck general negligence denial and general causation denial. ECF No. 16-40 at 14, ¶¶ i-v. |
| Telematics data (Samsara/Lytx), safety notifications, safety score, safety settings/alert configurations, accident register, list of prior serious injury and death claims, prior deposition transcripts.<br><br>ECF No. 16-24 at 217-223. | <u>Allegations</u>: ECF No. 16-5 at 13-15.<br><br>Negligent hiring, negligent training, negligent supervision, negligent retention, and negligent supervision.<br><br>Gross negligence of Lamb, who was acting as an agent/employee of XPO and within the course and scope of employment with XPO.<br><br>Direct gross negligence of XPO, Punitive damages.<br><br><u>Defenses</u>: ECF No. 16-7 at 8-9, 11-12. | Lamb violated XPO's own internal policies relating to distracted driving and cell phone distractions. ECF No. 16-40 at 13, ¶ d.<br><br>Lamb's conduct in pulling directly in front of decedent was negligent, careless, reckless and grossly negligent. ECF No. 16-40 at 13, ¶¶ a-b.<br><br>XPO failed to properly train and supervise Lamb in accordance with industry standards. ECF No. 16-40 at 13, ¶ e. |

| | XPO alleges contributory negligence as to decedent.<br><br>XPO alleges that decedent, who is operating a passenger vehicle, violated multiple federal regulations related to interstate motor carriers. | Struck general negligence denial and general causation denial. ECF No. 16-40 at 14, ¶¶ i-v.<br><br>Struck XPO's contributory negligence defenses. ECF No. 16-40 at 14 ¶¶ i-v. |
|---|---|---|

As these points show, Plaintiff could not "prove [her] case" or rebut XPO's defenses without the highly relevant materials XPO wrongfully withheld. *Richards*, 872 F.2d at 93; *accord Devine*, 126 F.4th at 344 ("By withholding such material evidence, Appellants denied Appellee the opportunity to develop an effective litigation strategy to prove his case and to have a fair trial."); *Mey*, 71 F.4th at 220 ("Appellants' failure to disclose this information not only deprived Appellee of discoverable information necessary to prove her claim, but it also caused delays in the litigation and considerable expense to Appellee because her counsel had to spend time researching and uncovering information Appellants should have properly disclosed but chose to withhold.").

In response, XPO argues that it finally complied with the state court order when it provided supplemental discovery on October 1, 2025, thereby curing all the harm it had done. Br. at 24. That argument cannot warrant vacating the sanctions order. XPO was ordered to produce this discovery by February 21, 2025. Ignoring that court order for eight months is proof of XPO's bad faith, not a cure of prejudice. If a litigant can moot a sanctions order by complying eight months later, then Rule 37 would be rendered toothless. Court orders then become optional. *Folse v. McCormick*,

No. 2:22-CV-00435, 2024 WL 3085143, at *5 (S.D.W. Va. June 21, 2024), *aff'd,* No. 24-1583, 2025 WL 303311 (4th Cir. Jan. 27, 2025) (sanctioning plaintiff with dismissal and explaining that "[t]he Court cannot permit litigants to simply ignore court orders and deadlines that they find inconvenient"). A party cannot wait to comply until *after* sanctions are imposed to start complying and then claim the prejudice has been cured.

Even taking the October 1 supplemental discovery into account, XPO still hasn't complied with the order compelling discovery. For example, XPO was ordered to produce its "accident register," which is required by federal law under 49 CFR 390.15, but XPO has not produced these records. An "accident register" is an internal record-keeping system maintained by motor carriers to document all crashes involving their commercial motor vehicles. It is required by federal law to be kept for a period of three years after the date of each accident and must include specific information such as the date of the accident, location, driver's name, number of injuries or fatalities and whether hazardous materials were released. In its October 1 supplement, XPO produced "SOS Reports" for William Lamb but did not produce the accident register for the company, as it was ordered to do. ECF No. 30-14 at 18, ¶ 18.

XPO was also ordered to produce documents relating to the telematics systems (Samara and Lytx) specifically relating to William Lamb but has failed to do so. ECF No. 30-1 at 20-21. For example, XPO was ordered to provide the safety settings, notifications and other highly relevant telematics data to Plaintiff. ECF No. 16-40 at

17-19. In its October 1 supplement, XPO complains that "notifications are not archived" and the system does "not retain notifications once dismissed" despite counsel for Plaintiff providing a detailed spoliation notice to XPO *12 days after the collision*, which specifically requested that all relevant data be preserved. ECF No. 30-14 at 20-21. Ex. 2 (to this motion), Spoliation Notice to XPO dated October 23, 2023. This is yet another example of XPO's discovery misconduct.

XPO was also ordered to produce the administrative username and password for its Samsara telematics system *specifically relating to William Lamb* and the *subject crash* but has still failed to produce this information to Plaintiff, despite being specifically ordered to do so. ECF No. 16-40 at 19, ¶ 59.w; ECF No. 30-14 at 22, ¶ 28.

XPO's argument and untimely production only underscores the need for sanctions. In *Richards*, the Fourth Circuit emphasized that late compliance cannot be used to avoid sanctions:

> Even though the defendants may have made efforts to comply, the attempts were lastditch and only offered when it became crystal clear that they were going to lose the case unless they did something. In the context here, the things done did not add up to an adequate "something." Entrance of default judgment against the defendants now is not punishment for their "compliance" as they would have it characterized, but an unmistakable message to them and others that the judicial system will not tolerate repeated misconduct never wholly remedied in the future. To find otherwise would be to send the opposite message that the court may be pushed, ignored and defied to the outermost limits so long as the noncomplying party has even an inadequate fallback act ready in the wings should the final curtain be falling.

