IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
Civil Action No. 7:25-CV-1545

| | |
|---|---|
| CINDY SOLES SMITH, Administratrix of the ESTATE OF MARK KEANNAN SMITH, <br><br> Plaintiff/Counterclaim-Defendant, <br><br> v. <br><br> XPO LOGISTICS FREIGHT, INC., <br><br> Defendant/Counterclaim-Plaintiff. | **REPLY IN SUPPORT OF DEFENDANT'S MOTION TO REVISE INTERLOCUTORY ORDER** |

1. Plaintiff's opposition tries to turn this motion into a referendum on removal and insists the April 25, 2025 sanctions Order ("Order") was a "calibrated middle ground" entered with "surgical precision," such that XPO should be "thankful" to receive it. Dkt. 41, pp. 23–25. But labels cannot change what the Order does. The Order "established as fact" that both William Lamb and XPO were "negligent, careless, reckless and grossly negligent" and struck XPO's contributory-negligence and causation defenses "for all purposes," including dispositive motions and trial. Dkt. 8-5, ¶¶ 56(a)–(f). That is not a "middle ground" sanction, it is a practical default on liability and punitive damages.

2. XPO does not ask the Court to excuse delay or erase consequences. It asks the Court to revise only the merits-determinative provisions of the Order that are untethered to any particular discovery issue and that continue to operate as a default after trial is no longer imminent and XPO has served verified, order-directed supplementation. In stark contrast to what is contained in the Order, fee-shifting and costs fully address prejudice and deterrence without adjudicating negligence and gross negligence by sanction, thereby providing a proportional, issue-linked, and just remedy.

1

## I. THE RULE 54(B) STANDARD IS NOT "DOUBLY" HEIGHTENED, AND XPO MEETS IT

3. *U.S. Tobacco* addressed one federal district judge revisiting another's prior order granting a petition to substitute a party defendant under the Westfall Act, a distinct posture from this Court exercising its express § 1450 authority to modify state court sanctions after removal. Nothing in *U.S. Tobacco* suggests that a pre-removal state order carried over under § 1450 is insulated by a heightened reconsideration standard. The "dead wrong" rhetoric is simply shorthand for clear-error and manifest-injustice, not a different test.

4. A sanction that deploys Rule 37 to adjudicate gross negligence and eliminate punitive-damages defenses, without identifying any evidentiary gap tied to the specific discovery at issue, is not a close exercise of discretion. It is structurally incompatible with *Insurance Corp. of Ireland* and *Taylor* at their most basic level, especially where the collision is captured on multiple videos and Plaintiff's ability to prove core liability was never hostage to the withheld materials. That is dead wrong and manifest injustice by any measure. Maintaining those determinations today, after verified supplementation and a new trial schedule, converts a compliance tool into an unjust default.

5. Plaintiff tries to multiply the burden by arguing it is "doubly true" when a federal court is asked to reconsider a state-court order. Dkt. 41, p. 10. No binding authority holds that the Rule 54(b) standard is heightened simply because the order originated in state court. §1450 confirms this Court's authority to modify pre-removal orders: state-court orders "remain in full force and effect until dissolved or modified by the district court." 28 U.S.C. § 1450. The Supreme Court has explained that § 1450 preserves the effectiveness of state-court orders after removal but does not give them greater effect in federal court than in state court. *Granny Goose*, 415 U.S. at 436–37. Thus, this Court has full authority—and responsibility—to ensure that any ongoing sanction conforms to due process.

6. Nor does Plaintiff's invocation of discovery "discretion" change the analysis. Discretion is not a license to impose (or to perpetuate) a sanction that is untethered from Rule 37's core limits. Here, the April 25 Order's deemed-fact and defense-striking provisions are not issue-linked to an evidentiary gap, and they now operate as a perpetual default despite significantly changed circumstances. That is exactly the kind of manifest injustice for which Rule 54(b) exists to correct.