*Richards*, 872 F.2d at 94.

Those words are just as true in this case.

**C.  Sanctions were necessary to deter XPO from further misconduct.**

Discovery sanctions under Rule 37(b) serve dual purposes. They both punish the disobedient party, and deter that party and others tempted to do the same thing. The most severe sanctions "must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Richards*, 872 F.2d at 94 (quoting *NHL v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)). Thus, in *NHL*, the Supreme Court explained that, even if a litigant might start complying with less severe sanctions, withholding sanctions would send the wrong message: "other parties to other lawsuits would feel freer than we think Rule 37 contemplates they should feel to flout other discovery orders of other district courts." *NHL*, 427 U.S. at 643; *accord Devine*, 126 F.4th at 344 ("Such defiance not only undermines the opposing party's ability to seek justice but, if left unchecked, emboldens other litigants to flout the authority of the court.").

The state court found both that XPO had lied to Plaintiff's counsel about discoverable information and that XPO had openly and intentionally defied the court's prior order. "[S]uch misconduct must obviously be deterred." *Richards*, 872 F.2d at 93; *Belk v. Charlotte-Mecklenburg Bd. of Educ.*, 269 F.3d 305, 348 (4th Cir. 2001) (lack of candor and discovery shenanigans on the eve of trial needed to be deterred).

**D.** **The state court considered less severe sanctions and rejected the most severe sanction.**

Finally, the state court properly exercised its discretion when it imposed a middle-of-the-road sanction against XPO.

Contrary to XPO's representations, the state court never imposed the most severe sanction available for a defendant's misbehavior: entry of default. *See Wilson v. Volkswagen of Am., Inc.*, 561 F.2d 494, 503 (4th Cir. 1977). The state court explained that it considered a variety of sanctions, "including the striking of XPO's Answer in its entirety, the granting of a default judgment against XPO on the issue of liability, deeming Plaintiffs First Requests for Admission to be admitted as to XPO, and the imposition of contempt proceedings against XPO." ECF No. 16-40 at 12 ¶ 54. The court rejected some of those harsh, and instead chose only to deem certain facts as true and struck certain affirmative defenses. *Id.* ¶ 56. The court then explained that the "imposition of lesser sanctions is inadequate given Defendant XPO's continuing discovery abuse and misconduct, the needs of the litigation, and the critically relevant nature of the documents and information that have been intentionally and unjustly withheld from Plaintiff." *Id.* ¶ 58.

Just like the Fourth Circuit explained to the defendant in *Belk*, XPO should consider itself "fortunate to receive such a light sanction." *Belk*, 269 F.3d at 348. The state court chose deemed facts and defense-striking as the calibrated middle ground.

Although XPO insists that sanctions must fit the crime, that's what the superior court did, with surgical precision. The court didn't just pick sanctions off a menu, but tailored them to what was withheld. *See supra* Argument § III.B.2. The

deemed facts and struck defenses track the discovery that XPO lied about and refused to produce. That easily satisfies the "specifically related" requirement from *Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) (affirming sanctions order).

When a defendant refuses to produce discovery that a plaintiff needs to prove her case, the typical sanction is default, since the plaintiff carries the burden of proof. *Devine*, 126 F.4th at 345. Since XPO got by with a less severe sanction, the state court did not commit clear error or abuse its discretion in the sanctions order.

In response, XPO says that it should have been sanctioned with fees only, arguing that fees would have been harsh enough for it to start obeying court orders. Br. at 23. But fee-shifting does nothing to deter misbehaving litigants like XPO, who intend to delay the case. XPO is happy to pay for delay. Fee-shifting only encourages litigants like XPO to play procedural games, ignore court orders, and conduct discovery on their own timeline and their own set of rules.

Even after being sanctioned, XPO still refused to produce further discovery for another six months and, to this day, refuses to produce certain materials that the state court ordered XPO to produce. That flippant attitude toward court orders should not be tolerated. Vacating the sanctions sends the wrong message to litigants and the bar by encouraging them to resist, comply at their convenience, remove to federal court, and then ask the federal court to undo the sanctions.

## CONCLUSION

XPO's reconsideration should be denied. In state court, XPO outright ignored the court's order, and then only "submitt[ed] chaotically and defectively" to the order.

*Richards*, 872 F.2d at 94. That kind of misbehavior called for tough sanctions. XPO should be thankful that the state court didn't impose anything worse.

This the 13th day of February, 2026.

**MUSSELWHITE, MUSSELWHITE, BRANCH & GRANTHAM, P.A.**

/s/ J. William Owen
J. William Owen
N.C. Bar No. 47994
wowen@mmbglaw.com
P.O. 1448
Lumberton, NC 28359
*Co-Counsel for Plaintiff*

**DOWLING PLLC**

/s/ Troy D. Shelton
Troy D. Shelton
N.C. Bar No. 48070
tshelton@dowlingfirm.com
3801 Lake Boone Trail, Suite 260
Raeligh, NC 27607
*Co-Counsel for Plaintiff*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rules 7.2(f)(3), undersigned counsel certifies that this memorandum complies with the applicable word limit. Per the word processing software, this memorandum contains 6,333 words, excluding the case caption, the signature block, required certificates, table of contents, table of authorities, and any attachments, exhibits, affidavits, or other addenda.

/s/ J. William Owen
J. William Owen