## II. THE ORDER IS A PRACTICAL DEFAULT, AND PLAINTIFF'S POST HOC CHART AND HEARING BINDER CANNOT CURE THE RULE 37 DEFECT

7. Plaintiff's insistence that the sanctions were a "calibrated middle ground" entered with "surgical precision" is impossible to reconcile with the Order's operative text. Dkt. 41, pp. 23–25. The Order does not merely preclude evidence or deem narrow facts established to cure a discrete evidentiary gap; it "established as fact" negligence and mental culpability (gross negligence) and struck core defenses "for all purposes," including dispositive motions and trial. Dkt. 8-5, ¶¶ 56(a)–(f). Further, it binds issues beyond Plaintiff's affirmative case, including XPO's counterclaim, an overbreadth that underscores the absence of tailoring. Dkt. 39, pp. 25–27.

8. Plaintiff tries to defend that harsh result with a chart that purportedly ties discovery disputes to deemed facts and stricken defenses. Dkt. 41, pp. 17–19. But a post hoc chart is not part of the Order's findings and cannot transform its sweeping, untethered rulings into issue-linked sanctions. Rule 37 requires a sanction that is "just" and "specifically related" to the claim or issue affected by the discovery order. *Ins. Corp. of Ireland*, 456 U.S. at 707.

9. The Order, essentially adopted wholesale from Plaintiff's proposed order with no ostensible inquiry on the part of the Court, supplies no issue-by-issue explanation of why ultimately establishing liability and culpable mental state "for all purposes," much less striking dispositive defenses, was necessary to cure any evidentiary gap created by the specific discovery at issue.

10. The chart also confirms disproportionality. Plaintiff's claimed prejudice arose primarily from disputes about a complex telematics platform as well as discrete categories of training, insurance, and preventability materials. Yet the remedy imposed was to establish negligence and gross negligence as facts and to strike liability defenses. Under *Taylor*, even where a failure to produce jeopardizes the discovering party's case, the sanction "must be no more severe than is necessary to prevent prejudice." 985 F.2d at 553. And critically, the collision itself is captured on video, so Plaintiff's ability to prove the core liability facts was never hostage to telematics materials.

11. Plaintiff's "hearing binder" underscores why the default-like sanctions cannot stand. Rather than identify a discrete evidentiary gap in this case and tie any sanction to curing that gap, the binder repeatedly tries to import alleged "similar" discovery disputes from unrelated litigation, including by pointing to and attaching filings from an Alabama case as purported proof of the "same exact" tactics and a reason "much stronger sanctions" are warranted here. Dkt. 41-1 pp. 6, 158–163.

12. This betrays an impermissible premise; that it is "fair" to impose a merits-determinative sanction in this case because of allegations about XPO elsewhere. Rule 37 does not authorize collective punishment or propensity-based sanctions. Due process requires remedies that are just and specifically related to the limited claim or issue affected by the discovery violation that particular case. *Ins. Corp. of Ireland*, 456 U.S. at 707.

13. Consistent with the above, the binder shows that Plaintiff sought to win the liability case through Rule 37: she asked the state court to "deem established" multiple pleaded allegations and to strike the defenses that would allow XPO to contest fault and causation. Dkt. 41-1 pp. 10–11.

14. Finally, Plaintiff's portrayal of the sanctions as "surgically precise" cannot be squared with how the Order was entered. At the April 16 hearing, the court issued no oral findings, directed

4

competing proposed orders, and then entered an order that substantially tracks Plaintiff's proposed submission. Dkt. 39, p. 8.

15. That history reinforces why the deemed-fact provisions and defense striking were not the product of an issue-by-issue tailoring exercise that Rule 37 requires for sanctions with default-like effect, and why Plaintiff's after-the-fact narrative cannot cure what the Order itself does not contain.

### III. THIS MOTION IS NOT AN "APPEAL," AND PLAINTIFF'S FORUM-SHOPPING NARRATIVE DOES NOT OVERRIDE § 1450

16. Plaintiff characterizes removal and this motion as an "appeal" seeking a forum to "overlook" discovery issues. Dkt. 41, pp. 1. But removal transfers jurisdiction; it does not convert federal proceedings into appellate review. After removal, this Court governs the future course of proceedings under federal law and retains express authority to "dissolve or modify" pre-removal orders. 28 U.S.C. § 1450; *Granny Goose*, 415 U.S. at 436–37.

17. Plaintiff's policy rhetoric that courts should discourage removal to re-raise state-court rulings does not supply a heightened legal standard, and it does not immunize an order that works manifest injustice. The question here is not whether there were discovery disputes. The question is whether, under federal Rule 37 and Fourth Circuit law, a practical-default sanction should continue to bind liability and strike dispositive defenses after the case's posture has changed and compliance-directed alternatives can cure any remaining issues.

### IV. BELK CONFIRMS REVISION, AS THERE IS NO CURRENT TRIAL-PREJUDICE OR ANY BASIS TO MAINTAIN DEFAULT-LIKE SANCTIONS

18. Plaintiff relies on *CFPB v. Nexus Servs., Inc.*, 156 F.4th 443, 456 n.10 (4th Cir. 2025), to argue that an explicit warning is not always necessary because Rule 37 itself provides notice. Dkt. 41, pp. 12–14. XPO does not contend that an explicit warning is always a prerequisite. But where, as

5

here, sanctions operate as a practical default, the Fourth Circuit has emphasized the significance of fair warning before such a harsh result. *Hathcock*, 53 F.3d 36, 40 (4th Cir. 1995) ("In particular, this court has emphasized the significance of warning a defendant about the possibility of default before entering such a harsh sanction.") *citing Choice Hotels*, 11 F.3d at 473 (fairness required "explicit and clear" notice when court intended noncompliance to result in dismissal with prejudice).[1]

19. *Nexus* involved "knowing noncompliance with numerous orders of the court." 156 F.4th at 456. Here, the predicate was a single order compelling discrete supplementation, and the resulting sanctions went well beyond securing compliance by establishing negligence and gross negligence "for all purposes" and striking dispositive defenses. Plaintiff also invokes "inherent authority" and argues that notice is satisfied by a sanctions motion and hearing. Dkt. 41, pp. 13–14. Even assuming *arguendo* that inherent authority was invoked, the exercise of that authority must still comport with due process and the same core limits that govern severe sanctions.

20. Plaintiff incorrectly asserts that XPO failed to analyze the relevant factors and claims XPO "doesn't dispute" bad faith. Dkt. 41, pp. 2, 14–15. XPO's supporting brief explicitly addresses *Belk* and *Taylor*, explaining (a) the nature of any prejudice in the case's current posture; (b) why less drastic sanctions are effective; and (c) why the Order's most extreme provisions are now punitive rather than curative. Dkt. 39, pp. 17–27.

21. To the extent Plaintiff suggests XPO concedes bad faith, XPO denies it on this record. Dkt. 39, pp. 2–14, 20–21, 24–25. But even accepting the state court's findings at face value, *Belk* does not treat bad faith as a trump card that ends the proportionality inquiry, it is but one factor among four, and the nature of the conduct matters. The record reflects disputes about the scope of discovery

---

[1] *See also Lolatchy*, 816 F.2d at 954 fn. 2 (vacating default; emphasizing lack of prejudice and defendants' lack of personal responsibility, and noting the absence of an explicit warning as a salient distinction from cases upholding default).

for a complex telematics platform, disagreements about the breadth of corporate-wide demands, and a missed deadline on one order—not concealment or destruction of evidence, and not the serial defiance of six consecutive orders that supported default in *Richards*. Dkt. 39, pp. 3–8. Whatever label attaches to that conduct, it does not justify establishing negligence and gross negligence "for all purposes" while eliminating XPO's ability to contest liability at trial.

22. The most consequential justification for the Order was timing: an imminent May 12, 2025 trial setting and the state court's view that Plaintiff was "severely prejudiced" in preparing for trial. That premise no longer applies. XPO served verified supplementation on October 1, 2025, and this case is now on a federal schedule with discovery open and no imminent trial date. Plaintiff also sought and obtained severance so she could proceed against Lamb separately, which further undermines any claim that sanctions against XPO were necessary to avoid trial prejudice.

23. Plaintiff argues XPO should not "benefit" from the consequences of alleged misconduct. Dkt. 41, p. 16. But Rule 37's purpose is to cure prejudice and deter misconduct, not to impose perpetual merits determinations once prejudice can be cured. When timing-based prejudice can be addressed through a revised schedule, targeted compliance orders, and fee-shifting, maintaining a practical default is more severe than necessary. *Taylor*, 985 F.2d at 553.

24. Plaintiff's reliance on *Richards* for the proposition that "late compliance cannot be used to avoid sanctions" overstates the holding. Dkt. 41, p. 21. The *Richards* court instructed that "the defendants could improve their situation by providing the documents and information yet to be obtained under the previous orders or affidavits swearing that the information was unavailable and why." 872 F.2d at 93. Default was affirmed in *Richards* only because the defendants had violated *six consecutive* discovery orders, their belated production was inadequate on its merits,

7

and the district court had already imposed lesser sanctions (costs and attorney's fees) at an earlier stage, which proved ineffective. *Id.* at 89–93. The court's language about "last-ditch" compliance and pushing the court "to the outermost limits" deal with a very different record. *Id.* at 94.

25. This case is not *Richards*. The interval between the Order and XPO's supplementation was consumed by actively litigating legitimate procedural challenges through proper channels, the state-court appeal, two denied stay motions, severance proceedings, and removal, not by concealing or destroying evidence. XPO failed to timely comply with one order compelling discovery, not six. XPO's supplementation was not a bare-bones "fallback act" but nearly 4,000 additional pages of verified, category-by-category responses addressing all of the directives of both orders. Dkt. 30-14, p. 1. And critically, no lesser sanction was ever imposed before the court leapt to merits-determinative relief, unlike Richards, which involved fees and findings that lesser measures failed. 872 F.2d at 93. If anything, *Richards* supports XPO's request: the proportional first step in *Richards* was fees and costs, which is precisely what XPO seeks.

26. Plaintiff's deterrence argument rests on the rhetoric that XPO is "happy to pay for delay" and that fees are therefore insufficient. Dkt. 41, pp. 22, 24–25. But Rule 37 does not permit a court to maintain a merits default as an extra punitive "multiplier" once the case is in a posture where prejudice can be cured by narrower means. Fee and cost shifting are meaningful sanctions, especially where the Court retains full authority to escalate sanctions if any future noncompliance occurs. The availability of future enforcement tools is precisely why a perpetual default is unnecessary now.

27. Finally, Plaintiff asserts that XPO still has not complied with specific directives, including production of an "accident register," telematics notifications/settings, and Samsara administrative credentials. Dkt. 41, pp. 20–21. Those accusations are incorrect on this record.

28. XPO produced unredacted SOS reports that serve as XPO's accident-register equivalent and include the information required by 49 C.F.R. § 390.15. Dkt. 30-14, p. 18, ¶ 18. XPO also explained, after reasonable inquiry, that certain categories Plaintiff demands do not exist in the form Plaintiff assumes. Samsara "notifications" are not archived and the system does not retain dismissed notifications, and Safety Scores/settings do not have preserved historical configuration/version logs that would allow reconstruction of past methodologies. *Id.*, p. 20, ¶¶ 22–25. Plaintiff's reliance on a spoliation letter does not convert non-retained, ephemeral platform notifications, similar to the type of notifications one receives on their phone, into producible records, and it does not authorize a sanction premised on the nonproduction of information that does not exist.

29. As to administrative credentials, XPO explained why providing administrative credentials would create serious safety, system-integrity, confidentiality/PII, regulatory, and spoliation risks and proposed a supervised-access protocol, under which a qualified consultant can direct queries while an XPO representative operates the system. Dkt. 30-14, p. 22, ¶ 28.

30. Plaintiff's insistence on administrative usernames and passwords is the clearest example that this dispute was never about access to information, it has always been about leverage. Before the Order, XPO put this issue squarely before the state court, explaining on the record that turning over Samsara credentials would expose information beyond the crash and driver and would create serious integrity risks, and supporting those concerns with sworn testimony that Samsara is a customized system requiring substantial permissioning and training, and that an untrained user can alter logs or dismiss safety events. Dkt. 30-4 at 26:8–25; Dkt. 7-4 at 4, ¶¶ 19–22.

31. After removal and verified supplementation, XPO reiterated the same safety, compliance, privacy/PII, and spoliation risks in detail, including that administrative tools can disable

recording, delete events, change thresholds, and compromise compliance across the fleet, and it offered a supervised-access protocol that gives Plaintiff's consultant the same substantive review without those risks. Dkt. 30-14 at 22, ¶ 28. Tellingly, she nevertheless treats the inability to hand over unnecessary credentials that would create clear safety risks as "misconduct." Dkt. 41 at 21.

32. That posture reveals the true aim: to insist on an unsafe and unnecessary method of production, thereby making it impossible for XPO to "comply" and preserve what are essentially terminating sanctions. Rule 37 is not a sword to manufacture an impossible dilemma. Rather, it authorizes sanctions that are "just" and specifically related to curing prejudice, not sanctions that force a party to choose between public-safety and regulatory risks on one hand and a merits default on the other. *Ins. Corp. of Ireland*, 456 U.S. at 707.

## V. CONCLUSION

33. Rule 37 does not permit default-like sanctions untethered to an issue-specific cure, and it certainly does not permit them after verified supplementation, with no imminent trial, and where fee-shifting can fully address any remaining prejudice. The Court therefore should grant XPO's Motion in full and revise the April 25, 2025 Order as requested.

Respectfully submitted this 27th day of February 2026.

> **GORDON REES SCULLY MANSUKHANI LLP**
>
> By: /s/ *Robert W. F. Beckmann*
> Robert W. F. Beckmann
> N.C. State Bar No.: 63232
> 150 Fayetteville Street, Suite 1120
> Raleigh, North Carolina 27601
> Telephone: (919) 787-4555
> Facsimile: (919) 741-5840
> E-mail: rbeckmann@grsm.com
> ***Counsel for Defendant XPO Logistics Freight, Inc.***

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing **REPLY IN SUPPORT OF DEFENDANT'S MOTION TO REVISE INTERLOCUTORY ORDER** with the Clerk of Court for the Eastern District of North Carolina by using the CM/ECF system, which will send notification to the following counsel of record:

J. William Owen
Musselwhite, Musselwhite, Branch & Grantham, P.A.
P.O. Box 1448
Lumberton, NC 28359
wowen@mmbglaw.com
*Counsel for Plaintiff Cindy Smith, Administratrix of the Estate of Mark K. Smith*

Troy D. Shelton
Dowling PLLC
3801 Lake Boone Trail, Suite 260
Raleigh, NC 27606
Tshelton@dowlingfirm.com
*Counsel for Plaintiff Cindy Smith, Administratrix of the Estate of Mark K. Smith*

*Jennifer Welch*
*Cranfill Sumner*
*P.O. Box 27808*
*Raleigh, NC 27611-7808*
*jwelch@cshlaw.com*
*Counsel for Counterclaim-Defendant Cindy Smith, Administratrix of the Estate of Mark K. Smith*

This 27th day of February 2026.

**GORDON REES SCULLY MANSUKHANI LLP**

By: /s/ *Robert W. F. Beckmann*
Robert W. F. Beckmann
N.C. State Bar No.: 63232
150 Fayetteville Street, Suite 1120
Raleigh, North Carolina 27601
Telephone: (919) 787-4555
Facsimile: (919) 741-5840
E-mail: rbeckmann@grsm.com
***Counsel for Defendant XPO Logistics Freight, Inc.***

11